ACCEPTED
03-14-00197-CV
5431694
THIRD COURT OF APPEALS
AUSTIN, TEXAS
5/27/2015 12:14:14 PM
JEFFREY D. KYLE
CLERK

## NO. 03-14-00197-CV

_____

IN THE COURT OF APPEALS
THIRD JUDICIAL DISTRICT OF TEXAS
AT AUSTIN

RECEIVED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
5/27/2015 12:14:14 PM
JEFFREY D. KYLE
Clerk

_____

## GRAPHIC PACKAGING, INC.,
### Appellant

### v.

## SUSAN COMBS, COMPTROLLER OF PUBLIC ACCOUNTS OF THE STATE OF TEXAS; AND GREG ABBOTT, ATTORNEY GENERAL OF THE STATE OF TEXAS,
### Appellees

_____

FROM THE DISTRICT COURT OF TRAVIS, 353RD JUDICIAL DISTRICT,
CAUSE NO. D-1-GN-003038,
THE HONORABLE DARLENE BYRNE PRESIDING

_____

## BRIEF OF *AMICUS CURIAE* MULTISTATE TAX COMMISSION IN SUPPORT OF TEXAS COMPTROLLER OF PUBLIC ACCOUNTS AND TEXAS ATTORNEY GENERAL

_____

Joe Huddleston
  Executive Director
Sheldon Laskin
  Counsel
444 N. Capitol St., N.W., Ste. 425
Washington, D.C. 20001
202-650-0300
slaskin@mtc.gov
Attorneys for *Amicus Curiae*
Multistate Tax Commission

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

INTEREST OF THE *AMICUS CURIAE* ............................................................. 1

INTRODUCTION ............................................................................................. 4

ARGUMENT ................................................................................................. 14

I.  Articles III.1 and IV of the Multistate Tax Compact do not prevent the Texas legislature from requiring the use of a receipts factor to apportion the franchise margin base because the Compact is not a binding interstate compact, but is instead an advisory compact containing a uniform law. ............................. 14

    A.  The Multistate Tax Compact has none of the indicia of a binding interstate compact. ................................................. 17

        (1)  The Compact does not contain a requirement of reciprocation.

        (2)  The Compact does not establish a joint regulatory body. ....................................................................... 22

        (3)  The Compact does not prohibit unilateral modification or repeal. ....................................... 24

    B. The Compact is an advisory compact incorporating into Article IV, and by extension Article III.1, a uniform law. ....................................................................... 26

II.  Even if the Compact were a binding compact, its terms do not prohibit modification of Article III.1 or IV and therefore this Court must look to the compact member states' course of conduct in determining whether the Compact allows modification of those apportionment provisions. ......................... 31

CONCLUSION ............................................................................................... 37

APPENDIX

# TABLE OF AUTHORITIES

**Cases**

*Alabama v. North Carolina*,
130 S.Ct. 2295 (2010) ...................................................................... 32, 33

*Com. of Penn. v. Wheeling & Belmont Bridge Co.*,
54 U.S. 518 (1851) ................................................................................14

*Comptroller of Treasury of Md. v. Wynne*,
135 S.Ct. 1787 (2015) ...........................................................................21

*Emco Enterprises, Inc. v. Dep't of Treasury*,
Case No. 12- 000152- MT (Mich. Ct. Cl. April 21, 2015) ...................................30

*Ex parte Ervin*,
187 SW 3d 386 (Tex. Crim. App. 2005)................................................25

*In re Myrick*,
624 A.2d 1222 (D.C. 1993)....................................................................19

*Ingram Micro, Inc. v. Department of Treasury*,
Case No. 11- 000035- MT (Mich. Ct. Cl. December 19, 2014) ..........................30

*International Shoe Co. v. Fonternot*,
359 U.S. 984 (1959) .................................................................................7

*Int'l Bus. Machines Corp. v. Dep't of Treasury*,
852 NW 2d 865 (Mich. 2014) ........................................................ 13, 15

*Lane v. Travelers Indem. Co.*,
391 SW 2d 399 (Tex. 1965)....................................................................25

*McComb v. Wambaugh*,
934 F.2d 474 (3d Cir. 1991)........................................................... 15, 19

*Moorman Mfg. Co. v. Bair*,
437 U.S. 267 (1978) ....................................................................... 12, 21

*Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*,
105 S. Ct. 1441 (1985) .................................................................................11

*Northeast Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
472 U.S. 159 (1985) ............................................................... *passim*

*New Jersey v. Delaware*,
552 U.S. 597 (2008) ................................................................ 20, 33

*Northwestern States Portland Cement Co. v. Minnesota*,
358 U.S. 450 (1959) .....................................................................6

*Oklahoma Tax Com'n v. Jefferson Lines, Inc.*,
514 U.S. 175 (1995) .....................................................................7

*Phillips v. Com., Dept. of Transp., Bureau of Driver Licensing*,
80 A.3d 561 (Pa. 2013) .................................................................19

*Scripto, Inc. v. Carson*,
362 U.S. 207 (1960) .....................................................................8

*Seattle Master Builders Ass'n v. Pac. Nw. Elec.*
*Power & Conservation Planning Council*,
786 F.2d 1359 (9th Cir. 1986)........................................................17

*Tarrant Reg'l Water Dist. v. Herrmann*,
133 S.Ct. 2120 (2013) .................................................... 20, 26, 34

*U.S. Steel Corp.* v. *Multistate Tax Comm'n*,
434 U.S. 452 (1978) ............................................................... *passim*

*Yaskawa America, Inc. v. Department of Treasury*,
Case No. 11-000077-MT (Mich. Ct. Cl. December 19, 2014) ...........................30

**Constitutional Provisions, Statutes, and Rules**

U.S. Const., art. I, § 10, cl. 3................................................................18

U.S. Const., art. I, § 10.....................................................................15

Tex. Const. art. I, § 16......................................................................15

Pub. L. No. 86-272,
   73 Stat. 555 (1959) ........................................................... 7, 9, 10

ALA. CODE § 434 40-27-1........................................................................36

ARK. CODE ANN. § 26-5-101.................................................................36

CAL. REV. & TAX CODE § 25128(a) ......................................................36

COLO. REV. STAT. § 39-22-303 ..............................................................35

IDAHO CODE ANN. § 63-3027(i)............................................................36

MICH. COMP. LAWS § 205.581...............................................................35

MINN. STAT. § 290.171............................................................................35

MO. REV. STAT. § 32.200 .................................................................. 14, 36

OR. REV. STAT. § 314.606 .......................................................................36

TEX. BUS. & COM. CODE ANN. § 1.303 ............................................ 32, 33

TEX. EDUC. CODE ANN. § 161.01..........................................................28

TEX. FAM. CODE ANN. § 162.102...........................................................19

TEX. HEALTH & SAFETY CODE ANN. § 612.001.....................................19

TEX. TAX CODE ANN. § 141.001 ..............................................................1

TEX. TRANSP. CODE ANN. § 523.001 .....................................................19

UTAH CODE ANN. § 59-1-801.IV.9 ........................................................36

**Other Authorities**

2013 Or. Laws Ch. 407...........................................................................13

2013 Utah Laws, Ch. 462 ...................................................................13

Brief of Multistate Tax Commission in
    *United States Steel Corporation v. Multistate Tax Commission*,
    United States Supreme Court No. 76-635, 1977 WL 189138 ............................27

Bylaws of the Multistate Tax Commission,
    Bylaw 7: Hearings and Procedures for Uniformity Recommendations,
    http://www.mtc.gov/The-Commission/Bylaws .......................................3

CA Stats. 2012, c. 37 (S.B.1015), § 3 ...................................................36

Caroline N. Broun, Michael L. Buenger, Michael H. McCabe &
    Richard L. Masters,
    *The Evolving Use and the Changing Role of Interstate Compacts:*
    *A Practitioner's Guide* (ABA, 2006) ................................... 16, 26, 27, 30

Charles Conlon, *The Report of the Special Subcommittee:*
    *A Preliminary Appraisal*,
    Proceedings of the Fifty-Seventh Annual Conference on Taxation,
    Pittsburgh: National Tax Association, 1964 .......................................8

Charter of the MTC Uniformity Committee,
    http://www.mtc.gov/uploadedFiles/Multistate_Tax_Commission/Unifo
    rmity/About_Uniformity/Charter%20for%20the%20Uniformity%20Co
    mmittee.pdf...................................................................12

Council on State Governments –National Center for Interstate Compacts,
    *Interstate Compacts vs. Uniform Laws*;
    http://cglg.org/media/1302/compacts_vs_uniform_laws-csgncic.pdf.................16

D.C. Act 20-130, July 30, 2013 .........................................................13

H.R. 11798, 89th Congress (1965) ....................................................10

H.R. 16491, 89th Congress (1966) ....................................................10

H.R. 2158, 90th Congress (1967) .....................................................10

Jerome R. Hellerstein and Walter Hellerstein,
STATE TAXATION, (3d ed. 2015)..............................................................6, 8

Michael T. Fatale, *Common Sense: Implicit Constitutional Limitations on
Congressional Preemptions of State Tax*,
2012 Mich. St. L. Rev. 41 ........................................................................10

Mich. Pub. Acts 2011, No. 40 (H.B. 4479) ............................................35

Mich. Pub. Acts 2014, No. 282 (S.B. 156) ............................................13

Minn. Laws 2013, c. 143, art. 13, § 24 ..................................................39

MTC Annual Report, FY 67-68,
http://www.mtc.gov/uploadedFiles/Multistate_Tax_Commission/Re
sources/Archives/Annual_Reports/FY67-68.pdf............................11, 29

MTC Annual Report, FY 68-69,
http://www.mtc.gov/uploadedFiles/Multistate_Tax_Commission/Re
sources/Archives/Annual_Reports/FY68-69.pdf.................................29

MTC Annual Report, FY 70-71,
http://www.mtc.gov/uploadedFiles/Multistate_Tax_Commission/Re
sources/Archives/Annual_Reports/FY70-71.pdf.................................29

MTC Annual Report, FY 71-
72, http://www.mtc.gov/uploadedFiles/Multistate_Tax_Commissio
n/Resources/Archives/Annual_Reports/FY71-72.pdf .........................29

MTC Annual Report, FY 72-73,
http://www.mtc.gov/uploadedFiles/Multistate_Tax_Commission/Re
sources/Archives/Annual_Reports/FY72-73.pdf.................................29

MTC Annual Report, FY 73-74
http://www.mtc.gov/uploadedFiles/Multistate_Tax_Commission/Re
sources/Archives/Annual_Reports/FY73-74.pdf.................................29

Multistate Tax Commission, Public Participation Policy,
http://www.mtc.gov/The-Commission/Public-Participation-Policy.....................3

Multistate Tax Compact.....................................................................*passim*

Murray Drabkin, *The Report of the Special Subcommittee:*
  *A Preliminary Appraisal,*
  Proceedings of the Fifty-Seventh Annual Conference on Taxation,
  Pittsburgh: National Tax Association, 1964 ........................................................9

Special Subcomm. of the House Comm. on the Judiciary,
  *State Taxation of Interstate Commerce,*
  H. Rep. No. 952, 89th Congress, 1st Sess. (1965).................................. 7, 8, 9, 10

Texas Letter Ruling 20107003L .............................................................................36

U.C.C. §2-208 ................................................................................................ 32, 33

Uniform Division of Income for Tax Purposes Act,
  7A U.L.A. 155 (2002) ..................................................................................*passim*

## INTEREST OF THE *AMICUS CURIAE*

*Amicus curiae* Multistate Tax Commission (the Commission) respectfully submits this brief in support of the Texas Comptroller of Public Accounts.[1]

The Commission was established by the Multistate Tax Compact, the subject of this case.[2] The Compact became effective in 1967 when the minimum number of states (seven) enacted it by statute,[3] and the validity of the Compact was upheld in *U.S. Steel Corp.* v. *Multistate Tax Comm'n*, 434 U.S. 452 (1978). The Commission is uniquely qualified to speak to the Compact's proper interpretation and to the course of performance of its members.

The Commission is composed of one member from each state that has enacted the Compact.[4] That member is the head of the respective state agency charged with administration of taxes.[5] In addition to Texas, fourteen other states and the District of Columbia are compact member states. Thirty-one other states regularly participate in Commission activities, including in the Commission's Uniformity Committee, as sovereignty or associate members.[6]

---

[1] No counsel for any party authored this brief in whole or in part. Only *amicus curiae* Multistate Tax Commission made any monetary contribution to the preparation or submission of this brief. This brief is filed by the Commission, not on behalf of any member state.

[2] Multistate Tax Compact, Art. X.1. See the Compact as enacted by Texas. TEX. TAX CODE ANN. § 141.001

[3] Id. Art.VI.

[4] Id. Art. VI.1.

[5] Id.

[6] *Compact Members*: Alabama, Alaska, Arkansas, Colorado, District of Columbia, Hawaii, Idaho, Kansas, Missouri, Montana, New Mexico, North Dakota, Oregon, Texas, Utah and

The stated purposes of the Compact are to: (1) facilitate proper determination of state and local tax liability of multistate taxpayers, including equitable apportionment of tax bases and settlement of apportionment disputes, (2) promote uniformity or compatibility in significant components of state tax systems, (3) facilitate taxpayer convenience and compliance in the filing of tax returns and in other phases of state tax administration, and (4) avoid duplicative taxation.[7]

Under the Compact, the Commission has the power to: (1) study state and local tax systems and particular types of state and local taxes; (2) develop and recommend proposals for an increase in uniformity or compatibility of state and local tax laws with a view toward encouraging the simplification and improvement of state and local tax law and administration; (3) compile and publish such information as would, in its judgment, assist the party states in implementation of the compact and taxpayers in complying with state and local tax laws; and (4) do all things necessary and incidental to the administration of its functions pursuant to the Compact.[8]

The Commission has established standing committees supporting its programs and functions in which states, including non-compact states, may choose

---

Washington. *Sovereignty Members*: Georgia, Kentucky, Louisiana, Michigan, Minnesota, New Jersey, and West Virginia. *Associate Members*: Arizona, California, Connecticut, Florida, Illinois, Iowa, Indiana, Maine, Maryland, Massachusetts, Mississippi, Nebraska, New Hampshire, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Vermont, Wisconsin, and Wyoming.

[7] Multistate Tax Compact, Art. I.

[8] Id., Art. VI.

to participate. Those committees include Uniformity, Audit, Nexus, and Litigation and are headed up by representatives from state tax agencies.[9] Meetings of the committees — except when dealing with confidential information — are open to the public and public participation, especially in the Uniformity Committee, is encouraged.[10]

Compact members are responsible for appropriating funds for the Commission's budget in accordance with Article VI.4. Other states that participate in audit or nexus programs pay fees for those programs. Representatives of the compact member states in their role on the Commission approve certain actions of the executive director and the standing committees. In particular, the Commission approves any recommendations of model laws developed by the Uniformity Committee, after those models go through a development and hearing process.[11] Representatives of the compact member states may also serve on the Executive Committee of the Commission, which has the power to oversee and direct the activities of the executive director and the staff of the Commission and provide oversight and direction to the standing committees.[12]

---

[9] Information on these committees and the programs they support is on the Multistate Tax Commission's website at: http://www.mtc.gov/Home.
[10] See the Commission's Public Participation Policy, http://www.mtc.gov/The-Commission/Public-Participation-Policy.
[11] Multistate Tax Compact, Art. VII. See also Bylaws of the Multistate Tax Commission, Bylaw 7: Hearings and Procedures for Uniformity Recommendations, http://www.mtc.gov/The-Commission/Bylaws.
[12] Multistate Tax Compact, Art. VI.2.(a).

**INTRODUCTION**

This brief addresses whether the Texas legislature was precluded by the Multistate Tax Compact from requiring that taxpayers apportion their franchise tax margin base using a single gross receipts apportionment formula, rather than the formula contained in Article IV of the Multistate Tax Compact. The Commission agrees with the Texas Comptroller that Compact Article IV and the related election in Article III.1 (the apportionment provisions) do not apply to the Texas franchise tax, but assumes that they do for purposes of this brief. Even if the Compact's apportionment provisions apply to the franchise tax, those provisions do not preclude the legislature from requiring that taxpayers use a gross receipts-based apportionment formula instead. The Compact and the apportionment provisions do not create a binding interstate agreement and therefore do not restrict state lawmakers authority to unilaterally amend, modify, or supersede those provisions, once enacted. Even if the Compact were a binding compact, its terms do not prohibit modification of Article III.1 or IV and the compact member states' course of conduct demonstrates their understanding that those provisions may be modified. Nor is allowing those provisions to be modified inconsistent with the Compact's purpose of promoting uniformity or compatibility in state tax laws.

Because the Appellant in this case sets much store by the history surrounding the Compact, this brief considers that history as well before turning to

our arguments. Many of the historical facts are not in dispute. There were advocates for the Compact at the time of its original adoption who believed that it was necessary for the states to demonstrate to Congress that they could achieve a higher degree of uniformity in the taxation of multistate income in order to avoid federal preemption. There were also those who believed the states would not act and that Congress should. But the Appellant reads into this history both too much and too little. The Appellant posits that the Compact was enacted "in response to a *demand* by Congress," and that the "party states . . . intended to *satisfy* the federal government" by adopting the Compact. See Brief for Appellant, pp. 1,7 (emphasis added). According to this theory, the history surrounding the compact proves the subjective intent, not just of those who debated or promoted the Compact, but of various state legislative bodies, to enter into a binding contract in satisfaction of an unspecified demand by an entity that was not a party to that agreement, namely Congress. This is something the history simply cannot prove. Not only were the states slow to join the Compact (with many never joining), but as the Commission asserts below, the Compact imposed no requirement of reciprocation under its terms and allowed members to withdraw at any time, for any reason. If Congress's demand for state uniformity was as certain and serious as the Appellant portrays it, this response would hardly have satisfied it.

The important historical facts can be briefly summarized. Prior to the 1960's, states used different methods to determine their respective taxable shares of the earnings of multistate enterprises. Some used separate geographic accounting while others applied formulary apportionment. Formulary apportionment uses ratios or "factors" representing the instate percentages of certain verifiable business activities to determine the state's share of multistate earnings. At that time, formulas used by the states were not uniform or consistent.

In 1957, the Uniform Law Commission promulgated the model Uniform Division of Income for Tax Purposes Act (UDITPA).[13] That model used an apportionment formula calculated by taking the equally weighted average of three factors—property, payroll and sales.[14] In the decade following its promulgation, only a handful of states adopted UDITPA. *See* Jerome R. Hellerstein and Walter Hellerstein, STATE TAXATION, ¶ 9.01 (3d ed. 2015).

In 1959, in *Northwestern States Portland Cement Co. v. Minnesota*, the U.S. Supreme Court held that a state had jurisdiction to impose corporate income tax on a corporation that had an office and a small sales force in the state. 358 U.S. 450 (1959). Shortly afterward, the Court refused to review a state court decision upholding state jurisdiction to impose tax on a business that merely solicited sales

---

[13] Uniform Division of Income for Tax Purposes Act, § 2, 7A U.L.A. 155 (2002) *available at*: http://www.uniformlaws.org/Act.aspx?title=Division%20of%20Income%20for%20Tax%20Purp oses (last visited May 25, 2015)
[14] Id.

in the state. *International Shoe Co. v. Fonternot*, 359 U.S. 984 (1959), denying cert. in 236 La. 279, 107 So. 2d 640 (1958). The Supreme Court has never renounced the reasoning in *Northwestern States.*[15] But within seven months, businesses and industry groups were able to convince Congress to step in and preempt the state's jurisdiction to impose business income taxes where a business limits its activities to the solicitation of sales in a state. *See* Pub. Law No. 86-272, 73 Stat. 555 (1959) (later codified at 15 U.S.C.A. § 318, et. seq.) (hereafter P.L. 86-272). Rather than taking any action to mandate one method of apportionment, however, the legislation created a Special Subcommittee on State Taxation of Interstate Commerce of the House Committee on the Judiciary — the Willis Committee — to study the issue and make a report to Congress. P.L. 86-272 at 556.

The Willis Committee studied the matter for over three years and issued its final report on September 2, 1965. Special Subcomm. of the House Comm. on the Judiciary, *State Taxation of Interstate Commerce*, H. Rep. No. 952, 89th Congress, 1st Sess. (1965) (hereafter the Willis Report). The Willis Report analyzed state

---

[15] See *Oklahoma Tax Com'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 183-184 (1995)(describing the Court's struggle with an "old absolutism that proscribed all taxation formally levied upon interstate commerce" prior to *Northwestern States*, and the eventual adoption of the *Complete Auto* substantial nexus standard, consistent with the holding in that case, that overturned that older doctrine once and for all).

business income taxes imposed in thirty-eight states, not including Texas.[16] The Willis Report recommended federal legislation that would have required states to use formulary apportionment and employ a formula "composed of property and payroll factors, without the use of a sales factor." *Id*., Vol. 4, p. 1144.

State tax officials criticized the Willis Report for omitting a sales factor from its recommended apportionment formula since most states and the model UDITPA had formulas that included a sales factor. The executive secretary of the National Association of Tax Administrators, Charles Conlon, noted that: "The argument [in the Willis Report] against the concept of the receipts factor is the familiar one based on input-output analysis . . . [but] the division of the unitary income base among the several states is an entirely different problem . . . and where the unitary tax base is income, the source of gross receipts is a relevant factor and has widely been accepted as such."[17]

Before, during, and after the period over which the Willis Committee was deliberating, states were beginning to adopt the model UDITPA formula as part of

---

[16] See the Willis Report, Vol. 1, pp. 99-103. Texas's franchise tax was included in the Willis Committee report's section on Capital Stock Taxes. Id. Vol. 3, pp. 903-917. The Willis Committee's charge was expanded to looking at other state taxes imposed on multistate businesses after the U.S. Supreme Court's decision in *Scripto, Inc. v. Carson*, 362 U.S. 207 (1960) and the report eventually made recommendations as to other taxes besides income taxes—including the use of a uniform apportionment formula for capital stock taxes. *See* the Willis Report Vol. 1, p.9 and Vol. 4, p. 1169-1171.

[17] Charles Conlon*, The Report of the Special Subcommittee: A Preliminary Appraisal*, pp. 537-8, Proceedings of the Fifty-Seventh Annual Conference on Taxation, Pittsburgh: National Tax Association, 1964.

their state business income tax systems. Hellerstein, *supra*. Some also enacted the Multistate Tax Compact, Article IV of which incorporates the model UDITPA nearly word for word. *Id.* And some did both. *Id.*

At the annual meeting of the National Tax Association in 1964, Murray Drabkin, chief counsel of the Willis Committee, summarized the results and the recommendations of the Committee and said: "[T]he conclusion is clear from the Subcommittee's report that Congress will be asked to act in this area. I know there are those who will question some of the particulars of this report, but even those people seem to be in agreement that something has to be done. The difference is only that they say, 'Let the states do it.'" Then, in response to those who advised congressional restraint for that reason, the chief counsel for the Willis Committee expressed his skepticism that the states would "do it," and concluded that, "It hasn't been done and there is no reason to believe that salvation is on the way." *The Report of the Special Subcommittee: A Preliminary Appraisal*, p. 528, Proceedings of the Fifty-Seventh Annual Conference on Taxation, Pittsburgh: National Tax Association, 1964.

Federal legislation to mandate a standard apportionment formula was indeed introduced at least three times after passage of P.L. 86-272, but prior to the

adoption of the Compact in 1967. H.R. 11798, 89th Congress (1965),[18] H.R. 16491, 89th Congress (1966), H.R. 2158, 90th Congress (1967).[19] But it also soon became apparent that Congress would leave in place P.L. 86-272's limitation on taxing jurisdiction, first proposed as a temporary or "stop-gap" measure.[20]

Given this history, some state officials may have believed that, having restricted state taxing jurisdiction under Pub. L. 86-272 (effectively reversing the Supreme Court case that created the issue in the first place), Congress's "demands" were already effectively "satisfied"—or at least that Congress would not move beyond restricting state taxation to actually regulating it. The cynical among them might even have viewed the creation of a committee to study the problem as a sign that there was no congressional consensus to take further action. Of course, some state officials no doubt believed that the Willis Report's unfavorable description of state taxing schemes, and the perception that the states would not act, would compel Congress to mandate a nationwide income tax apportionment system. But had Congress been so compelled, it is difficult to understand how it would have been satisfied by a few states enacting a voluntary interstate compact.[21]

---

[18] This is the bill that accompanied the Willis Committee Report. H.R. Rep. No. 952, 89th Cong., 1st Sess. (1965).

[19] Congress would also fail to ratify the Compact on numerous occasions. *U.S. Steel Corp. v. Multistate Tax Commission*, 434 U.S. 452 (1978), at 458 n. 8.

[20] Michael T. Fatale, *Common Sense: Implicit Constitutional Limitations on Congressional Preemptions of State Tax*, 2012 Mich. St. L. Rev. 41.

[21] As of its initial meeting in October 1967, the Commission noted that there were ten members of the Compact: Florida, Illinois, Kansas, Missouri, Nebraska, Nevada, New Mexico, Oregon,

Even if each legislature enacting the Compact in 1967 made the same political calculation that doing so might forestall federal preemption, this cannot form the basis for a legally-enforceable obligation. Congress was not a party to the Compact, nor did the states obligate themselves contractually to each other or anyone else in exchange for Congress's agreement not to act. *See, e.g., Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.,* 105 S. Ct. 1441 at 1451 (1985) ("[T]he presumption is that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.' … [T]he principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state." (*Internal citations omitted*.))

Nor does this suggest that states that enacted the Compact did so only on a pretense of concern over the problems created by disuniformity. As noted above, one of the Compact's purposes is to "promote uniformity or compatibility in significant components of state tax systems." The Compact accomplishes this purpose through Art. VII, which provides that: "Whenever any two or more party States or subdivisions have uniform or similar provisions of law relating to an income tax . . . the Commission may adopt uniform regulations . . ." for

Texas and Washington. MTC Annual Report, FY 67-68 (First Annual Report), p. 3. A copy of the annual report is available on the Commission's website, at http://www.mtc.gov/uploadedFiles/Multistate_Tax_Commission/Resources/Archives/Annual_Reports/FY67-68.pdf

11

consideration by the states.[22] The Executive Committee of the Commission established the Uniformity Committee in which any state and members of the public may participate.[23] This created a dedicated forum for the continuing study of the kinds of multistate tax issues that had been taken up by the Uniform Law Commission and the Willis Committee. In its 48 years, the Commission has analyzed, developed and ultimately recommended approximately 40 model laws.[24] While these models are advisory only,[25] they and the process by which they are adopted contribute to greater uniformity and compatibility in state laws. This approach to uniformity, unlike binding contractual obligations or federal legislation, allows state laws to adapt as necessary, in recognition that such adaptation will always be required.

One such adaptation that states have made involves the emphasis placed on the sales factor in apportionment formulas used to divide multistate income. By 1978, the U.S. Supreme Court noted that the UDITPA equally-weighted formula had become "the prevalent practice." *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 279 (1978). *Moorman* involved the choice by Iowa lawmakers to use a single sales-factor formula. The Court recognized that "political and economic

---

[22] Compact, Article VII. *See also* Compact, Article VI (3)(b).
[23] Charter of the MTC Uniformity Committee, http://www.mtc.gov/uploadedFiles/Multistate_Tax_Commission/Uniformity/About_Uniformity/Charter%20for%20the%20Uniformity%20Committee.pdf
[24] For a compilation of the Commission's completed model laws, see: http://www.mtc.gov/Uniformity.aspx?id=524.
[25] Compact, Articles VI.3(b) and VII.

considerations vary from state to state" and might impact a state's choice of apportionment methods. Id. The Court concluded that the constitution permits states to apply different apportionment formulas. *Id*., 281. While a number of states have moved away from requiring an equally-weighted three-factor formula since 1978, they have consistently moved in the same direction—toward formulas that emphasize the sales or receipts factor.

Today, 38 of the 47 states with some form of apportioned business tax use a formula that gives at least double-weighting to the sales factor when used in combination with property and payroll factors.[26] Only nine states exclusively require an equally-weighted three-factor formula.[27] Among Compact members, the movement is the same. Of the sixteen compact member states, only six continue to require the equally-weighted three-factor apportionment formula.[28] Eight members require at least a double-weighted sales factor.[29] None of these eight permits the

---

[26]*See* Attachment A, *State Apportionment of Corporate Income*
[27] *Id.*
[28] *Id.* Alaska, Hawaii, Kansas, Montana, New Mexico, and North Dakota.
[29] *Id.* Alabama, Arkansas, Colorado, Dist. of Columbia, Idaho, Oregon, Texas, and Utah. In 2013, Utah, Oregon, and the District of Columbia each repealed the Compact and enacted a version without Articles III.1 and IV. 2013 Utah Laws, Ch. 462; 2013 Or. Laws Ch. 407 (SB 307); D.C. Act 20-130, July 30, 2013. Michigan repealed the Compact in its entirety in 2014. Mich. Pub. Acts 2014, No. 282 (S.B. 156), retroactive to January 1, 2008. Both prior and subsequent to the repeal, Michigan required taxpayers to apply a single sales factor apportionment formula. *Int'l Bus. Machines Corp. v. Dep't of Treasury,* 852 NW 2d 865 (Mich. 2014).

13

apportionment election of Article III.1.[30] Only one Compact member explicitly allows the election in Article III.[31]

As their course of performance indicates, the Compact members do not interpret the Multistate Tax Compact as prohibiting their state legislatures from requiring heavier-weighted or single-sales-factor apportionment formulas for apportioning income. As the Commission argues below, this interpretation and course of performance is consistent also with the laws of statutory and contract construction and is supported by the conclusions of the U.S. Supreme Court in *U.S. Steel*. Further, this interpretation is consistent with the purposes of the Compact.

## ARGUMENT

**I.    Articles III.1 and IV of the Multistate Tax Compact do not prevent the Texas legislature from requiring the use of a receipts factor to apportion the franchise margin base because the Compact is not a binding interstate compact, but is instead an advisory compact containing a uniform law.**

Before analyzing whether the Multistate Tax Compact is a binding compact or contains provisions that cannot be unilaterally modified, we would remind the Court that the Compact was never approved by Congress. *U.S. Steel*, at 454. Therefore, it does not have the force of federal law so as to require congressional approval of any modifications. *Com. of Penn. v. Wheeling & Belmont Bridge Co.*,

---

[30] *Supra,* n. 26.
[31] MO. REV. STAT. § 32.200. *Note,* Colorado recognized the election until passage of H.B. 08-1380, signed May 20, 2008, effective for tax years commencing on or after Jan. 1, 2009.

14

54 U.S. 518 (1851). The Court must therefore treat with great caution any cases relied upon by the Appellant in support of its challenge which hold that a Congressionally approved compact may not be modified unilaterally by state law or that the provisions of such compacts take precedence over conflicting state law.

Moreover, whether there are "binding" compacts, outside those approved by Congress, is debatable,[32] although the Commission does not assert that there are none. Because it is clear that the Multistate Tax Compact does not have the characteristics of a binding interstate agreement, this brief argues that this Court may properly find for the Comptroller on that basis.

The Appellant recognizes that the Compact was not approved by Congress but nevertheless claims that Articles III.1 and IV of the Compact cannot be unilaterally modified. Brief for Appellant, p. 29. The Appellant also claims it is a violation of the contracts clauses of both the federal and state constitutions[33] for Texas to refuse to allow a taxpayer to elect the apportionment formula of Compact Article IV. *Id*. at 46. Because the Appellant cannot rely on Congressional approval

---

[32] The Michigan Supreme Court recently decided a case similar to this. There, a plurality made its holding without reaching the question of whether the Compact was binding. Three justices, however, would have reached that question. Writing for those three, Justice McCormack rejected the contention that the Compact was binding and noted that a case relied upon by the taxpayer there, as well as the Appellant here, "did not cite any authority for the above emphasized rule—that compacts without congressional approval cannot be unilaterally amended and must take precedent over conflicting state law—and I have found none." *Int'l Bus. Machines Corp. v. Dep't of Treasury*, 852 N.W.2d at 887 (McCormack, J. dissenting, referring to *McComb v. Wambaugh*, 934 F.2d 474 (3d Cir. 1991)).
[33] U.S. Const., art. I, §10, Tex. Const. art. 1, §16.

15

for its challenge, it must show that the Compact has elements of a binding interstate agreement. But the Compact lacks these elements. Instead, it is an advisory compact containing a uniform law.

Interstate agreements may take different forms. Some are binding, in the sense that some or all of their provisions may not be unilaterally modified.[34] Many, however, are not binding—but may be advisory in nature, and do not prevent unilateral modification of their terms.[35] States may also adopt model laws that contain uniform language but lack any element of an agreement to maintain uniform provisions.[36] Neither a model law nor an advisory compact constitutes a contract. Both may be unilaterally modified.[37] Labels are not controlling and the fact that something is labeled a "compact" does not determine whether its provisions create binding obligations.

In analyzing whether the provisions of the Multistate Tax Compact are binding, this Court should apply the "classic indicia of a compact" as set out by the U.S. Supreme Court in *Northeast Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.,* 472 U.S. 159 (1985), and applied by 9th Circuit Court of Appeals'

---

[34] Council on State Governments –National Center for Interstate Compacts, *Interstate Compacts vs. Uniform Laws*
 http://cglg.org/media/1302/compacts_vs_uniform_laws-csgncic.pdf (last visited May 25, 2015)
[35] Caroline N. Broun, Michael L. Buenger, Michael H. McCabe & Richard L. Masters, *The Evolving Use and the Changing Role of Interstate Compacts: A Practitioner's Guide* 12, 14 (ABA, 2006).
[36] Id.
[37] *Id.*, p. 17

16

analysis in *Seattle Master Builders Ass'n v. Pac. Nw. Elec. Power & Conservation Planning Council,* 786 F.2d 1359 (9th Cir. 1986).

The three "classic indicia" in *Northeast Bancorp* (slightly restated in *Seattle Master Builders*) may be summarized as:

(1) the requirement of reciprocation,

(2) the establishment of a joint regulatory body, and

(3) the prohibition of unilateral modification or repeal.[38]

## A. The Multistate Tax Compact has none of the indicia of a binding interstate compact.

### (1) The Compact does not contain a requirement of reciprocation.

The requirement of reciprocation is the sine qua non of a binding interstate compact as well as any binding provision of a compact. The U.S. Supreme Court recognized this in *Northeast Bancorp.* In that case, federal law permitted states to regulate in-state bank acquisitions by companies domiciled outside the state. A group of states had enacted similar statutes allowing acquisitions on a reciprocal basis. The statutes also imposed a regional limitation, which the Appellants in the case claimed created an unconstitutional interstate compact, bringing challenges to the statutes in two states. The Court observed:

---

[38] *Northeast Bancorp, supra,* 472 U.S. at 175. *Accord, Seattle Master Builders, supra,* 786 F.2d at p. 1363.

17

"Appellants maintain that the Massachusetts and Connecticut statutes constitute a compact to exclude non-New England banking organizations which violates the Compact Clause, U.S. Const., Art. I, § 10, cl. 3, because Congress has not specifically approved it. We have some doubt as to whether there is an agreement amounting to a compact. The two statutes are similar in that they both require reciprocity and impose a regional limitation, both legislatures favor the establishment of regional banking in New England, and there is evidence of cooperation among legislators, officials, bankers, and others in the two States in studying the idea and lobbying for the statutes. But several of the classic indicia of a compact are missing. No joint organization or body has been established to regulate regional banking or for any other purpose. Neither statute is conditioned on action by the other State, and each State is free to modify or repeal its law unilaterally. *Most importantly, neither statute requires a reciprocation of the regional limitation.* Bank holding companies based in Maine, which has no regional limitation, and Rhode Island, which will drop the regional limitation in 1986, are permitted by the two statutes to acquire Massachusetts and Connecticut banks. These two States are included in the ostensible compact under Appellants' theory, yet one does not impose the exclusion to which Appellants so strenuously object and the other plans to drop it after two years."

472 at 175 (emphasis added).

While the issue in Bancorp ultimately did not turn on whether there was a compact, the Court is clear that a uniform law is not sufficient, nor is an agreement to cooperate in studying an issue or lobbying for the uniform provisions to be enacted. Rather, the most important indicia of a compact is a requirement of reciprocation. Such a requirement may be explicit or implicit.

In addition to citing cases involving compacts that have been Congressionally approved, interstate compacts cited by the Appellant in support of its case may be read as creating a requirement of reciprocation. For example:

18

- The Interstate Compact on the Placement of Children, TEX. FAM. CODE ANN. §162.102 *et. seq.* Allows the authority of participating states to be extended beyond their borders and provides procedures for the interstate placement of children for foster care or as a preliminary to a possible adoption. After a placement has been made, the sending state continues to have financial responsibility for support and retains jurisdiction over the child. Also provides: "No sending agency shall send, bring or cause to be sent or brought into any other party state, any child for placement in foster care or as a preliminary to a possible adoption unless the sending agency shall comply with each and every requirement set forth in this article." *See McComb v. Wambaugh*, 934 F.2d at 480.

- The Drivers' License Compact, TEX. TRANSP. CODE ANN. §523.001 *et seq.* Requires reciprocal licenses suspension by member states. Members must report driving offenses to other member states and suspend driving privileges for offenses committed in another state. *See Phillips v. Com., Dept. of Transp., Bureau of Driver Licensing*, 80 A.3d 561, 567 (Pa. 2013).

- The Interstate Compact on Mental Health, TEX. HEALTH & SAFETY CODE ANN. §612.001 *et. seq.* Among other things, ensures that a member may not avoid financial responsibility by sending a mentally ill person to another state without first obtaining the consent of the receiving state to accept that patient. *See In re Myrick*, 624 A.2d 1222, 1226 (D.C. 1993).

States that enter into these kinds of compacts expect to derive a benefit not just from sharing resources or from collective effort, but from the requirement of reciprocation itself. They will only derive that benefit, however, if the reciprocal requirement is respected by the other members. Compact provisions that depend on reciprocation are obviously not susceptible to unilateral modification.

Compacts may contain requirements of reciprocation that mandate or prohibit actions. For example, the Red River Compact, considered by the U.S. Supreme Court in June 2013, established a detailed regulatory scheme for use of

water from the Red River which barred any member state from taking or diverting water from within another state's borders. *Tarrant Reg'l Water Dist. v. Herrmann*, 133 S.Ct. 2120 (2013). Similarly, the Compact of 1905 governing riparian rights on the Delaware River bars any member from exercising exclusive jurisdiction over those rights. *New Jersey v. Delaware*, 552 U.S. 597 (2008). Whether the requirement is to do something, or not do something, cases that have held that interstate compacts could not be unilaterally altered (apart from the requirement for Congressional approval) have turned on the fact that the parties undertook mutual obligations that were critical for the proper functioning of the compact.

In contrast, the Multistate Tax Compact imposes no requirement of reciprocation on its members. Nor do the benefits of membership in the Compact depend on reciprocation of the members. The Multistate Tax Compact allows each Compact member state to fully exercise its sovereign power to tax independently of any requirement of concurrence by the other members and with no delegation of power to the Commission to bind the members. *U.S. Steel*, at 473. The apportionment provisions of Articles III.1 and IV are no exception. No Compact member state has a right to nor has any ever attempted to require another Compact member state to refrain from modifying Article III.1 or Article IV of the Compact, nor is it clear how a state might hope to benefit from doing so. Each state's own law determines the portion of multistate income subject to tax in *that* state. Even

assuming that one state's law could control the portion of multistate income taxable in *another* state, this would not benefit the first state. The portion of income subject to tax in the first state is not determined by reference to what portion any other state taxes. The Compact does not alter this reality nor is there any indication the states ever intended it to do so.

That one state's determination of the taxable share of multistate income does not depend upon any other state's determination of its taxable share has long been recognized as a feature of our federal system of government. *Moorman Manufacturing Co. v. Bair*, 437 U.S. at 274. This fundamental principle was very recently affirmed by the U.S. Supreme Court. In *Comptroller of Treasury of Maryland v. Wynne*, 135 S.Ct. 1787 (2015), 2015 WL 2340843, the Court held that a state's law taxing a share of interstate income is to be evaluated solely on the "internal consistency" of that law. Specifically, the Court noted that it had chosen to "distinguish between (1) tax schemes that inherently discriminate against interstate commerce without regard to the tax policies of other States, and (2) tax schemes that create disparate incentives . . . only as a result of the interaction of two different but nondiscriminatory and internally consistent schemes … [because] [t]he first category of taxes is typically unconstitutional; the second *is not*." *Wynne* at *13 (emphasis added).

Nor does any other provision of the Compact require or implicate this kind of reciprocation with respect to application of the state apportionment rules in Article III.1 and IV. For example, member states, acting in their role in the Commission, may freely choose to vote for or against recommended uniform or model regulations interpreting Article IV (or may even abstain from voting to make such recommendations). Nor are the member states required to adopt any recommended regulations or even to refrain from applying a contradictory regulation or interpretation.

### (2) The Compact does not establish a joint regulatory body.

The precise nature of the joint regulatory body to which the U.S. Supreme Court referred in *Northeast Bancorp* is best understood in the context of the particular requirement of reciprocation the Court was searching for in that case. As noted, the challengers in that case took issue with the regional limitation. The U.S. Supreme Court therefore questioned whether, in the statutes creating that limitation, a "joint organization or body has been established to regulate regional banking or for any other purpose." 472 U.S. at 175.

The Multistate Tax Commission is *not* a regulatory body in that sense. Indeed, that was one of the primary reasons the U.S. Supreme Court ruled that the Compact did not require Congressional approval under the Compact Clause.

> This pact does not purport to authorize the member States to exercise any powers they could not exercise in its absence. *Nor is there any*

22

*delegation of sovereign power to the Commission*; each State retains complete freedom to adopt or reject the rules and regulations of the Commission.[39]

Further,

> [I]ndividual member States retain complete control over all legislation and administrative action affecting the rate of tax, the composition of the tax base (including the determination of the components of taxable income), and the means and methods of determining tax liability and collecting any taxes determined to be due.[40]

As the U.S. Supreme Court recognizes, the Commission was delegated no sovereign power and cannot impose requirements on its member states to adopt or apply regulations. In enacting the Compact, the members did not surrender any aspect of state sovereignty. The Court's descriptions of the powers of the Commission confirm that they are strictly limited to an advisory and informational role.[41]

While the Commission, with the support of its staff, cooperates through its various programs and activities and while the members benefit from those actions, this is not enough to create a binding compact. If it were, then every organization or association with state governmental members might be deemed to establish a binding compact.

---

[39] *U.S. Steel Corp., supra,* 434 U.S. at 473 (emphasis added).
[40] *Id.* at 457.
[41] In *U.S. Steel,* the U.S. Supreme Court described the powers of the Commission at 456-457.

For example, the Appellant notes that the Commission provides audit services to compact member states and to other states that wish to contract with the Commission for that purpose. *U.S. Steel*, of course was a challenge to the Commission's audits, and this did not alter the U.S. Supreme Court's views of the Commission's authority. But it may also be useful to note that no Compact member state is obligated to use the Commission's audit services. And Texas does not.[42] The audit program is overseen by the states that participate in it and the Commission is authorized by each state that wishes to engage in a particular joint audit to perform that audit on behalf of those states. The participating states select taxpayers for audit and receive a report as a result of the audit with recommended adjustments. It is up to each state whether or not to make any adjustments recommended as a result of the audit, which are made based on each states' own laws, using that state's own assessment procedures.[43]

### (3) The Compact does not prohibit unilateral modification or repeal.

The third of the classic indicia of a compact noted by the Supreme Court in *Northeast Bancorp* is whether the agreement prohibits unilateral modification or repeal. The Multistate Tax Compact prohibits neither. It explicitly permits

---

[42] See a list of states that participate in the Commission's audit program at: http://www.mtc.gov/Audit-Program/Member-States.

[43] See information on the Commission's audit program at: http://www.mtc.gov/Audit-Program.

24

unconditional, unilateral repeal.[44] The Compact is silent as to modification. But where an interstate agreement creates neither any reciprocal obligations nor a regulatory agency to enforce those obligations, and where that agreement also provides for unilateral and unconditional repeal, without notice or delay, it is difficult to understand in what way the agreement could possibly be "binding" so that provisions might not be modified by its members.[45] Accordingly, it is not determinative that the agreement does not explicitly address unilateral modification. To hold otherwise would be a strained reading whether the Compact is analyzed as a contract or as a statute.[46] *Lane v. Travelers Indem. Co.*, 391 SW 2d 399, 402 (Tex. 1965); *Ex parte Ervin*, 187 SW 3d 386, 388 (Tex. Crim. App. 2005).

Nor can silence be construed against the compact member states in determining whether they are precluded from modifying its provisions where those provisions would otherwise constrain their ability to establish the states' own tax rules. As pointed out recently by the U.S. Supreme Court, "States rarely relinquish their sovereign powers, so when they do we would expect a clear

---

[44] Multistate Tax Compact, Art. X.2.

[45] Article X's withdrawal provision is not "similar" to the withdrawal provisions cited in the Brief for Appellant, at footnote 6. All those compacts require a state to give advance notice, either to the other member states or to an interstate regulatory body, of its intent to withdraw as much as two years before the withdrawal takes effect. All a member state need do to withdraw from the Multistate Tax Compact is repeal it, without any advance notice to the other members. This distinction underscores the binding nature of the compacts cited by The Appellant and the advisory nature of the Multistate Tax Compact.

indication of such devolution, not inscrutable silence." *Tarrant Reg'l Water Dist. v. Herrmann* , 133 S Ct 2120 at 2133.

**B.      The Compact is an advisory compact incorporating into Article IV, and by extension Article III.1, a uniform law.**

The Multistate Tax Compact is not a binding interstate agreement requiring reciprocation nor does anything in the Compact prohibit the unilateral modification of the apportionment provisions of Article III.1 and IV. This conclusion puts to rest the Appellant's claims that the Texas legislature was precluded by the Compact from requiring that franchise taxpayers use a single sales factor apportionment formula. Implicit in the Appellant's arguments, however, is the contention that the Compact must be a binding interstate compact since it cannot be characterized as anything else. We reject this contention, relying as it must on labels rather than substance. To the extent is it necessary to label it, the Commission believes that the Compact can best be described as an advisory compact, Articles III.1 and IV of which are in the nature of uniform laws.

Advisory compacts are characterized as "lack[ing] formal enforcement mechanisms and are designed not to actually resolve an interstate matter, but simply to study such matters."[47] In *The Evolving Use and the Changing Role of Interstate Compacts*, the authors explain that "[b]y their very terms, advisory

---

[47] Broun et al., *supra* n. 35, at 13 (citing the Delmarva Peninsula Advisory Council Compact as an example of such a compact).

compacts cede no state sovereignty nor delegate any governing authority to a compact-created agency."[48] The Commission characterized the Compact in exactly this way before the U.S. Supreme Court thirty-eight years ago, saying:

> [The Compact] consists solely of uniform laws, an advisory mechanism for the uniform interpretation and application of those laws, and an advisory mechanism for otherwise developing uniformity and compatibility in state and local taxation of multistate businesses.

Brief of Multistate Tax Commission in *United States Steel Corporation v. Multistate Tax Commission*, U.S. Supreme Court No. 76-635, 1977 WL 189138 at *12.

The Court agreed, first citing the powers of the Commission as described in Section 3 of Art. VI:

> (i) to study state and local tax systems; (ii) to develop and recommend proposals for an increase in uniformity and compatibility of state and local tax laws in order to encourage simplicity and improvement in state and local tax law and administration; (iii) to compile and publish information that may assist member States in implementing the Compact and taxpayers in complying with the tax laws; and (iv) to do all things necessary and incidental to the administration of its functions pursuant to the Compact.

*U.S. Steel*, 434 U.S. at 456-457, citing to Compact Art. VI. After which, the Court discussed Articles VII and VIII, detailing more specific functions of the

---

[48] Broun et al., *supra* n. 35, at 14. In view of Broun's clear description of advisory compacts as "lack[ing] formal enforcement mechanisms" and that they "are not designed to actually resolve an interstate matter, but simply to study such matters," Appellant's assertion that an advisory compact is nevertheless binding is simply ignores everything except the Compact's label. Appellant's Reply Brief at 13.

Commission. The Court's description recognized that these functions do not represent the exercise of any delegated sovereign authority:

> Under Art. VII, the Commission may adopt uniform administrative regulations in the event that two or more States have uniform provisions relating to specified types of taxes. These regulations are advisory only. Each member State has the power to reject, disregard, amend, or modify any rules or regulations promulgated by the Commission. They have no force in any member State until adopted by that State in accordance with its own law. Article VIII applies only in those States that specifically adopt it by statute. It authorizes any member State or its subdivision to request that the Commission perform an audit on its behalf. The Commission, as the State's auditing agent, may seek compulsory process in aid of its auditing power in the courts of any State that has adopted Art. VIII. Information obtained by the audit may be disclosed only in accordance with the laws of the requesting State.

> *Id.*, at 457.

That state governments might enter into agreements to cooperate or to create a joint organization to serve an advisory function (that is, advisory compacts), is not a novel idea. Nor is it unheard of for those agreements to be labeled "compacts." For example, the Compact for Education[49] appears to be very similar to the Multistate Tax Compact. It establishes an Educational Commission of the states whose purpose and function is serve as a clearinghouse to exchange information on best educational practices, to conduct research into improving those practices and to recommend educational policies to further those best practices.

---

[49] TEX. EDUC. CODE ANN. §161.01 *et seq.*

28

In addition to creating a means by which states could cooperate and engage in collective study and analysis of tax matters, the Compact includes the model UDITPA, promulgated by the Uniform Law Commission, in Article IV. Therefore, Article IV, and by extension Article III.1, can best be described as the enactment of uniform law. This has been the Multistate Tax Commission's understanding of the substance of the Compact since its beginning, more than forty years ago. The Commission's early annual reports regularly included a list of the states in which "the Multistate Tax Compact has been enacted *as a uniform law …*"[50] And as far back as thirty-eight years ago, in *U.S. Steel,* the Commission informed the U.S. Supreme Court that both Article IV and Article III.1 are essentially uniform acts that "could be adopted by any state independently of any compact …." MTC U.S. Steel Brief, pp. 8 and 12.

---

[50] *See* MTC Annual Report, FY 67-68, p. 12,
http://www.mtc.gov/uploadedFiles/Multistate_Tax_Commission/Resources/Archives/Annual_Reports/FY67-68.pdf (last visited May 25, 2015)
MTC Annual Report, FY 68-69, p. 25,
http://www.mtc.gov/uploadedFiles/Multistate_Tax_Commission/Resources/Archives/Annual_Reports/FY68-69.pdf (last visited May 25, 2015)
MTC Annual Report, FY 70-71, p. 13,
http://www.mtc.gov/uploadedFiles/Multistate_Tax_Commission/Resources/Archives/Annual_Reports/FY70-71.pdf (last visited May 25, 2015)
MTC Annual Report, FY 71-72, p. 14,
http://www.mtc.gov/uploadedFiles/Multistate_Tax_Commission/Resources/Archives/Annual_Reports/FY71-72.pdf (last visited May 25, 2015)
MTC Annual Report, FY 72-73, p. 8,
http://www.mtc.gov/uploadedFiles/Multistate_Tax_Commission/Resources/Archives/Annual_Reports/FY72-73.pdf (last visited May 25, 2015)
MTC Annual Report, FY 73-74, p. 26,
http://www.mtc.gov/uploadedFiles/Multistate_Tax_Commission/Resources/Archives/Annual_Reports/FY73-74.pdf (last visited May 25, 2015) (emphasis added).

Of course, uniform laws may be unilaterally modified. As the Broun treatise on compacts explains, model uniform laws do not constitute a contract between the states and thus, unlike contracts, are not binding:

> Although legislatures are urged to adopt model uniform laws as written, they are not required to do so and may make changes to fit individual state needs. Uniform acts do not constitute a contract between the states, even if adopted by all states in the same form, and thus, unlike contracts, are not binding upon or enforceable against the states. Each state retains complete authority to unilaterally amend or change such codes to meet its unique circumstances. There is no prohibition in uniform acts limiting the ability of state legislatures to alter particular provisions as times change or to address the peculiar domestic political circumstances in a state.[51]

That the Compact has been properly viewed by its members as an advisory compact or agreement incorporating in its apportionment provisions (Articles III.1 and IV) a uniform law is evident[52] As will be explained below, the members have treated the apportionment provisions as subject to unilateral modification, consistent with this view. Not only does this further demonstrate the understanding of the members as to the fundamental nature of the Compact, but as the Commission argues below, it establishes a course of conduct or performance that this Court must consider in determining whether, even if the Compact is itself

---

[51] Broun et al., *supra* n. 35, at 16.

[52] Recently, the Michigan Court of Claims has held that the Multistate Tax Compact is an advisory compact and not binding on its members. *Yaskawa America, Inc. v. Department of Treasury*, Mich. Ct. Cl. Case No. 11 – 000077-MT (December 19, 2014); *Ingram Micro, Inc. v. Department of Treasury*, Mich. Ct. Cl. Case No. 11 – 000035 – MT (December 19, 2014); *Emco Enterprises, Inc. v. Department of Treasury*, Mich. Ct. Cl. Case No. 12 – 000152 – MT (April 21, 2015).Copies of *Emco* and *Yaskawa* are attached as C and D in the Appendix.

deemed to be a binding compact, the provisions at issue may nevertheless be modified by state law.

**II.    Even if the Compact were a binding compact, its terms do not prohibit modification of Article III.1 or IV and therefore this Court must look to the compact member states' course of conduct in determining whether the Compact allows modification of those apportionment provisions.**

The Commission asserts that the Multistate Tax Compact is not a binding interstate compact. It imposes no requirement of reciprocity on its members, nor is any such requirement embodied in Articles III.1 and IV. Consistent with this lack of any requirement for reciprocity, it gives the members no grounds or procedures for disputing unilateral modifications of its provisions. The organization created by the Compact was not delegated any sovereign authority and cannot require the compact member states to take any particular action related to taxation.

The provision at issue here is the incorporation of a uniform law and a related election, and it is clear that uniform laws are, by their nature, subject to unilateral modification. The Compact itself allows unconditional, unilateral withdrawal by state enactment alone and it contains no explicit prohibition against unilateral modification of any provision. Moreover, if any of its provisions were found to violate a particular state's constitution or were otherwise held invalid, that

31

Compact state's membership is not voided but the invalid provision is deemed severed.[53]

These facts are sufficient to reject the Appellant's claims that Texas cannot require a different apportionment formula. But if this Court were to conclude that the Compact is, in any way, a binding interstate agreement, then the fact that it is silent with respect to the ability of states to modify the apportionment provisions of Articles III.1 and IV would require this Court to consider the course of conduct or performance of the compact member states.

In interpreting the obligations of the parties to a compact, courts have long recognized that, as with contracts generally, the actual performance of a compact by the parties has high probative value in determining the scope of those obligations: "In determining [the meaning of a compact] the parties' course of conduct under the Compact is highly significant." *Alabama v. North Carolina*, 130 S.Ct. 2295, 2309 (2010).

A basic premise of contract law, recognized as part of the Uniform Commercial Code (UCC) is that "the parties [to the contract] themselves know best what they have meant by their words of agreement and their action under that agreement is the best indication of what that meaning was."[54] For instance, Section

---

[53] Multistate Tax Compact, Article XII.

[54] U.C.C. §2-208 cmt. 1. Section 2-208 of the U.C.C. is codified, without substantive change, at TEX. CODE ANN. BUS. & COM. § 1.303.

32

2-208 of the UCC provides that "course of performance" is relevant even if the express terms of the contract seem clear on their face. The course of performance doctrine has two material elements, both of which have been satisfied in this case. As defined under the Uniform Commercial Code:

(a) A "course of performance" is a sequence of conduct between the parties to a particular transaction that exists if:
(1) the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and
(2) the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.[55]

The course of performance doctrine in interpreting modern *compacts* is demonstrated by the U.S. Supreme Court's reliance on the actions of the compacting parties taken years or even decades after the compacts became effective in order to ascertain the original understanding of those parties in entering into the compact. For example, in *New Jersey v. Delaware,* 552 U.S. 597 (2008), the Court relied on the parties' course of performance which began more than 60 years after the compact was enacted to demonstrate that the parties to the compact never intended either party to exercise exclusive jurisdiction over riparian rights on the Delaware River.

In *Alabama v. North Carolina,* in concluding that no member state of the Southeast Interstate Low-Level Radioactive Waste Management Commission was

---

[55] TEX. CODE ANN. BUS. & COM. § 1.303.

obligated to continue meeting its licensing obligations under the compact if the costs of doing so became prohibitively expensive, the Court relied on the parties' course of performance over the eleven year period after Congress approved of the interstate compact providing for the disposal of low-level radioactive waste.

In *Tarrant Reg'l Water Dist. v. Herrmann,* 133 S.Ct. 2120 (2013), the Water District's actions starting twenty-two years after Congress ratified the Red River Compact in 1980 established that the compacting parties did not authorize any member of the Compact to take or divert water from within another member's borders.

The members of the Multistate Tax Compact have demonstrated that a state may unilaterally modify the apportionment provisions at issue. In 1971, the Florida legislature: (1) repealed Articles III and IV of the Compact, (2) reenacted the apportionment provisions of Article IV (§214.71, the "general method" of apportionment) and (3) amended their business income tax to provide that: "In lieu of the equally weighted three factor apportionment formula ... described in §214.71, there shall be used for purposes of the tax imposed by this code [the corporate income tax] an apportionment fraction composed of a sales factor representing 50 percent of the fraction, a property factor representing 25% of the fraction, and a payroll factor representing 25% of the fraction."[56] This change

---

[56] See copies of the session laws attached to this brief.

became effective in January 1972, only five years after the Compact was initially adopted.

At the Commission's annual meeting that year, the compact member states, acting through their representatives, unanimously passed a resolution upholding Florida's continued membership in the Compact and the Commission notwithstanding that state's unilateral repeal of Articles III and IV of the Compact and its adoption of a mandatory double-weighting of the sales factor. Texas, a member of the Compact since 1967, attended the meeting at which the resolution was passed and voted in favor of Florida's continued membership.[57]

Other present or former compact members have varied from the apportionment provisions in Article III. 1 and IV by some action modifying, amending, repealing or otherwise superseding some or all of the formula or the election set out in those provisions. The Appellant may take issue with the ability of these states to do so, but there is no serious dispute that the states themselves take the position that these changes were effective. Three present or former Compact members eliminated or limited the election directly.[58] Three others amended Article IV to be consistent with their statutory apportionment formula

---

[57] A copy of the minutes of the Commission's meeting of December 1, 1972 is appended to this brief as Section B.

[58] Colorado (COLO. REV. STAT. §§ 39-22-303.5 and 39-22-303.7), Michigan (as applied to the Michigan Business Tax after January 1, 2008; (MICH. COMP. LAWS § 205.581); *see also* Mich. Pub. Acts 2011, No. 40 (H.B. 4479)), Minnesota (MINN. STAT. § 290.171). Minnesota repealed its version of the compact entirely in 2013. MN Laws 2013, c. 143, art. 13, § 24. Michigan did so in 2014 Mich. Pub. Acts 2014, No. 282 (S.B. 156), retroactive to January 1, 2008.

that emphasizes the sales factor.[59] And three states in addition to Texas indicated by separate statute or other guidance that the compact election does not apply to factor-weighting.[60] Only one Compact member explicitly recognizes the election.[61] The remaining members require an equal-weighted formula, identical to Article IV of their respective enacted compacts, such that the election is of no consequence with respect to factor-weighting.[62]

The course of performance of the compact member states over a more than forty-year period demonstrates that the apportionment provisions of Articles III.1 and IV are subject to unilateral modification. Nor is this inconsistent with the Compact's purpose of promoting "uniformity or compatibility in significant components of state tax systems."[63] The apportionment provisions contained in Article IV are much more comprehensive than just the weighting given to the sales factor. It would not have been reasonable to expect that that such a comprehensive system of uniform apportionment rules enacted in 1967 would permanently represent the policy views of state lawmakers or be responsive to an evolving

---

[59] Alabama (ALA. CODE § 434 40-27-1), Arkansas (ARK. CODE ANN. § 26-5-101), Utah (UTAH CODE ANN. § 59-1-801.IV.9). In 2013 Utah repealed the Compact and enacted a version that does not contain either Articles III.1 or IV (Utah Senate Bill 247, effective June 30, 2013).

[60] California (CAL. REV. & TAX CODE §25128(a)), Idaho (IDAHO CODE ANN. § 63-3027(i)), Oregon (OR. REV. STAT. § 314.606). In 2013 Oregon repealed the Compact and enacted a version that does not contain either Articles III.1 or IV. 2013 Oregon Laws Ch. 407 (S.B. 307).Texas (letter ruling 201007003L). California repealed its version of the compact entirely in 2012. CA Stats. 2012, c. 37 (S.B.1015), § 3.

[61] MO. REV. STAT. § 32.200.

[62] Alaska, Hawaii, Kansas, Montana, New Mexico, North Dakota.

[63] Multistate Tax Compact, Art. I.

economy or to the changing needs of the states. Nor has that been the case. Policies have evolved. And it is clear that a number of states have felt the specific need to modify the Compact's apportionment provisions in a particular way—to give more emphasis to the sales factor of the apportionment formula, and to make that heavier-weighted sales factor formula the standard formula by which taxpayers will apportion their income.

Had it been necessary for these states to withdraw from the Compact in order to give effect to this particular change in policy, or had they been prevented from joining the Compact on this account, there would have been much less reason for them to adopt or maintain the other elements of the UDITPA formula which help to create a more uniform system of state taxation. Had it been necessary for all of the compact member states to agree on any changes to the standard apportionment formula, a number of states would inevitably have had to withdraw.

## CONCLUSION

The Commission urges this Court to respect the decision of the Texas legislature, which is also in keeping with the legislative bodies in a number of states, that Texas may be a member of the Multistate Tax Compact without ceding authority over its own tax laws. The Commission maintains that it has always been the case that state legislative bodies retained the authority to vary their tax rules without fear that the Compact could impose some superior law that could not be

changed without the collective agreement of the Compact members—or without the requirement that those members abandon the Compact and its worthwhile purposes. This conclusion is in keeping with the plenary authority of legislatures when it comes to taxes and with the legislative prerogative generally—and it should not be contested without more compelling grounds than exist here. That the questions at issue have only recently arisen is one more indication that they are not well-founded. The Commission therefore believes that the right resolution is to find that the Compact is not a binding interstate agreement, and that any question as to whether states may modify its apportionment provisions should be resolved on the basis of its members' course of conduct.

Respectfully submitted this 26th day of May, 2015.

*/s/ Joe Huddleston*

Joe Huddleston
  Executive Director
Sheldon Laskin
  Counsel
444 N. Capitol St., N.W., Ste. 425
Washington, D.C. 20001
202-650-0300
slaskin@mtc.gov
Attorneys for *Amicus Curiae*
Multistate Tax Commission

**CERTIFICATE OF COMPLIANCE**

This brief complies with the typeface requirements Texas Rule of Appellate Procedure 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitation of Texas Rule of Appellate Procedure 9.4(i)(2)(B) because it contains 9,694 words, excluding the parts of the brief exempted by Rule 9.4(i)(1).

*/s/ Lila Disque*
Lila Disque

**CERTIFICATE OF SERVICE**

I certify that the foregoing **Brief of *Amicus Curiae* Multistate Tax Commission In Support of Texas Comptroller of Public Accounts and Texas Attorney General** was electronically filed with the Clerk of the Court using the electronic case filing system of the Court. I also certify that a true and correct copy of the foregoing was served via e-service or e-mail on the following counsel of record on May 26, 2015.

James F. Martens
jmartens@textaxlaw.com
Amanda G. Taylor
ataylor@textaxlaw.com
Lacy L. Leonard
lleonard@textaxlaw.com
Danielle Ahlrich
dahlrich@textaxlaw.com
MARTENS, TODD, LEONARD &
TAYLOR
301 Congress Avenue, Suite 1950
Austin, Texas 78701
*Counsel for Appellant*

Amy L. Silverstein
asilverstein@sptaxlaw.com
SILVERSTEIN & POMERANTZ
LLP
12 Gough Street, Second Floor
San Francisco, California 94103
*Counsel for Appellant*

Rance Craft
Assistant Solicitor General
Rance.craft@texasttorneygeneral.gov
Cynthia A. Morales,
Assistant Attorney General
Cynthia.morales@texasattorneygeneral.gov
OFFICE OF THE ATTORNEY
GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tele: (512) 936-2872
Fax: (512) 474-2697
*Counsel for Appellees*

*/s/ Lila Disque*
Lila Disque

# APPENDIX

# APPENDIX TABLE OF CONTENTS

A. State Apportionment of Corporate Income

B. Minutes of MTC General Session, Dec. 1, 1972

C. Florida Session Laws, 1971

D. *Emco Enterprises, Inc. v. Dep't of Treasury*,
   Case No. 12- 000152- MT (Mich. Ct. Cl. April 21, 2015)

E. *Yaskawa America, Inc. v. Department of Treasury*,
   Case No. 11-000077-MT (Mich. Ct. Cl. December 19, 2014)

# A

# STATE APPORTIONMENT OF CORPORATE INCOME

(Formulas for tax year 2014 -- as of January 1, 2014)

| State | Formula | State | Formula |
|---|---|---|---|
| ALABAMA * | Double wtd Sales | NEBRASKA | Sales |
| ALASKA* | 3 Factor | NEVADA | No State Income Tax |
| ARIZONA * | Double wtd Sales/85% Sales, 7.5% Property & 7.5% Payroll | NEW HAMPSHIRE | Double wtd Sales |
|  |  | NEW JERSEY | Sales |
| ARKANSAS * | Double wtd Sales | NEW MEXICO * | 3 Factor/Double wtd Sales (4) |
| CALIFORNIA * | Sales | NEW YORK | Sales |
| COLORADO * | Sales | NORTH CAROLINA * | Double wtd Sales |
| CONNECTICUT | Double wtd Sales/Sales | NORTH DAKOTA * | 3 Factor |
| DELAWARE | 3 Factor | OHIO | N/A (3) |
| FLORIDA | Double wtd Sales | OKLAHOMA | 3 Factor |
| GEORGIA | Sales | OREGON | Sales |
| HAWAII * | 3 Factor | PENNSYLVANIA | Sales |
| IDAHO * | Double wtd Sales | RHODE ISLAND | 3 Factor |
| ILLINOIS * | Sales | SOUTH CAROLINA | Sales |
| INDIANA | Sales | SOUTH DAKOTA | No State Income Tax |
| IOWA | Sales | TENNESSEE | Double wtd Sales |
| KANSAS * | 3 Factor | TEXAS | Sales |
| KENTUCKY * | Double wtd Sales | UTAH | Sales |
| LOUISIANA | 3 Factor | VERMONT | Double wtd Sales |
| MAINE * | Sales | VIRGINIA | Double wtd Sales/Quadruple wtd Sales (1) |
| MARYLAND | Sales/Double wtd Sales |  |  |
| MASSACHUSETTS | Sales/Double wtd Sales | WASHINGTON | No State Income Tax |
| MICHIGAN | Sales | WEST VIRGINIA * | Double wtd Sales |
| MINNESOTA | Sales | WISCONSIN * | Sales |
| MISSISSIPPI | Sales/Other (2) | WYOMING | No State Income Tax |
| MISSOURI * | 3 Factor | DIST. OF COLUMBIA | Double wtd Sales |
| MONTANA * | 3 Factor |  |  |

Source: Compiled by FTA from state sources.

Notes:

The formulas listed are for general manufacturing businesses. Some industries have a special formula different from the one shown.

* State has adopted substantial portions of the UDITPA (Uniform Division of Income Tax Purposes Act).

Slash (/) separating two formulas indicates taxpayer option or specified by state rules.

3 Factor = sales, property, and payroll equally weighted.

Double wtd Sales = 3 factors with sales double-weighted

Sales = single sales factor

(1) Virignia ( certain manufactures) are phasing in a single sales factor which will reach 100% for tax years beginning after 7/1/2014.

(2) Mississippi provides different apportionment formulas based on specific type of business. A single sales factor formula is

required if no specific business formula is specified.

(3) Ohio Tax Department publishes specific rules for situs of receipts under the CAT tax.

(4) New Mexcio is phasing in a single sales factor for manufacture business through 1/1/2018.

FEDERATION OF TAX ADMINISTRATORS -- JANUARY 2014

**B**

**OFFICERS:**

**BYRON L. DORGAN,** Chairman
Tax Commissioner
State of North Dakota

**WILLIAM E. PETERS,** Vice Chairman
State Tax Commissioner
State of Nebraska

**ALLISON GREEN,** Treasurer
Treasurer, Department of Treasury
State of Michigan

*Multistate Tax Commission*



EUGENE F. CORRIGAN, Executive Director

**EXECUTIVE COMMITTEE:**
**VERNON HOLMAN**
Chairman, State Tax Commission
State of Utah
**EWING H. LITTLE**
Chairman, State Tax Commission
State of Idaho
**CHARLES H. MACK**
Director, Department of Revenue
State of Oregon
**JAMES T. McDONALD**
Director, Department of Revenue
State of Kansas

MINUTES OF THE MEETING OF THE

MULTISTATE TAX COMMISSION

GENERAL SESSION
December 1, 1972
Denver, Colorado

Chairman Byron L. Dorgan called the meeting to order at 9:13 a.m. December 1, 1972, at the Radisson Hotel, Denver, Colorado.

Mr. Corrigan then took the roll call, which showed the following states present, two being recorded shortly after the roll call:

| Regular Member States | | Associate Member States |
|---|---|---|
| Alaska | Montana | Alabama |
| Arkansas | Nebraska | Arizona |
| Colorado | Nevada | California |
| Hawaii | New Mexico | |
| Idaho | North Dakota | |
| Illinois | Oregon | |
| Kansas | Texas | |
| Michigan | Utah | |
| | Washington | |

Mr. Corrigan noted that regular member Indiana, associate members Minnesota, Ohio and Tennessee, and non-members Kentucky and New York had been taking part in the meeting during the week, making a total of 20 regular members, 6 associate members and 2 non-members in attendance.

## Approval of Minutes

The minutes of the last meeting of the Commission having been mailed to the member states more than 30 days prior to this meeting in accordance with the requirements of the By-laws, and no proposed objections, changes or alterations being submitted from the floor, the Minutes were approved as presented.

Resolutions

Chairman Dorgan had, on November 30, appointed the following men to be members of the Resolutions Committee:

Arthur Fulmer, Florida, Chairman
Jene Bell, Montana
Sydney Goodman, Michigan
Nolan Humphrey, Arkansas
William Peters, Nebraska

On behalf of the Committee, Chairman Fulmer submitted resolutions for approval as follows:


RESOLUTION No. 1

WHEREAS, the State of Florida views its position as fully consistent with the principles of the Multistate Tax Compact and the Multistate Tax Commission as enunciated in Article I of the Compact; and

WHEREAS, the State of Florida has repealed Articles III and IV of the Multistate Tax Compact, while still legislatively, adhering to the spirit of the Compact; and

WHEREAS, the State of Florida will continue to strive together with tax administrators, national tax groups, and representatives of the business community to develop new and additional methods of resolving multistate tax problems;

NOW, THEREFORE, BE IT RESOLVED that the State of Florida be recognized as a regular member in good standing of the Multistate Tax Compact and the Multistate Tax Commission.

On motion made and seconded, the resolution was unanimously approved, Florida abstaining.


RESOLUTION No. 2

WHEREAS, the purpose of the Multistate Tax Commission is to bring uniformity to the tax laws of the various states of the United States insofar as said laws affect multistate business; and

WHEREAS, the Commission believes that the business community and the States should have a single place to which to take their tax problems;

NOW, THEREFORE, BE IT RESOLVED that the Multistate Tax Commission invite the business community to attend all

sessions of the Commission, serve on Commission Committees, and assist the Multistate Tax Commission in promoting good relations with said business community; and

MAY IT FURTHER BE RESOLVED that the Multistate Tax Commission extend its thanks and appreciation to the business community for its assistance given to the Commission in all its endeavors to this date.

Upon motion made and seconded, the resolution was unanimously approved.

### RESOLUTION No. 3
### (Amending By-law 4(a))

WHEREAS, notice of a proposed change in By-law 4(a) was duly given in accordance with the provisions of By-law 12 at the Bismarck meeting on June 9, 1972;

NOW, THEREFORE, BE IT RESOLVED that said By-law be, and it is hereby, amended to read as follows:

4(a)  The annual meeting of the Commission shall be the regular meeting of the Commission in each calendar year next preceding the fiscal year period.  All regular meetings of the Commission shall be held on dates and at places to be fixed by the Executive Committee unless otherwise ordered by the Commission.

Upon motion made and seconded, the resolution was unanimously approved.

### RESOLUTION No. 4

WHEREAS, paragraph (d) of By-law 7 provides that notice of the public hearings of the Commission shall be given by "publication in at least three metropolitan daily newspapers having substantial nationwide or regional circulation and in at least one tax journal or publication"; and

WHEREAS, the Commission believes that the publicity given to such hearings through the extensive mailing list of the Commission and through the major tax service publications is sufficient for the purposes of all parties interested in or affected by the Commission's hearings; and

WHEREAS, the Commission desires to eliminate the requirement for publication in the metropolitan daily newspapers;

NOW, THEREFORE, BE IT RESOLVED that paragraph (d) of By-law 7 be, and it hereby is, amended to read as follows:

"(d) All hearings shall be open to the public and, in addition to any other notice required, shall be announced no less than 30 days in advance of such hearing, (by publication in at least three metropolitan daily newspapers having substantial nationwide or regional circulation and in at least one tax journal or publication.) in a mailing to the names on the mailing list maintained by the office of the Multistate Tax Commission, and in such other manner as the Executive Director shall deem appropriate.

Mr. Corrigan noted that this resolution would amend By-law 7(d) and that notice of such a proposed by-law change is required to be given at the meeting previous to the meeting at which the vote on such a change is taken. Accordingly, he requested that Mr. Fulmer's reading of the resolution constitute such notice so that the vote on it could be taken at the next meeting of the Commission. The request was unanimously approved.

RESOLUTION No. 5

WHEREAS, notice of a proposed change in By-law 10 was duly given, in accordance with the provisions of By-law 12, at the Bismarck meeting, on June 9, 1972;

NOW, THEREFORE, BE IT RESOLVED that said By-law be, and it is hereby, amended to read as follows:

10. The order of business at regular meetings of the Commission shall be:

1. Roll call of the states.
2. Communications.
3. Approval of the minutes of the last regular meeting and of any special meetings held since the last regular meeting.
4. Report of Treasurer.
5. Report of Executive Director.
6. Report of Standing Committees.
7. Unfinished business.
8. New business.
9. Report of Resolutions Committee.
10. Report of Nominating Committee (at Annual Meeting).
11. Election of officers and Executive Committee (at Annual Meeting).
12. Report of Chairman.
13. Comments by Chairman-elect (at Annual Meeting).
14. Adjournment.

The Commission may order any matter placed on the agenda for any meeting as special business, or in his discretion, the Chairman may place upon the agenda any matter which he deems of sufficient or pressing importance.

Upon motion made and seconded, the resolution was unanimously approved.

## RESOLUTION No. 6

WHEREAS, notice of a proposed change in By-law 3(g) was duly given in accordance with the provisions of By-law 12, at the Bismarck meeting on June 9, 1972;

NOW, THEREFORE, BE IT RESOLVED that said By-law be, and it is hereby, amended to read as follows:

3(g)  The Executive Director shall be selected by the Chairman with the approval of the Executive Committee, and shall serve at the pleasure of the Chairman and the Executive Committee.  The Executive Director shall be in general administrative charge of the affairs of the Commission. Subject to any directions given by the Commission and within its policies, he shall hire, promote, supervise, discharge and fix the duties of members of the Commission staff.  He shall prepare the annual report required by Article VI, 1(1) of the Compact, in time to be submitted to the members on or before October 31 and transmitted to the governors and legislatures of the party states prior to the first day of January next following.  In addition, the Executive Director shall have such other duties as are conferred upon him elsewhere in these bylaws and by action of the Commission During any time when the Commission does not have an Executive Director, the Chairman may act as such on a temporary basis or may select an Acting Executive Director.

At Mr. Corrigan's request, Mr. Fulmer then offered an amendment to change the proposed date included in the resolution from October 31 to November 30.  Upon motion made and seconded, this proposed amendment to the resolution was unanimously approved. Upon motion made and seconded, the resolution, as so amended, was also unanimously approved.

## RESOLUTION No. 7

WHEREAS, Section III of the current Multistate Tax Commission Travel Regulations provides that authorized air transportation shall be of the "economy" type; and

WHEREAS, it is the desire of the Commission to substitute the words "tourist or coach" therefor; and

WHEREAS, said Section III of the current regulations requires that the Executive Director retain in his custody all credit cards and issue them to individual travellers only as required; and

WHEREAS, said limitation is not practical in view of the travel needs of the Audit Coordinator and in view of the travel needs of the audit personnel in the New York and Chicago audit offices; and

WHEREAS, the Commission desires to authorize the Executive Director to issue travel cards to members in "accordance with his judgment as to the travel needs of the Commission";

NOW, THEREFORE, BE IT RESOLVED that Section III of the Multistate Tax Commission Travel Regulations be, and they are herewith, changed to read as follows:

III.  Authorized Reimbursement:

a) Transportation:  Commercial air tourist or coach class is normally to be utilized.  However, rail or bus transportation may be substituted therefor when in the best interest of the Commission.  Travel by a personal automobile may be utilized.  If such automotive travel is, in the opinion of the Executive Director, in the best interest of the Multistate Tax Commission, a mileage allowance of 10 cents per mile is authorized.  Taxi fares, limousine fares, toll charges, parking fees and rental car expenses will be authorized in addition to other transportation expenses.  Tickets for commercial travel for employees will normally be procured by the Multistate Tax Commission Account-Clerk without personal expense to the traveler.  The Executive Director is authorized to procure credit cards and to issue them to employees in accordance with his judgment as to the travel needs of the Commission. Authorized travel of other than Commission employees will be reimburseable by the Commission upon submission of approved claims.

Upon motion made and seconded, the resolution was unanimously approved.

Mr. Fulmer then thanked Jene Bell of Montana, Sydney Goodman of Michigan, and Nolan Humphrey of Arkansas, for their work with him on the Resolutions Committee.


Treasurer's Report

Chairman Dorgan noted that he had, two weeks previously, sent to each member of the Commission a detailed statement of the

Commission's financial affairs. In the absence of the Treasurer from this meeting, Chairman Dorgan requested that that financial statement be considered to be the Treasurer's Report, and that it be approved as such. On motion made and seconded, his proposal was unanimously approved.

## Chairman's Report

Mr. Dorgan then noted that two weeks earlier he had sent to all regular members a report "detailing plans for procuring new members, outlining some thoughts on the joint audit program and other matters." At his request, on motion made and seconded, that report was unanimously accepted as the Chairman's Report.

## COMMITTEE REPORTS

### Sales and Use Tax Committee, Fred O'Cheskey, Chairman

Mr. Corrigan reported for Mr. O'Cheskey that the Committee had discussed priorities as to which of several suggested activities were most attractive. He said that the Committee addressed itself primarily to areas in which uniformity appeared to be possible; and that significant progress had already been made toward a uniform sales and use tax exemption certificate. He said that Gates Rubber Company had been largely responsible for the progress which had already been made in this area. He said that their cooperation with theCommission was indicative of the type which can be beneficial to both the business community and the states.

### Income Tax Committee, William Peters, Chairman

Mr. Peters reported that his committee had proceeded in much the same manner as had the Sales and Use Tax Committee. It aimed at discussing and getting reactions from both business and state representatives concerning in which areas uniformity is most desirable. Statutes of limitation constituted one such area of discussion. Mr. Peters said that subcommittees would soon be appointed to attack the various problems. He invited volunteers for those subcommittees.

### Rules and Regulations Committee, Theodore de Looze, Chairman

Mr. de Looze reported that his committee had met with a large group of business and state representatives on November 29. It had at that time reviewed at length the proposed revision of the Commission's corporate income tax regulations. As a result of that meeting and of subsequent executive sessions of the committee, it was unanimously agreed to recommend to the Commission that public hearings on

the proposal be conducted in accordance with the Multistate Tax Compact and the by-laws of the Multistate Tax Commission in order that, if the hearing officer's recommendations were issued promptly, the Commission might consider the proposal and the hearing officer's report with respect thereto at the February meeting of the Commission in Washington, D. C.

## Joint Audit Committee, Robert Kessel, Chairman

Mr. Dorgan noted that Mr. Kessel had reported his committee's activities to the Executive Committee on a prior day. He said that he would consider that report to be incorporated into this meeting by reference.

Mr. Kessel had reported that his committee had been active in 1) creating an audit resources list consisting of corporations which the states had assigned to the Commission for audit; 2) composing a Regional Information Sharing Agreement for execution by the various states; and 3) preparing a seminar on jurisdiction. (The first presentation of this seminar was conducted at Springfield, Illinois, the following week.)

Mr. Dorgan then noted that he had appointed a Long Range Planning Committee to consider areas of activity to which the Commission should expect to devote major portions of its attention during coming years. He has appointed John Heckers as Chairman of that committee.

Mr. Dorgan then noted that the Reciprocal Information Sharing Agreement, to which Mr. Kessel had referred, had been examined by the members and that several states had already executed it. He emphasized the importance of its being executed by as many states as possible, stating that in his consideration it represents a significant milestone in furthering cooperation among the states in sharing tax information. (See attached copy.)

Mr. Norman Nowak, of the Institute for Tax Administration of the University of Southern California, then addressed the meeting. He referred to the Commission's efforts to obtain federal funding of a training program under the Intergovernmental Personnel Act. He said that the rejection of the application for the funds resulted primarily from lack of supporting materials from among the states. He noted that the Commission had sought to obtain the needed material by distributing a questionnaire (see attachment), but that only sixteen states had responded to it thus far. He urged all states to complete the questionnaire as soon as possible. He also urged all tax administrators to seek additional training funds this year from their legislatures in order to be able

to take advantage of training programs which are being made increasingly available through the Multistate Tax Commission and the University of Southern California.

Mr. Dorgan then noted that, while the December 7-8 seminar in Springfield had originally been planned for a group of 18-20 people, eighty people were now expected to attend. (Eighty five did attend and gave the seminar high grades.) He said that this was just an indication of the success of the Commission as the member states became more and more appreciative of its benefits and increased their participation in its activities.

He then adjourned the meeting.

C

# ADDENDUM

# to

# VOLUME 1

# of

# FLORIDA STATUTES, 1971

The Florida Legislature met in special session between November 29 and December 9, 1971, and enacted a number of measures appropriate for inclusion in the *Florida Statutes*. However, the printing of this 1971 edition had by then proceeded too far to permit incorporation of these measures at the appropriate places in these volumes. Therefore, it has been decided to publish the product of the special session as Addenda to volumes 1 and 2. However, entries reflecting the special session have been inserted at the proper places in the tables of section changes, tracing table, and alphabetical index.

The format is the same as that used for the Supplement to the *Florida Statutes,* 1969. The full text of each section amended during the special session is published in the Addendum to the volume in which it would otherwise have appeared. Repealed sections are identified by catchline and bracketed note only. In order to make the Addenda more noticeable, colored paper has been used.

# CHAPTER 199
## INTANGIBLE PERSONAL PROPERTY TAX ACT

### PART I
### GENERAL PROVISIONS

199.032  Levy.

**\*199.032  Levy.**—There is hereby levied, to be assessed and collected as provided by this chapter:

(1)  An annual tax of one mill on the dollar of the just valuation of all intangible personal property except money as defined in §199.023 (1)(a), and except notes, bonds, and other obligations for payment of money which are secured by mortgage, deed of trust, or other lien upon real property situated in the state;

(2)  A nonrecurring tax of two mills on the dollar of the just valuation of all notes, bonds, and other obligations for payment of money, which are secured by mortgage, deed of trust, or other lien upon real property situated in the state.

History.—§1, ch. 71-134; §1, ch. 71-987.
\*Note.—Section, as amended, effective July 1, 1972.

---

# CHAPTER 212
## TAX ON SALES,
## USE AND OTHER TRANSACTIONS

212.02  Definitions.
212.03  Transient rentals tax; rate, procedure, enforcement, etc.
212.031  Lease or rental of real property.
212.08  Sales, rental, storage, use tax; specified exemptions.

**212.02  Definitions.**— The following terms and phrases when used in this chapter, shall have the meaning ascribed to them in this section, except where the context clearly indicates a different meaning:

(1)  "Person" includes any individual, firm, copartnership, joint adventure, association, corporation, estate, trust, business trust, receiver, syndicate, or other group or combination acting as a unit, and shall include any political subdivision, municipality, state agency, bureau or department, and the plural as well as the singular number.

(2)  "Sale" means and includes:

(a)  Any transfer of title or possession, or both, exchange, barter, lease or rental, conditional or otherwise, in any manner or by any means whatsoever of tangible personal property for a consideration;

(b)  The rental of living quarters, sleeping or housekeeping accommodations in hotels, apartment houses or rooming houses, tourist or trailer camps, as hereinafter defined in this chapter;

(c)  The producing, fabricating, processing, printing or imprinting of tangible personal property for a consideration for consumers who furnish either directly or indirectly the materials used in the producing, fabricating, processing, printing or imprinting; and

(d)  The furnishing, preparing or serving for a consideration of any tangible personal property for consumption on or off the premises of the person furnishing, preparing, or serving such tangible personal property which includes the sale of meals or prepared food by an employer to his employees.

(e)  A transaction whereby the possession of property is transferred but the seller retains title as security for the payment of the price.

(3)  (a)  "Retail sale" or a "sale at retail" means a sale to a consumer or to any person for any purpose other than for resale in the form of tangible personal property, and shall mean and include all such transactions that may be made in lieu of retail sales or sales at retail. A resale must be in strict compliance with rules and regulations and any dealer making a sale for resale which is not in strict compliance with rules and regulations shall himself be liable for and pay the tax.

(b)  The terms "retail sales," "sales at retail," "use," "storage," and "consumption" shall include the sale, use, storage or consumption of all tangible advertising materials imported or caused to be imported into this state. Tangible advertising material shall include displays, display containers, brochures, catalogs, price lists, point of sale advertising and technical manuals or any tangible personal property which does not accompany the product to the ultimate consumer.

(c)  The terms "retail sales," "sale at retail," "use," "storage," and "consumption" shall not include materials, containers, labels, sacks, or bags intended to be used one time only for packaging tangible personal property for sale, and shall not include the sale, use, storage, or consumption of industrial materials for future processing, manufacture, or conversion into articles of tangible personal property for resale when such industrial materials become a component or ingredient of the finished product. However, said terms shall include the sale, use, storage, or consumption of tangible personal property, including fuels. used and dissipated in fabricating, converting, or processing tangible personal property for sale.

(d)  The term "gross sales" means the sum total of all retail sales of tangible personal property as defined herein, without any deduction whatsoever of any kind or character, except as provided in this chapter.

(4)  "Sales price" means the total amount paid for tangible personal property, including any services that are a part of the sale, valued in money, whether paid in money or otherwise,

and includes any amount for which credit is given to the purchaser by the seller, without any deduction therefrom on account of the cost of the property sold, the cost of materials used, labor or service cost, interest charged, losses or any other expense whatsoever. Sales price also includes the consideration for a transaction which requires both labor and material to alter, remodel, maintain, adjust or repair tangible personal property. Trade-ins or discounts allowed and taken at the time of sale shall not be included within the purview of this subsection.

(5) "Cost price" means the actual cost of articles of tangible personal property without any deductions therefrom on account of the cost of materials used, labor or service costs, transportation charges, or any expenses whatsoever.

(6) "Lease," "let," or "rental" means leasing or renting of living quarters, sleeping or housekeeping accommodations in hotels, apartment houses, rooming houses, tourist or trailer camps and real property, the same being defined as follows:

(a) Every building or other structure kept, used, maintained, advertised as or held out to the public to be a place where sleeping accommodations are supplied for pay to transient or permanent guests or tenants, in which ten or more rooms are furnished for the accommodation of such guests, and having one or more dining rooms or cafes where meals or lunches are served to such transient or permanent guests, such sleeping accommodations and dining rooms or cafes being conducted in the same building or buildings in connection therewith, shall, for the purpose of this chapter, be deemed a hotel.

(b) Any building or part thereof, where separate accommodations for two or more families living independently of each other are supplied to transient or permanent guests or tenants, shall for the purpose of this chapter be deemed an apartment house.

(c) Every house, boat, vehicle, motor court, trailer court or other structure or any place or location kept, used, maintained, advertised or held out to the public to be a place where living quarters, sleeping or housekeeping, accommodations are supplied for pay to transient or permanent guests or tenants, whether in one or adjoining buildings, shall for the purpose of this chapter be deemed a rooming house.

(d) In all hotels, apartment houses and rooming houses within the meaning of this chapter, the parlor, dining room, sleeping porches, kitchen, office and sample rooms shall be construed to mean rooms.

(e) A "tourist camp" is a place where two or more tents, tent houses, or camp cottages are located and offered by a person or municipality for sleeping or eating accommodations, most generally to the transient public for either a direct money consideration or an indirect benefit to the lessor or owner in connection with a related business.

(f) A "trailer camp" is a place where space is offered, with or without service facilities, by any persons or municipality to the public for the parking and accommodation of two or more automobile trailers which are used for lodging, for either a direct money consideration or an indirect benefit to the lessor or owner in connection with a related business, such space being hereby defined as living quarters, and the rental price thereof shall include all service charges paid to the lessor.

(g) "Lease," "let" or "rental" also means the leasing or rental of tangible personal property and the possession or use thereof by the lessee or rentee for a consideration, without transfer of the title of such property, except as expressly provided to the contrary herein. Provided that, where two taxpayers, in connection with the interchange of facilities, rent or lease property, each to the other, for use in providing or furnishing any of the services mentioned in §167.431, the term lease or rental shall mean only the net amount of rental involved.

*(h) "Real property" means any interest in the surface of real property unless said property is:

1. Assessed as agricultural property under §193.461.

2. Used exclusively as dwelling units.

3. Property subject to tax on parking, docking or storage spaces under §212.03(6).

(7) "Storage" means and includes any keeping or retention in this state of tangible personal property for use or consumption in this state, or for any purpose other than sale at retail in the regular course of business.

(8) "Use" means and includes the exercise of any right or power over tangible personal property incident to the ownership thereof, or interest therein, except that it shall not include the sale at retail of that property in the regular course of business.

(9) "Business" means any activity engaged in by any person, or caused to be engaged in by him, with the object of private or public gain, benefit, or advantage, either direct or indirect. Except for sales of motor vehicles, the term "business" shall not be construed in this chapter to include occasional or isolated sales or transactions involving tangible personal property by a person who does not hold himself out as engaged in business, but shall include other charges for the sale or rental of tangible personal property, sales of or charges of admission, communication services, all rentals and leases of living quarters, other than low rent housing operated under chapter 421, sleeping or housekeeping accommodations in hotels, apartment houses, rooming houses, tourist or trailer camps, and all rentals of real property, other than low rent housing operated under chapter 421, all leases or rentals of parking lots or garages for motor vehicles, docking or storage spaces for boats in boat docks or marinas as defined in this chapter and made subject to a tax

imposed by this chapter. Any tax on such sales, charges, rentals, admissions, or other transactions made subject to the tax imposed by this chapter shall be collected by the state, county, municipality, any political subdivision, agency, bureau or department or other state or local governmental instrumentality in the same manner as other dealers, unless specifically exempted by this chapter.

(10) "Retailer" means and includes every person engaged in the business of making sales at retail, or for distribution, or use, or consumption, or storage to be used or consumed in this state.

(11) The term "department" means the department of revenue.

(12) "Tangible personal property" means and includes personal property which may be seen, weighed, measured, or touched or is in any manner perceptible to the senses, including electric power or energy, boats, motor vehicles as defined in §320.01(1), aircraft as defined in §330.01, and all other types of vehicles. The term "tangible personal property" shall not include stocks, bonds, notes, insurance, or other obligations or securities; intangibles as defined by the intangible tax law of the state; or parimutuel tickets sold or issued under the racing laws of the state.

(13) The term "use tax" referred to in this chapter includes the use, the consumption, the distribution, and the storage as herein defined.

(14) The term "intoxicating" or "alcoholic beverages" referred to in this chapter includes all such beverages as are so defined or may be hereafter defined by the laws of the state.

(15) The terms "cigarettes" or "tobacco" or "tobacco products" referred to in this chapter include all such products as are defined or may be hereafter defined by the laws of the state.

(16) The term "admissions" means and includes the net sum of money after deduction of any federal taxes for admitting a person or vehicle or persons to any place of amusement, sport, or recreation or for the privilege of entering or staying in any place of amusement, sport or recreation, including but not limited to theaters, outdoor theaters, shows, exhibitions, games, races or any place where charge is made by way of sale of tickets, gate charges, seat charges, box charges, season pass charges, cover charges, greens fees, participation fees, entrance fees or other fees or receipts of anything of value measured on an admission or entrance or length of stay or seat box accommodations in any place where there is any exhibition, entertainment, including admissions to performances of philharmonic associations, opera guilds, little theaters, and similar organizations, amusement, sport or recreation, and all dues paid to private clubs providing recreational facilities, including but not limited to golf, tennis, swimming, yachting and boating facilities.

(17) "In this state" or "in the state" means within the exterior limits of Florida and includes all territory within these limits owned by or ceded to the United States.

History.—§2, ch. 26319, 1949; §§1-3, ch. 26871, 1951; §1, ch. 29883, 1955; §13, ch. 59-1; §§1-4, ch. 59-288; §3, ch. 61-274; §1, ch. 63-526; §7, ch. 63-253; §§1-3, ch. 65-329; §5, ch. 65-371; §2, ch. 65-420; §1, ch. 67-180; §§1, 2, ch. 68-27; §1, ch. 68-119; §§21, 35, ch. 69-106; §§1-3, ch. 69-222; §1, ch. 70-206; §1, ch. 71-360; §47, ch. 71-377; §2, ch. 71-986.

*Note.—Paragraph (h), as amended, effective March 1, 1972.

### 212.03 Transient rentals tax; rate, procedure, enforcement, etc.—

(1) It is hereby declared to be the legislative intent that every person is exercising a taxable privilege who engages in the business of renting, leasing or letting any living quarters, sleeping or housekeeping accommodations in, from, or a part of, or in connection with any hotel, apartment house, rooming house, tourist or trailer camp, as hereinbefore defined in this chapter. For the exercise of said privilege a tax is hereby levied as follows: in the amount equal to four per cent of and on the total rental charged for such living quarters, sleeping or housekeeping accommodations by the person charging or collecting the rental; provided that such tax shall apply to hotels, apartment houses, rooming houses, tourist or trailer camps, as hereinbefore defined in this chapter, whether or not there be in connection with any of the same, any dining rooms, cafes or other places where meals or lunches are sold or served to guests.

(2) The tax provided for herein shall be in addition to the total amount of the rental and shall be charged by the lessor or person receiving the rent in and by said rental arrangement to the lessee or person paying the rental, and shall be due and payable at the time of the receipt of such rental payment by the lessor or person, as defined in this chapter, who receives said rental or payment. The owner, lessor or person receiving the rent shall remit the tax to the department at the times and in the manner hereinafter provided for dealers to remit taxes under this chapter. The same duties imposed by this chapter upon dealers in tangible personal property respecting the collection and remission of the tax, the making of returns, the keeping of books, records and accounts and the compliance with the rules and regulations of the department in the administration of this chapter shall apply to and be binding upon all persons who manage or operate hotels, apartment houses, rooming houses, tourist and trailer camps, and to all persons who collect or receive such rents on behalf of such owner or lessor taxable under this chapter.

(3) Where rentals are received by way of property, goods, wares, merchandise, services or other things of value, the tax shall be at the rate of four per cent of the value of said property, services or other things of value.

(4) The tax levied by this section shall not apply to, be imposed upon, or collected from

any person who shall reside continuously longer than twelve months at any one hotel, apartment house, rooming house, tourist or trailer camp, and shall have paid the tax levied by this section for twelve months of residence in any one hotel, rooming house, apartment house, tourist or trailer camp. Notwithstanding other provisions of this chapter, no tax shall be imposed upon rooms provided guests when there is no consideration involved between guest and the public lodging establishment.

(5) The tax imposed by this section shall constitute a lien on the property of the lessee or rentee of any sleeping accommodations in the same manner as and shall be collectible as are liens authorized and imposed by §§713.68 and 713.69.

(6) It is the legislative intent that every person is engaging in a taxable privilege who leases or rents parking or storage spaces for motor vehicles in parking lots or garages or who leases or rents docking or storage spaces for boats in boat docks or marinas. For the exercise of this privilege a tax is hereby levied at the rate of four per cent on the total rental charged.

*(7)(a) The tax levied by this section shall not apply to or be imposed upon or collected on the basis of rentals to any person who resides in any building or group of buildings intended primarily for lease or rent to persons as their permanent or principal place of residence.

(b) It is the intent of the legislature that this subsection provide tax relief for persons who rent living accommodations rather than own their homes, while still providing a tax on the rental of lodging facilities that primarily serve transient guests.

(c) The rental of facilities, including trailer lots, which are intended primarily for rental as a principal or permanent place of residence is exempt from the tax imposed by this chapter. The rental of facilities that primarily serve transient guests is not exempt by this subsection. In the application of this law, or in making any determination against the exemption, the department shall consider and be guided by, among other things:

1. Whether or not a facility caters primarily to the traveling public;

2. Whether less than half of its tenants have a continuous residence in excess of three months; and

3. The nature of the advertising of the facility involved.

(d) The provisions of this subsection shall become effective March 1, 1972, but shall not be construed to exempt taxes on rentals paid, or for services received, prior to March 1, 1972.

History.—§3, ch. 26319, 1949; §4, ch. 26871, 1951; §§2, 3, ch. 29883, 1955; §§2, 7, ch. 63-526; §7, ch. 63-253; §5, ch. 65-371; §2, ch. 65-420; §3, ch. 68-27; §2, ch. 68-119; §§4, 5, ch. 69-222; §15, ch. 69-353; §§21, 35, ch. 69-106; §1, ch. 71-986.
*Note.—Effective Mar. 1, 1972.
cf.—Ch. 85 Enforcement of statutory liens.

**212.031 Lease or rental of real property.—**
(1)*(a) It is declared to be the legislative intent that every person is exercising a taxable privilege who engages in the business of renting, leasing, or letting any real property unless such property is:

1. Assessed as agricultural property under §193.461.

2. Used exclusively as dwelling units.

3. Property subject to tax on parking, docking or storage spaces under §212.03(6).

*(b) When a lease involves multiple use of real property wherein a part of the real property is subject to the commercial rental tax herein, and a part of the property would be excluded from the tax under subparagraphs 1., 2., or 3. of this subsection, the department shall determine from the lease and such other information as may be available, that portion of the total rental charge which is exempt from the tax imposed by this section.

(c) For the exercise of such privilege a tax is levied in the amount equal to four per cent of and on the total rent charged for such real property by the person charging or collecting the rental.

(d) Where the rental of any such real property is paid by way of property, goods, wares, merchandise, services or other thing of value, the tax shall be at the rate of four per cent of the value of the property, services or other things of value.

(2)(a) The tenant actually occupying, using or entitled to the use of any property the rental from which is subject to taxation under this section shall pay the tax to his immediate landlord or other person granting the right to such tenant to occupy or use such real property.

(b) It is the further intent of this legislature that only one tax be collected on the rental payable for the occupancy or use of any such property and that the tax so collected shall not be pyramided by a progression of transactions and further that the amount of the tax due the state shall not be decreased by any such progression of transactions.

(3) The tax imposed by this section shall be in addition to the total amount of the rental and shall be charged by the lessor or person receiving the rent in and by a rental arrangement with the lessee or person paying the rental and shall be due and payable at the time of the receipt of such rental payment by the lessor or other person who receives said rental or payment. The owner, lessor or person receiving the rent shall remit the tax to the department at the times and in the manner hereinafter provided for dealers to remit taxes under this chapter. The same duties imposed by this chapter upon dealers in tangible personal property respecting the collection and remission of the tax, the making of returns, the keeping of books, records and accounts

and the compliance with the rules and regulations of the department in the administration of this chapter shall apply to and be binding upon all persons who manage any leases or operate real property, hotels, apartment houses, rooming houses, tourist and trailer camps, and to all persons who collect or receive such rents on behalf of such owner or lessor taxable under this chapter.

(4) The tax imposed by this section shall constitute a lien on the property of the lessee of any real estate in the same manner as, and shall be collectible as are liens authorized and imposed by §§713.68 and 713.69.

History.—§6, ch. 69-222; §§21, 35, ch. 69-106; §3, ch. 71-986.
*Note.—As amended, paragraphs (a) and (b) of subsection (1) are effective March 1, 1972.

**212.08 Sales, rental, storage, use tax; specified exemptions.**—The sale at retail, the rental, the use, the consumption, the distribution and the storage to be used or consumed in this state, of the following tangible personal property, are hereby specifically exempt from the tax imposed by this chapter.

(1) EXEMPTIONS; GENERAL GROCERIES.—There shall be exempt from the tax imposed by this chapter foods and drinks for human consumption and candy, but only when the price at which said candy is sold is twenty-five cents or less. Unless the exemption provided by subsection (7)(b) for school lunches pertains, none of such items of food and drink shall mean:

(a) Foods and drinks served, prepared, or sold in or by restaurants, drugstores, lunch counters, cafeterias, hotels, or other like places of business or by any business or place required by law to be licensed by the division of hotels and restaurants of the department of business regulation;

(b) Foods and drinks sold ready for immediate consumption from *vending machines, pushcarts, motor vehicles, or any other form of vehicle;

(c) Soft drinks; or

(d) Foods cooked and prepared on the seller's premises and sold ready for immediate consumption either on or off the premises.

(2) EXEMPTIONS, MEDICAL.—There shall be exempt from the tax imposed by this chapter medicine compounded in a retail establishment by a pharmacist licensed by the state according to an individual prescription or prescriptions written by a practitioner of the healing arts licensed by the state, and common household remedies recommended and generally sold for the relief of pain, ailments, distress or disorders of the human body, according to a list prescribed and approved by the division of health of the department of health and rehabilitative services, which said list shall be certified to the department of revenue from time to time and be included in the rules promulgated by the department; artificial eyes and limbs, eyeglasses, dentures, hearing aids, crutches, prosthetic and orthopedic appliances

and funerals. Funeral directors shall pay tax on all tangible personal property used by them in their business. This subsection shall be strictly construed and enforced.

(3) EXEMPTIONS, PARTIAL; CERTAIN FARM EQUIPMENT.—There shall be taxable at the rate of three percent the sale, use, consumption, or storage for use in this state of self-propelled or power-drawn farm equipment used exclusively by a farmer on a farm owned, leased, or sharecropped by him in plowing, planting, cultivating, or harvesting crops. The rental of self-propelled or power-drawn farm equipment shall be taxed at the rate of four percent.

(4) EXEMPTIONS, ITEMS BEARING OTHER EXCISE TAXES, ETC.—Also exempt are water (not exempting mineral water or carbonated water); all fuels used by a public or private utility, including municipal corporations and rural electric cooperative associations, in the generation of electric power or energy for sale; and motor fuels and special fuels on which a tax is imposed by chapter 206. All other fuels are taxable, except that those used to transport persons or property in interstate or foreign commerce are taxable only to the extent provided herein. The basis of the tax shall be the ratio of intrastate mileage to interstate or foreign mileage traveled by the carrier, during the previous fiscal year of the carrier, such ratio to be determined at the close of the carrier's fiscal year. This ratio shall be applied each month to the total purchases made in this state by the carrier of gasoline and other fuels to establish that portion of the total used and consumed in intrastate movement and subject to tax under this chapter. Alcoholic beverages and malt beverages are not exempt. The terms "alcoholic beverages" and "malt beverages" as used in this subsection shall have the same meaning ascribed to them in §561.01(3) and (7), respectively. It is determined by the legislature that the classification of alcoholic beverages made in this subsection for the purpose of extending the tax imposed by this chapter is reasonable and just, and it is intended that such tax be separate from, and in addition to, any other tax imposed on al coholic beverages.

(5) EXEMPTIONS; ACCOUNT OF USE.—There shall be exempt from the tax imposed by this chapter nets designed and used exclusively by commercial fisheries; feeds for raising poultry and livestock on farms and for feeding dairy cows; fertilizers, insecticides and fungicides used for application on crops or groves; portable containers used for processing farm products; field and garden seeds; nursery stock, seedlings, cuttings or other propagative material purchased for growing on or growing stock; cloth, plastic, and other similar materials used for shade, mulch, protection from frost or insects on a farm; provided that such exemption shall not be allowed unless the purchaser or lessee signs a certifi-

cate stating that the item to be exempted is for the exclusive use designated herein.

(6) EXEMPTIONS; POLITICAL SUBDIVISIONS, COMMUNICATIONS.—There shall also be exempt from the tax imposed by this chapter sales made to the United States government, the state, or any county, municipality or political subdivision of this state; provided this exemption shall not include sales of tangible personal property made to contractors employed either directly or as agents of any such government or political subdivision thereof when such tangible personal property goes into or becomes a part of public works owned by such government or political subdivision thereof, except public works in progress or for which bonds or revenue certificates have been validated on or before August 1, 1959; and further provided this exemption shall not include sales, rental, use, consumption, or storage for use in any political subdivision or municipality in this state of machines and equipment and parts and accessories therefor used in the generation, transmission, or distribution of electrical energy by systems owned and operated by a political subdivision in this state except sales, rental, use, consumption or storage for which bonds or revenue certificates are validated on or before January 1, 1973, for transmission or distribution expansion. Likewise exempt are newspapers, film rentals, when an admission is charged for viewing such film, and charges for services rendered by radio and television stations, including line charges, talent fees or license fees and charges for films, video tapes, and transcriptions used in producing radio or television broadcasts.

(7) MISCELLANEOUS EXEMPTIONS.—

(a) *Religious, charitable and educational.*— There shall be exempt from the tax imposed by this chapter articles of tangible personal property sold or leased direct to or by churches or sold or leased to, nonprofit religious, nonprofit educational, or nonprofit charitable institutions and used by such institutions in carrying on their customary nonprofit religious, nonprofit educational, or nonprofit charitable activities, including church cemeteries.

(b) *School books and school lunches.*—This exemption shall apply to school books used in regularly prescribed courses of study, and school lunches served to students, in public, parochial or nonprofit schools operated for and attended by pupils of grades one through twelve. School books and food sold or served at junior colleges and other institutions of higher learning are taxable.

(c) *Restrictive definitions.*—The provisions of this section authorizing exemptions from tax shall be strictly defined, limited and applied in each category as follows:

1. Religious institutions shall mean churches and established physical places for worship in this state at which nonprofit religious services and activities are regularly conducted and carried on.

2. Educational institutions shall mean state tax supported or parochial, church and nonprofit private schools, colleges or universities conducting regular classes and courses of study required for accreditation by or membership in the southern association of colleges and secondary schools, department of education or the Florida council of independent schools. Nonprofit libraries, art galleries and museums open to the public are defined as educational institutions and eligible for exemption.

3. Charitable institutions shall mean only nonprofit corporations operating physical facilities in Florida at which are provided charitable services, a reasonable percentage of which shall be without cost to those unable to pay.

(d) *Hospital meals and rooms.*—Also exempt from payment of the tax imposed by this chapter on rentals and meals are patients and inmates of any hospital or other physical plant or facility designed and operated primarily for the care of persons who are ill, aged, infirm, mentally or physically incapacitated or otherwise dependent on special care or attention.

(e) *Professional services.*—

1. Also exempted are professional, insurance or personal service transactions which involve sales as inconsequential elements for which no separate charges are made.

2. The above exempted personal service transactions do not exempt the sale of information services involving the furnishing of printed, mimeographed, multigraphed matter or matter duplicating written or printed matter in any other manner, other than professional services and services of employees, agents or other persons acting in a representative or fiduciary capacity or information services furnished to newspapers and radio and television stations. Information services shall mean and include the services of collecting, compiling or analyzing information of any kind or nature and furnishing reports thereof to other persons.

(f) *Magazines.*—There shall likewise be exempt from the tax imposed by this chapter subscriptions to magazines entered as second class mail sold for an annual or longer period of time.

(g) *Volunteer fire departments.*—Also exempt are fire fighting and rescue service equipment and supplies purchased by volunteer fire departments, duly chartered under the Florida Statutes as corporations not for profit.

(h) *Guide dogs for the blind.*—Also exempt are the sale or rental of guide dogs for the blind, commonly referred to as "seeing-eye dogs," and the sale of food or other items for said guide dogs or for consumption or use by such dogs.

**(i) Also exempt from payment of the tax imposed by this chapter are sales of utilities to residential households in this state by utility companies who pay the gross receipts tax imposed under §203.01.

(8) PARTIAL EXEMPTIONS, VESSELS ENGAGED IN INTERSTATE OR FOREIGN COMMERCE.—All vessels and parts thereof used to transport persons or property in interstate or foreign commerce shall be subject to the taxes imposed in this chapter only to the extent provided herein. The basis of the tax shall be the ratio of intrastate mileage to interstate or foreign mileage traveled by the carrier during the previous fiscal year. The ratio would be determined at the close of the carrier's fiscal year. This ratio applied to the total purchases by the carriers of vessels and parts thereof each month to establish that portion of the total used and consumed in intrastate movement and subject to tax at the applicable rate. Vessels and parts thereof used to transport persons or property in interstate and foreign commerce are hereby determined to be susceptible to a distinct and separate classification for taxation under the provisions of this chapter.

(9) PARTIAL EXEMPTIONS, VEHICLES ENGAGED IN INTERSTATE OR FOREIGN COMMERCE.—Vehicles and parts thereof used to transport persons or property in interstate or foreign commerce are subject to tax imposed in this chapter only to the extent provided herein. The basis of the tax shall be the ratio of intrastate mileage to interstate or foreign mileage traveled by the carrier during the previous fiscal year of the carrier, such ratio to be determined at the close of the carrier's fiscal year. This ratio shall be applied each month to the total purchases by the carriers of vehicles and parts thereof which are used in Florida to establish that portion of the total used and consumed in intrastate movement and subject to tax under this chapter.

(10) No transactions shall be exempt from the tax imposed by this chapter except those expressly exempted herein. Except for §423.02, all special or general laws granting tax exemptions, to the extent they may be inconsistent or in conflict with this chapter, including but not limited to the following designated laws, shall yield to and be superseded by the provisions of this subsection: §§153.76, 183.14, 184.17, 258.14, 315.11, 323.15(6), 340.20, 348.122, 348.65, 348.762, 349.13, 374.132, 616.07, 623.09, 637.131, 637.151, 637.291, and 637.311 and the following Laws of Florida, acts of the year indicated: §31, ch. 30843, 1955; §19, ch. 30845, 1955; §12, ch. 30927, 1955; §8, ch. 31179, 1955; §15, ch. 31263, 1955; §13, ch. 31343, 1955; §16, ch. 59-1653; §13, ch. 59-1356; §12, ch. 61-2261; §19, ch. 61-2754; §10, ch. 61-2686; §11, ch. 63-1643; §11, ch. 65-1274; §16, ch. 67-1446; and §10, ch. 67-1681.

History.—§8, ch. 26319, 1949; §§1, 2, ch. 26323, 1949; §9, ch. 26871, 1951; §1, ch. 28082, 1953; §§7, 33, ch. 29615, 1955; §§6-8, ch. 29883, 1955; §1, ch. 57-76; §1, ch. 57-398; §1, ch. 57-821; §1, ch. 57-1968; §1, ch. 57-1971; §1, ch. 59-287; §§1, 2, ch. 59-402; §§1, 2, ch. 59-448; §1, ch. 61-464; §2, ch. 61-276; §1, ch. 61-274; §7, ch. 63-253; §§5, 6, ch. 63-526; §1, ch. 63-565; §6, ch. 65-190; §1, ch. 65-358; §§7-9, ch. 65-329; §1, ch. 65-331; §5, ch. 65-371; §2, ch. 65-420; §4, ch. 67-180; §§8-12, 15, ch. 68-27; §1, ch. 69-99; §§15, 16, 19, 21, 24, 35, ch. 69-106;

§§12-16, 19, ch. 69-222; §§2, 3, ch. 70-206; §2, ch. 70-373; §7, ch. 71-360; §1, ch. 71-985.

*Note.—The tax on vending machines takes effect October 1, 1971.
**Note.—Effective March 1, 1972.

---

## CHAPTER 213

## STATE REVENUE LAWS; GENERALLY

### PART II
### MULTISTATE TAX COMPACT

213.15    Multistate tax compact.

**213.15 Multistate tax compact.**—[Articles III and IV of compact repealed by §1, ch. 71-980.]

---

## CHAPTER 214
## ADMINISTRATION OF DESIGNATED NONPROPERTY TAXES

### PART IV
### APPORTIONMENT

214.71    Apportionment; general method.

**214.71 Apportionment; general method.**—Except as otherwise provided in §§214.72 and 214.73, the base upon which any tax made applicable to this chapter shall be apportioned shall be determined by multiplying same by a fraction the numerator of which is the sum of the property factor, the payroll factor, and the sales factor and the denominator of which is three. In the event any of the factors described in subsections (1), (2), or (3) has a denominator which is zero or is determined by the department to be insignificant, the denominator of the apportionment fraction shall be reduced by the number of such factors.

(1) The property factor is a fraction the numerator of which is the average value of the taxpayer's real and tangible personal property owned or rented and used in this state during the taxable year or period and the denominator of which is the average value of such property owned or rented and used everywhere.

(a) Real and tangible personal property owned by the taxpayer shall be valued at original cost. Real and tangible personal property rented by the taxpayer shall be valued at eight times the net annual rental rate paid by the taxpayer less any annual rental rate received from sub-rentals.

(b) The average value of real and tangible personal property shall be determined by averaging the value at the beginning and the end of the taxable year or period, unless the department determines that an averaging of monthly values during the taxable year or period is reasonably required to reflect properly the average value of the taxpayer's real and tangible personal property.

(2) The payroll factor is a fraction the numerator of which is the total amount paid in this state during the taxable year or period by the taxpayer for compensation and the denominator of which is the total compensation paid everywhere during the taxable year or period.

(a) The term "compensation" shall mean wages, salaries, commissions, and any other form of remuneration paid to employees for personal services.

(b) Compensation is paid in this state if:

1. The employee's service is performed entirely within the state; or
2. The employee's service is performed both within and without the state, but the service performed without the state is incidental to the employee's service within the state; or
3. Some of the employee's service is performed in the state and
a. The base of operations or, if there is no base of operations, the place from which the service is directed or controlled is in the state, or
b. The base of operations or the place from which the service is directed or controlled is not in any state in which some part of the service is performed and the employee's residence is in this state.

(3) The sales factor is a fraction the numerator of which is the total sales of the taxpayer in this state during the taxable year or period and the denominator of which is the total sales of the taxpayer everywhere during the taxable year or period.

*(a) Sales of tangible personal property are in this state if the property is delivered or shipped to a purchaser within this state, regardless of the f.o.b. point or other conditions of the sale.

(b) Sales of a financial organization, including, but not limited to, banking and savings institutions, investment companies, real estate investment trusts, and brokerage companies, shall be in this state if derived from:

1. Fees, commissions, or other compensation for financial services rendered within this state;
2. Gross profits from trading in stocks, bonds, or other securities managed within this state;
3. Interest and dividends received within this state;
4. Interest charged to customers at places of business maintained within this state for carrying debit balances of margin accounts, without deduction of any costs incurred in carrying such accounts; and
5. Any other gross income resulting from the operation as a financial organization with this state.

(c) In computing the amounts referred to in this subsection, any amount received by a member of an affiliated group (determined under §1504(a) of the Internal Revenue Code, but without reference to whether any such corporation is an "includable corporation" under §1504(b) of the Internal Revenue Code) from another member of such group shall be included only to the extent such amount exceeds expenses of the recipient directly related thereto.

History.—§19, ch. 71-359; §2, ch. 71-980.

*Note.—Paragraph (a), as amended, effective January 1, 1972.

---

## CHAPTER 220

### INCOME TAX CODE

PART I TITLE; DECLARATIONS OF INTENT; DEFINITIONS (§§220.01-220.03)

PART II TAX IMPOSED; APPORTIONMENT (§§220.11-220.15)

PART III RETURNS; DECLARATIONS; RECORDS (§§220.21-220.242)

PART IV PAYMENTS (§§220.31-220.34)

PART V ACCOUNTING (§§220.41-220.44)

PART VI MISCELLANEOUS (§§220.51-220.53)

### PART I

### TITLE; DECLARATIONS OF INTENT; DEFINITIONS

220.01    Short title.
220.02    Legislative intent.
220.03    Definitions.

**220.01 Short title.**—This chapter shall be known and may be cited as the "Florida Income Tax Code."

History.—§1, ch. 71-984.

**220.02 Legislative intent.—**

(1) It is the intent of the legislature in enacting this code to impose a tax upon all corporations, organizations, associations, and other artificial entities which derive from this state or from any other jurisdiction permanent and inherent attributes not inherent in or avail-

able to natural persons, such as perpetual life, transferable ownership represented by shares or certificates, and limited liability for all owners. It is the intent of the legislature to subject such corporations and other entities to taxation hereunder for the privilege of conducting business, deriving income, or existing within the state. This code is not intended to tax, and shall not be construed so as to tax, natural persons who engage in a trade or business or profession in this state under their own or any fictitious name, whether individually as proprietorships or in partnerships with others, estates of decedents or incompetents, or testamentary trusts. However, corporations or other taxable entities which are or which become partners with one or more natural persons shall not, merely by reason of being a partner, exclude from their net income subject to tax their respective share of partnership net income. This statement of intent shall be given preeminent consideration in any construction or interpretation of this code in order to avoid any conflict between this code and the mandate in art. VII, §5 of the state constitution that no income tax shall be levied upon natural persons who are residents and citizens of this state.

(2)   It is the intent of the legislature that the tax levied by this code shall be construed to be an excise or privilege tax measured by net income, and that said tax shall not be deemed or construed to be a property tax or a tax on property or a tax measured by the value of property for any purpose.

(3)   It is the intent of the legislature that the income tax imposed by this code shall utilize, to the greatest extent possible, concepts of law which have been developed in connection with the income tax laws of the United States, in order to:

(a)   Minimize the expenses of the department of revenue and difficulties in administering this code;

(b)   Minimize the costs and difficulties of taxpayer compliance; and

(c)   Maximize, for both revenue and statistical purposes, the sharing of information between the state and the federal government.

(4)   It is the intent of the legislature that the tax imposed by this code shall be prospective in effect only. Consistent with this intention and the intent expressed in subsection (3), it is hereby declared to be the intent of the legislature that:

(a)   "Income," for purposes of this code, including gains from the sale, exchange, or other disposition of property, shall be deemed to be created for Florida income tax purposes at such time as said income is realized for federal income tax purposes;

(b)   No accretion of value, no accrual of gain, and no acquisition of a right to receive or accrue income which has occurred or been generated prior to November 2, 1971 shall be deemed to be "property," or an interest in property, for any purpose under this code; and

(c)   All income realized for federal income tax purposes after November 2, 1971 shall be subject to taxation in full by this state and shall be taxed in the manner and to the extent provided in this code.

History.—§1, ch. 71-984.

### 220.03   Definitions.—

(1)   SPECIFIC TERMS.—When used in this code, and when not otherwise distinctly expressed or manifestly incompatible with the intent thereof, the following terms shall have the following meanings:

(a)   "Affiliated group of corporations" means two or more corporations which constitute an affiliated group of corporations as defined in section 1504(a) of the Internal Revenue Code.

(b)   "Corporation" includes all domestic corporations; foreign corporations qualified to do business in this state or actually doing business in this state; joint-stock companies; common law declarations of trust, under chapter 609; corporations not for profit, under chapter 617; agricultural cooperative marketing associations, under chapter 618; professional service corporations, under chapter 621; foreign unincorporated associations, under chapter 622; private school corporations, under chapter 623; foreign corporations not for profit which are carrying on their activities in this state; and all other organizations, associations, legal entities, and artificial persons which are created by or pursuant to the statutes of this state, the United States, or any other state, territory, possession, or jurisdiction. The term "corporation" shall not include proprietorships, even if using a fictitious name; partnerships of any type, as such; state or public fairs or expositions, under chapters 615 and 616; estates of decedents or incompetents; testamentary trusts; or private trusts.

(c)   "Department" means the department of revenue of this state.

(d)   "Director" means the executive director of the department of revenue and, when there has been an appropriate delegation of authority, his delegate.

(e)   "Earned," "accrued," "paid," and "incurred" shall be construed according to the method of accounting upon the basis of which a taxpayer's income is computed under this code.

(f)   "Fiscal year" means an accounting period of 12 months or less ending on the last day of any month other than December or, in the case of a taxpayer with an annual accounting period of 52-53 weeks under subsection 441(f) of the Internal Revenue Code, the period determined under that subsection.

(g)   "Includes" and "including," when used in a definition contained in this code, shall not be deemed to exclude other things otherwise within the meaning of the term defined.

(h)   "Internal Revenue Code" means the United States Internal Revenue Code of 1954 as amended and in effect on November 2, 1971, except as provided in subsection (3).

(i) "Partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, including limited partnerships; and the term "partner" includes a member having a capital or a profits interest in a partnership.

(j) "Regulations" includes rules promulgated, and forms prescribed, by the department.

(k) "Returns" includes declarations of estimated tax required under this code.

(l) "State," when applied to a jurisdiction other than Florida, means any state of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, or any political subdivision of any of the foregoing.

(m) "Taxable year" means the calendar or fiscal year upon the basis of which net income is computed under this code, including, in the case of a return made for a fractional part of a year, the period for which such return is made.

(n) "Taxpayer" means any corporation subject to the tax imposed by this code, and shall include all corporations for which a consolidated return is filed under §220.131.

(2) DEFINITIONAL RULES.—When used in this code and neither otherwise distinctly expressed nor manifestly incompatible with the intent thereof:

(a) The word "corporation" or "taxpayer" shall be deemed to include the words "and its successors and assigns" as if these words, or words of similar import, were expressed;

(b) Any term used in any section of this code with respect to the application of, or in connection with, the provisions of any other section of this code shall have the same meaning as in such other section; and

(c) Any term used in this code shall have the same meaning as when used in a comparable context in the Internal Revenue Code and other statutes of the United States relating to federal income taxes, as such code and statutes are in effect on November 2, 1971. However, if subsection (3) is implemented, the meaning of any term shall be taken at the time the term is applied under this code.

(3) FUTURE FEDERAL AMENDMENTS.— On or after January 1, 1972, when expressly authorized by law, any amendment to the Internal Revenue Code shall be given effect under this code in such manner and for such periods as are prescribed in the Internal Revenue Code, to the same extent as if such amendment had been adopted by the legislature of this state. However, any such amendment shall have effect under this code only to the extent that the amended provision of the Internal Revenue Code shall be taken into account in the computation of net income subject to tax hereunder.

History.—§1, ch. 71-984.

## PART II

## TAX IMPOSED, APPORTIONMENT

220.11   Tax imposed.
220.12   Net income defined.
220.13   Adjusted federal income defined.
220.131   Adjusted federal income; affiliated groups.
220.14   Exemption.
220.15   Apportionment of adjusted federal income.

**220.11   Tax imposed.—**
(1) A tax measured by net income is hereby imposed on every taxpayer for each taxable year commencing on or after January 1, 1972, and for each taxable year which begins before and ends after January 1, 1972, for the privilege of conducting business, earning or receiving income in this state, or being a resident or citizen of this state. Such tax shall be in addition to all other occupation, excise, privilege, and property taxes imposed by this state or by any political subdivision thereof, including any municipality or other district, jurisdiction, or authority of this state.

(2) The tax imposed by this section shall be an amount equal to 5 percent of the taxpayer's net income for the taxable year.

History.—§1, ch. 71-984.

**220.12   Net income defined.—**
(1) For purposes of this code, a taxpayer's net income for a taxable year which commences on or after January 1, 1972 shall be that share of its adjusted federal income for such year which is apportioned to this state under §220.15, less the exemption allowed by §220.14.

(2) For purposes of this code, a taxpayer's net income for a taxable year which begins before and ends after January 1, 1972 shall be that amount which bears the same ratio to the taxpayer's share of adjusted federal income which is apportioned to this state for the entire year as the number of days in such year after December 31, 1971 bears to the total number of days in such year, less a like proportion of the exemption allowed by §220.14, unless the taxpayer elects to compute net income for such taxable year in the manner and under the conditions provided in subsection (3).

(3)(a) If the taxpayer so elects, in the case of a taxable year beginning before and ending after January 1, 1972, there shall be taken into account in computing adjusted federal income, before apportionment, only those items earned, received, paid, incurred, or accrued after December 31, 1971, and the exemption provided by §220.14 shall be limited to that amount which bears the same ratio to the total exemption allowable under such section, determined without regard to this subsection, as the number of days in such year after December 31, 1971 bears to the total number of days in such year.

(b)   The election provided by this subsection shall be made not later than the due date, including any extensions thereof, for filing taxpayer's return for the taxable year, in such manner as the department may by regulation prescribe. However, no such election shall be valid unless the director has given his written approval at the time of such filing or unless the director fails to object to said election in writing within 30 days after such filing.

(c)   The method of computing adjusted federal income under this subsection shall be considered extraordinary and shall only be allowed by the director in special situations where the taxpayer has demonstrated that the method for determining net income which is prescribed in subsection (2) will not reasonably reflect that portion of the taxpayer's income attributable to the period after December 31, 1971.

History.—§1, ch. 71-984.

**220.13   Adjusted federal income defined.—**
(1)   "Adjusted federal income" shall mean an amount equal to the taxpayer's taxable income as defined in subsection (2), or said taxable income of more than one taxpayer as provided in §220.131, for the taxable year, adjusted as follows:

(a)   *Additions.*—There shall be added to such taxable income:

1.   The amount of income tax paid or accrued as a liability to this state under this code which is deductible from gross income in the computation of taxable income for the taxable year;

2.   The amount of interest which is excluded from taxable income under paragraph 103(a)(1) of the Internal Revenue Code and which is not derived from obligations of the state or any of its political subdivisions;

3.   In the case of a regulated investment company or real estate investment trust, an amount equal to the excess of the net long-term capital gain for the taxable year over the amount of the capital gain dividends attributable to the taxable year.

(b)   *Subtractions.—*

1.   In computing the net operating loss deduction allowable for federal income tax purposes under section 172 of the Internal Revenue Code for the taxable year, the net capital loss allowable for federal income tax purposes under section 1212 of the Internal Revenue Code for the taxable year, the excess charitable contribution deduction allowable for federal income tax purposes under section 170 (d)(2) of the Internal Revenue Code for the taxable year, and the excess contributions deductions allowable for federal income tax purposes under section 404 of the Internal Revenue Code for the taxable year, there shall be subtracted from taxable income, in order to arrive at adjusted federal income, such amounts as reflect the following limitations:

a.   No deduction shall be allowed for net operating losses, net capital losses, and excess contribution deductions under sections 170(d)(2) and 404 of the Internal Revenue Code which are carried forward from taxable years ending prior to January 1, 1972; and

b.   The net operating loss, net capital loss, and excess contributions deductions under sections 170(d)(2) and 404 of the Internal Revenue Code, respectively, allowable for any taxable year beginning before and ending after January 1, 1972 shall be limited to an amount which bears the same ratio to the taxpayer's net operating loss, net capital loss, and excess contributions deductions under sections 170(d) (2) and 404 of the Internal Revenue Code, respectively, for the entire taxable year as the number of days in such year after December 31, 1971 bears to the total number of days in such year, unless the taxpayer elects to account separately for income under subsection 220.12 (3), in which case the net operating loss, net capital loss, and excess contributions deductions under sections 170(d)(2) and 404 of the Internal Revenue Code, respectively, allowable for such year shall be determined on the basis of the items actually earned, received, paid, incurred, or accrued after December 31, 1971; and

c.   A net operating loss and a capital loss shall never be carried back as a deduction to a prior taxable year, but all deductions attributable to such losses shall be deemed net operating loss carryovers and capital loss carryovers, respectively, and treated in the same manner, to the same extent, and for the same time periods as are prescribed for such carryovers in section 172 and section 1212, respectively, of the Internal Revenue Code.

2.   There shall be subtracted from such taxable income any amount included therein:

a.   Under section 78 or section 951 of the Internal Revenue Code;

b.   Which was derived from sales outside the United States, and from sources outside the United States as interest, as a royalty, or as compensation for technical or other services; and

c.   Which was received as a dividend from a corporation which neither transacts any substantial portion of its business in the United States nor regularly maintains any substantial portion of its assets within the United States.

However, as to any amount subtracted under this subparagraph, there shall be added to such taxable income all expenses deducted on the taxpayer's return for the taxable year which are attributable, directly or indirectly, to such subtracted amount.

3.   There shall be subtracted from such taxable income all amounts included therein which are derived from stocks, bonds, treasury notes, and other obligations of the United States.

(c)   *Installment sales.—*

1.   Unless there has been an election under subparagraph 2., any taxpayer which returns any portion of its income for federal income tax

purposes under section 453 of the Internal Revenue Code, whether or not as a dealer, shall file its return under this code, and shall compute its adjusted taxable income, including income derived from transactions treated for federal tax purposes as installment sales, in accordance with the regular method by which the taxpayer accounts, under section 446(c) of the Internal Revenue Code, for transactions which are not installment sales. In preparing its return under this code, the taxpayer shall adjust taxable income, as defined in subsection (2), by excluding therefrom all installment sale income reported in the taxable year with respect to income realized from installment sales prior to January 1, 1972 and by including therein the full amount of all income realized from installment sales, under an accrual method of accounting, on or after said date. However, for a taxable year which begins before and ends after January 1, 1972, the ratio set forth in subsection 220.12 (2) shall not be applied to the taxpayer's apportioned share of installment sale income in computing net income.

2. Any taxpayer which has elected for federal income tax purposes to report any portion of its income on the installment basis under section 453 of the Internal Revenue Code may elect so to return income from installment sales for purposes of this code. However, the election provided by this subparagraph shall only be allowed if:

a. The election is made not later than the due date, including any extensions thereof, for filing the taxpayer's return under this code, in such manner as the department may prescribe; and

b. The taxpayer consents in writing, at the time of its election, to the filing of its return without the adjustments to taxable income which are described in subparagraph 1.

3. If the taxpayer is a dealer or otherwise returns a portion of its income under section 453 of the Internal Revenue Code, an election under subparagraph 2. must be made for the taxpayer's first taxable year under this code in which a portion of its income is so returned for federal tax purposes, and said election shall apply to all subsequent taxable years for which installment sale treatment is elected for federal income tax purposes, unless the department consents in writing to the revocation of such election prior to the first taxable year for which such revocation would apply.

4. If an election is made under subparagraph 2., then, in lieu of returning the entire amount of installment sale income returned for federal income tax purposes, the taxpayer may include in income for each taxable year under this code only the amount of income which is specified in subparagraph 5., in which event the taxpayer shall also add to taxable income, as defined in subsection (2), all expenses deducted on its federal return for the taxable year with respect to installment sale income excluded from Florida net income under this provision, including collection costs and the expenses attributable to servicing sales contracts.

5. The amount to be included in taxable income under subparagraph 4. shall be limited to the sum of the following amounts:

a. An amount equal to 100 percent of the income derived from installment sale transactions consummated on or after January 1, 1972;

b. An amount equal to 70 percent of the income returned for federal income tax purposes in the taxable year which was derived from installment sale transactions consummated prior to January 1, 1972 and after December 31, 1970;

c. An amount equal to 50 percent of the income returned for federal income tax purposes in the taxable year which was derived from installment sale transactions consummated prior to January 1, 1971 and after December 31, 1968;

d. An amount equal to 25 percent of the income returned for federal income tax purposes in the taxable year which was derived from installment sale transactions consummated prior to January 1, 1969 and after December 31, 1966; and

e. An amount equal to 10 percent of the income returned for federal income tax purposes in the taxable year which was derived from installment sale transactions consummated prior to January 1, 1967.

6. The department may by regulation prescribe the methods or procedures for computing the amounts included and excluded from taxable income under subparagraphs 4. and 5.

(2) For purposes of this section, a taxpayer's taxable income for the taxable year shall mean taxable income as defined in section 63 of the Internal Revenue Code and properly reportable for federal income tax purposes for the taxable year, but subject to the limitations set forth in paragraph (1)(b) with respect to the deductions provided by sections 172 (relating to net operating losses), 170(d)(2) (relating to excess charitable contributions), 404(a)(1)(D) (relating to excess pension trust contributions), 404(a)(3) (A) and (B) (to the extent relating to excess stock bonus and profit-sharing trust contributions), 404(d) (relating to excess contributions under the 1939 code) and 1212 (relating to capital losses) of the Internal Revenue Code, except that, subject to the same limitations:

(a) "Taxable income," in the case of a life insurance company subject to the tax imposed by section 802 of the Internal Revenue Code, shall mean life insurance company taxable income; however, the amount of said income to be taken into account for purposes of this code shall never exceed, cumulatively, the excess of amounts determined under paragraph 802(b)(3) of the Internal Revenue Code as of the close of the taxpayer's taxable year over the amount determined under said paragraph as of December 31, 1971;

(b) "Taxable income," in the case of a mutual insurance company subject to the tax imposed by section 821(a) or (c) of the Internal

Revenue Code, shall mean mutual insurance company taxable income or taxable investment income, as the case may be;

(c) "Taxable income," in the case of an insurance company subject to the tax imposed by section 831(a) of the Internal Revenue Code, shall mean insurance company taxable income;

(d) "Taxable income," in the case of a regulated investment company subject to the tax imposed by section 852 of the Internal Revenue Code, shall mean investment company taxable income;

(e) "Taxable income," in the case of a real estate investment trust subject to the tax imposed by section 857 of the Internal Revenue Code, shall mean real estate investment trust taxable income;

(f) "Taxable income," in the case of a corporation which is a member of an affiliated group of corporations filing a consolidated income tax return for the taxable year for federal income tax purposes, shall mean taxable income of such corporation for federal income tax purposes as if such corporation had filed a separate federal income tax return for the taxable year and each preceding taxable year for which it was a member of an affiliated group, unless a consolidated return for the taxpayer and others is required or elected under §220.131;

(g) "Taxable income," in the case of a cooperative corporation or association, shall mean the taxable income of such organization determined in accordance with the provisions of section 1381 through 1398 of the Internal Revenue Code;

(h) "Taxable income," in the case of an organization which is exempt from the federal income tax by reason of section 501(a) of the Internal Revenue Code, shall mean its unrelated business taxable income as determined under section 512 of the Internal Revenue Code; and

(i) "Taxable income," in the case of a corporation for which there is in effect for the taxable year an election under section 1372 of the Internal Revenue Code, shall mean the amount of income subject to tax at the corporate level under paragraph 1372(b)(1) of the Internal Revenue Code for each taxable year commencing prior to July 1, 1973, and taxable income for such a corporation for each taxable year commencing on or after July 1, 1973 shall mean taxable income as defined in section 63 of the Internal Revenue Code, determined without regard to the provisions of subchapter S of said code.

History.—§1, ch. 71-984.

**220.131 Adjusted federal income; affiliated groups.—**

(1) Subject to subsection (5), any corporation subject to tax under this code which is the parent company of an affiliated group of corporations may elect, not later than the due date for filing its return for the taxable year, including any extensions thereof, to consolidate its taxable income with that of all other members of the group subject to tax under this code and to return such consolidated taxable income hereunder, in which case all such other members must consent thereto in such manner as the department may by regulation prescribe. Any Florida parent company of an affiliated group of corporations may elect to consolidate its taxable income with all other members of the affiliated group, even though some of its members are not subject to tax under this code, provided:

(a) Each member of the group consents to such filing by specific written authorization at the time the consolidated return is filed;

(b) The affiliated group so filing under this code has filed a consolidated return for federal income tax purposes for the same taxable year; and

(c) The affiliated group so filing under this code is composed of the identical component members as have consolidated their taxable incomes in said federal return.

(2) Subject to subsection (5), the director may require a consolidated return for those members of an affiliated group of corporations which are subject to tax and which would be eligible to elect to consolidate their incomes under subsection (1), if the filing of separate returns for such corporations would improperly reflect the taxable incomes of said corporations or of said group.

(3) The filing of a consolidated return for any taxable year shall require the filing of consolidated returns for all subsequent taxable years so long as the filing taxpayers remain members of the affiliated group or, in the case of a group having component members not subject to tax under this code, so long as a consolidated return is filed by such group for federal income tax purposes, unless the director consents to the filing of separate returns.

(4) The computation of consolidated taxable income for the members of an affiliated group of corporations subject to tax hereunder shall be made in the same manner and under the same procedures, including all intercompany adjustments and eliminations, as are required for consolidating the incomes of affiliated corporations for the taxable year for federal income tax purposes in accordance with section 1502 of the Internal Revenue Code, and the amount shown as consolidated taxable income shall be the amount subject to tax under this code.

(5) No taxpayer may apportion adjusted federal income under §214.72 as a member of an affiliated group which files a consolidated return under this section on the basis of apportionment factors described in §214.71, and no

taxpayer may apportion under §214.71 as a member of an affiliated group which files a consolidated return on the basis of an apportionment factor described in §214.72, but no taxpayer shall be barred from filing as a member of an affiliated group if it apportions adjusted federal income in the same manner as the parent company and all other filing members of the group.

History.—§1, ch. 71-984.

### 220.14 Exemption.—

(1) In computing a taxpayer's liability for tax under this code, there shall be exempt from the tax $5,000 of net income as defined in §220.12 or such lesser amount as will, without increasing the taxpayer's federal income tax liability, provide the state with an amount under this code which is equal to the maximum federal income tax credit which may be available from time to time under federal law.

(2) In the case of a taxable year for a period of less than 12 months, the exemption allowed by this section shall be prorated on the basis of the number of days in such year to 365.

(3) Only one exemption shall be allowed to taxpayers filing a consolidated return under this code.

(4) Notwithstanding any other provision of this code, not more than one exemption under this section shall be allowed to the Florida members of a controlled group of corporations, as defined in section 1563 of the Internal Revenue Code with respect to taxable years ending on or after December 31, 1970, filing separate returns under this code. The exemption described in this section shall be divided equally among such Florida members of the group, unless all of such members consent, at such time and in such manner as the department shall by regulation prescribe, to an apportionment plan providing for an unequal allocation of such exemption.

History.—§1, ch. 71-984.

### 220.15 Apportionment of adjusted federal income.—

Adjusted federal income as defined in §220.13 shall be apportioned to this state in accordance with part IV of chapter 214, and for the purpose of applying said part to this code:

(1) The term "sales" in paragraph 214.71 (3)(a) shall mean all gross receipts of the taxpayer except interest, dividends, rents, royalties, and gross receipts from the sale, exchange, maturity, redemption, or other disposition of securities; except that:

(a) Rental income shall be included in the term "sales" whenever a significant portion of the taxpayer's business consists of leasing or renting tangible personal property;

(b) Royalty income shall be included in the term "sales" whenever a significant portion of the taxpayer's business consists of dealing in or with the production, exploration, or development of minerals; and

(2) The term "financial organization" in paragraph 214.71(3)(b) shall include any bank, trust company, savings bank, industrial bank, land bank, safe deposit company, private banker, savings and loan association, credit union, cooperative bank, small loan company, sales finance company, or investment company; and

(3) The term "everywhere" in part IV of chapter 214, which is used in the computation of apportionment factor denominators, shall mean "in all other states of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, or any political subdivision of the foregoing," and

(4) In lieu of the equally weighted three factor apportionment fraction based on property, payroll, and sales which is described in §214.71, there shall be used for purposes of the tax imposed by this code an apportionment fraction composed of a sales factor representing 50 percent of the fraction, a property factor representing 25 percent of this fraction, and a payroll factor representing 25 percent of the fraction. However, upon application in accordance with paragraph (a), any taxpayer shall be entitled to a refund of tax, in an amount determined under paragraph (b), if it can establish that the aggregate amount of its net income subject to tax under this code and in all other states for the taxable year exceeds 100 percent of the taxpayer's taxable income, as determined for federal income tax purposes, for the taxable year.

(a) Any taxpayer eligible for a refund under this subsection shall make application therefor in accordance with procedures set forth in part I of chapter 214. All applications for refund under this subsection shall be accompanied by a copy of the taxpayer's federal income tax return for the taxable year, copies of every return filed by the taxpayer in the states in which it has conducted business for the taxable year, and verification in the form of cancelled checks or other receipts of the taxpayer's payments of the amounts shown to be due on the several returns filed with the refund application.

(b) The refund to which any taxpayer shall be entitled under this subsection shall be equal to 5 percent of the lesser of:

1. The excess of the amount subject to tax for the taxable year under this code over the amount which would have been subject to tax if the taxpayer had computed net income for purposes of this code on the basis of the apportionment fraction described in §214.71; or

2. The excess of the aggregate amount of net income subject to tax in Florida and in all other states for the taxable year over the amount of federal taxable income for the taxable year.

(c) For purposes of this subsection, the terms "net income subject to tax" and "amount subject to tax" shall mean the amount against which a rate or rates are applied in determining

the taxpayer's dollar liability for tax in any jurisdiction.

History.—§1, ch. 71-984.

## PART III

### RETURNS, DECLARATIONS, RECORDS

220.21　Returns and records; regulations.
220.22　Returns; filing requirement.
220.221　Returns; signing and verification.
220.222　Returns; time and place for filing.
220.23　Federal returns.
220.24　Declaration of estimated tax.
220.241　Declaration; time for filing.
220.242　Declaration as return.

**220.21　Returns and records; regulations.—** Every taxpayer liable for the tax imposed by this code shall keep such records, render such statements, make such returns and notices, and comply with such rules and regulations, as the department may from time to time prescribe. The director may require any taxpayer or class of taxpayers, by notice or by regulation, to make such returns and notices, render such statements, and keep such records as the director deems necessary to determine whether such taxpayer or taxpayers are liable for tax under this code.

History.—§1, ch. 71-984.

**220.22　Returns; filing requirement.—**
(1)　A return with respect to the tax imposed by this code shall be made by every taxpayer for each taxable year in which such taxpayer either is liable for tax under this code or is required to make a federal income tax return, regardless of whether such taxpayer is liable for tax under this code.

(2)　Every Florida partnership having any partner subject to tax under this code, shall make an information return setting forth:

(a)　All items of income, gain, loss, and deduction;

(b)　The names and addresses of all partners subject to tax hereunder who would be entitled to share in the net income of the partnership if distributed;

(c)　The amount and proportion of the distributive share of each partner-taxpayer; and

(d)　Such other pertinent information as the department may by form or regulation prescribe.

(3)　Whenever a receiver, trustee in bankruptcy, or assignee, by order of law or otherwise, has possession of or holds title to all or substantially all of the property or business of a taxpayer, whether or not such property or business is being operated, such receiver, trustee, or assignee shall make the returns and notices required of such taxpayer.

History.—§1, ch. 71-984.

**220.221　Returns; signing and verification.—**
(1)　A return or notice required of a taxpayer shall be signed by an officer duly authorized so to act or, in the case of a return or notice made by a fiduciary under subsection 220.22(3), by the fiduciary. The fact that an officer or fiduciary has signed a return or notice shall be prima facie evidence that the individual was authorized to sign such document on behalf of the taxpayer.

(2)　A return or notice for a partnership shall be signed by any one of the general partners, and the fact that a partner has signed a return or notice shall be prima facie evidence that such partner was authorized to sign such document on behalf of the partnership.

(3)　Each return or notice required to be filed under this code shall be verified by a written declaration that it is made under the penalties of perjury, and if prepared by someone other than the taxpayer the return shall also contain a declaration by the preparer that it was prepared on the basis of all information of which the preparer had knowledge.

History.—§1, ch. 71-984.

**220.222　Returns; time and place for filing.—**
(1)　Returns required by this code shall be filed with the office of the department in Leon County or at such other place as the department may by regulation prescribe. All returns shall be filed on or before the first day of the fourth month following the close of the taxable year, unless under subsection (2) one or more extensions of time, not to exceed 6 months in the aggregate, are granted for such filing.

(2)(a)　When a taxpayer has been granted an extension or extensions of time within which to file its federal income tax return for any taxable year, and if the requirements of §220.32 are met, the filing of a copy of such extension or extensions with the department shall automatically extend the due date of the return required under this code until 15 days after the expiration of the federal extension or until the expiration of 6 months from the original due date, whichever first occurs.

(b)　The department may grant an extension or extensions of time for the filing of any return required under this code upon receiving a prior written request therefor if good cause for an extension is shown. However, the aggregate extensions of time under paragraphs (a) and (b) shall not exceed 6 months. No extension granted under this paragraph shall be valid unless the taxpayer complies with the requirements of §220.32

History.—§1, ch. 71-984.

**220.23　Federal returns.—**
(1)　Any taxpayer required to make a return for a taxable year under this code may, at any time that a deficiency could be assessed or a refund claimed under this code in respect of any item reported or properly reportable on such return or any amendment thereof, be required to furnish to the department a true and correct copy of any return which may pertain to such item and which was filed by such taxpayer under the provisions of the Internal Revenue Code.

(2) In the event the taxable income, any item of income or deduction, or the income tax liability reported in a federal income tax return of any taxpayer for any taxable year is adjusted by amendment of such return or as a result of any other recomputation or redetermination of federal taxable income or loss, if such adjustment would affect any item or items entering into the computation of such taxpayer's net income subject to tax for any taxable year under this code, the following special rules shall apply:

(a) The taxpayer shall notify the department of such adjustment by filing either an amended return or such other report as the department may by regulation prescribe, which return or report:

1. Shall show the taxpayer's name, address, and employer identification number; the adjustments; the taxpayer's revised net income subject to tax and revised tax liability under this code; and such other information as the department may by regulation prescribe;

2. Shall be signed by a person required to sign the original return or by a duly authorized representative; and

3. Shall be filed not later than 60 days after such adjustment has been agreed to or finally determined for federal income tax purposes, or after any federal income tax deficiency or refund, abatement, or credit resulting therefrom has been assessed, paid, or collected, whichever shall first occur.

(b) If the amended return or other report filed with the department concedes the accuracy of a federal change or correction, any deficiency in tax under this code resulting therefrom shall be deemed assessed on the date of filing such amended return or report, and such assessment shall be timely, notwithstanding any other provision contained in part I of chapter 214.

(c) In any case where notification of an adjustment is required under paragraph (a), then notwithstanding any other provision contained in part I of chapter 214:

1. A notice of deficiency may be issued at any time within 2 years after the date such notification is given; or

2. If a taxpayer either fails to notify the department or fails to report a change or correction which is treated in the same manner as if it were a deficiency for federal income tax purposes, a notice of deficiency may be issued at any time;

3. In either case, the amount of any proposed assessment set forth in such notice shall be limited to the amount of any deficiency resulting under this code from recomputation of the taxpayer's income for the taxable year after giving effect only to the item or items reflected in the adjustment.

(d) In any case when notification of an adjustment is required by paragraph (a), a claim for refund may be filed within 2 years after the date on which such notification was due, regardless of whether such notice was given, notwithstanding any other provision contained in part I of chapter 214. However, the amount recoverable pursuant to such a claim shall be limited to the amount of any overpayment resulting under this code from recomputation of the taxpayer's income for the taxable year after giving effect only to the item or items reflected in the adjustment required to be reported.

History.—§1, ch. 71-984.

**220.24 Declaration of estimated tax.—**
(1) Every taxpayer shall make a declaration of estimated tax for the taxable year, in such form as the department shall prescribe, if the amount payable as estimated tax can reasonably be expected to be more than $2,500. The term "estimated tax" shall mean the amount which the taxpayer estimates to be his tax under this code for the taxable year or, in the case of a taxable year of less than 12 months, an amount of tax determined in accordance with regulations prescribed by the department.

(2) A taxpayer may amend a declaration, under regulations prescribed by the department.

History.—§1, ch. 71-984.

**220.241 Declaration; time for filing.—**
A declaration of estimated tax under this code shall be filed on or before the first day of the fifth month of each taxable year, except that if the minimum tax requirement of subsection 220.24(1) is first met:

(1) After the third month and before the sixth month of the taxable year, the declaration shall be filed on or before the first day of the seventh month;

(2) After the fifth month and before the ninth month of the taxable year, the declaration shall be filed on or before the first day of the tenth month; or

(3) After the eighth month and before the twelfth month of the taxable year, the declaration shall be filed for the taxable year on or before the first day of the succeeding taxable year.

History.—§1, ch. 71-984.

**220.242 Declaration as return.—**All of the provisions of this part and of §214.21, relating to confidentiality, shall be applicable with respect to declarations of estimated tax unless manifestly inconsistent therewith. However, the declaration required of a preparer other than the taxpayer under subsection (3) of §220.22 shall not be required with respect to declarations of estimated tax.

History.—§1, ch. 71-984.

## PART IV

## PAYMENTS

220.31   Payments; due date.
220.32   Payments of tentative tax.
220.33   Payments of estimated tax.
220.34   Special rules relating to estimated tax.

**220.31 Payments; due date.—**

(1) Every taxpayer required to file a return under this code or a notification under subsection 220.23(2) shall, without assessment, notice, or demand, pay any tax due thereon to the department at the place fixed for filing, including payment to such depository institutions throughout the state as the department may by regulation designate, on or before the date fixed for filing such return, determined without regard to any extension of time for filing the return, or notification, pursuant to regulations prescribed by the department.

(2) Except as to estimated tax payments under §220.33, the payment required under this section shall be the balance of tax remaining due after giving effect to the following:

(a) Any amount of tentative tax or estimated tax paid by a taxpayer for a taxable year pursuant to §220.32 or §220.33 shall be deemed to have been paid on account of the tax imposed by this code for such taxable year; and

(b) Any amount of a tax overpayment which is credited against the taxpayer's liability for the taxable year under §214.13 shall be deemed to have been paid on account of the tax imposed by this code for such taxable year.

History.—§1, ch. 71-984.

**220.32 Payments of tentative tax.—**

(1) In connection with any extension of the time for filing a return under subsection 220.222 (2), the taxpayer shall file a tentative tax return and pay, on or before the date prescribed by law for the filing of such return, determined without regard to any extensions of time for such filing, an amount estimated to be the balance of its proper tax for the taxable year after giving effect to any estimated tax payments under §220.33 and any tax credit under §214.13.

(2) The department shall by regulation prescribe the manner and form for filing tentative returns.

(3) Interest on any amount of tax due and unpaid during the period of any extension shall be payable as provided in §214.43.

History.—§1, ch. 71-984.

**220.33 Payments of estimated tax.—**A taxpayer required to file a declaration of estimated tax pursuant to §220.24 shall pay such estimated tax as follows:

(1) If the declaration is required to be filed on or before the first day of the fifth month of the taxable year, the estimated tax shall be paid in four equal installments. The first installment shall be paid at the time of the required filing of the declaration; the second and third installments shall be paid on or before the first day of the seventh and tenth months of the taxable year, respectively; and the fourth installment shall be paid on or before the first day of the next taxable year.

(2) If the declaration is required to be filed on or before the first day of the seventh month of the taxable year, the estimated tax shall be paid in three equal installments. The first installment shall be paid at the time of required filing of the declaration; the second installment shall be paid on or before the first day of the tenth month of the taxable year; and the third installment shall be paid on or before the first day of the next taxable year.

(3) If the declaration is required to be filed on or before the first day of the tenth month of the taxable year, the estimated tax shall be paid in two equal installments: at the time of required filing of the declaration for such taxable year and on or before the first day of the next taxable year, respectively.

(4) If the declaration is required to be filed on or before the first day of the succeeding taxable year, the estimated tax shall be paid in full at the time of such required filing.

(5) If the declaration is filed after the time prescribed in §220.241 due to the grant of an extension of time for filing, subsections (1) through (4) of this section shall not apply, and there shall be paid at the time of such filing all installments of estimated tax which would have been payable on or before such time if the declaration had been filed within the time prescribed in §220.241 and without regard to the extension, and the remaining installments shall be paid at the time at which, and in the amounts in which, they would have been payable if the declaration had been so filed.

(6) If an amended declaration is filed, the remaining installments, if any, shall be ratably increased or decreased, as the case may be, to reflect the increase or decrease in the estimated tax occasioned by such amendment.

(7) The application of this section to taxable years of less than 12 months shall be in accordance with regulations prescribed by the department.

History.—§1, ch. 71-984.

**220.34 Special rules relating to estimated tax.—**

(1) Any amount paid as estimated tax shall be deemed assessed upon the due date for the taxpayer's return for the taxable year, determined without regard to any extensions of time for filing such return.

(2) No interest or penalty shall be due or paid with respect to a failure to pay estimated taxes except the following:

(a) Except as provided in paragraph (d), the taxpayer shall be liable for interest at the rate of 6 percent per year and for a penalty in an amount determined at the rate of 10 percent per year upon the amount of any underpayment of estimated tax determined under this subsection.

(b) For purposes of this subsection, the amount of any underpayment of estimated tax shall be the excess of:

1. The amount of the installment which would be required to be paid if the estimated tax were equal to 80 percent of the tax shown on the return for the taxable year or, if no

return were filed, 80 percent of the tax for such year, over

2. The amount, if any, of the installment paid on or before the last date prescribed for payment.

(c) The period of the underpayment for which interest and penalties shall apply shall commence on the date the installment was required to be paid, determined without regard to any extensions of time, and shall terminate on the earlier of the following dates:

1. The first day of the fourth month following the close of the taxable year; or

2. With respect to any portion of the underpayment, the date on which such portion is paid.

For purposes of this paragraph, a payment of estimated tax on any installment date shall be considered a payment of any previous underpayment only to the extent such payment exceeds the amount of the installment determined under subparagraph (b)1. for such installment date.

(d) No penalty or interest for underpayment of any installment of estimated tax shall be imposed if the total amount of all such payments made on or before the last date prescribed for the payment of such installment equals or exceeds the amount which would have been required to be paid on or before such date if the estimated tax were the lesser of:

1. An amount equal to the tax computed at the rates applicable to the taxable year, but otherwise on the basis of the facts shown on the return for, and the law applicable to, the preceding taxable year; or

2. An amount equal to 80 percent of the tax finally due for the taxable year; or

3. An amount equal to the tax shown on the taxpayer's return for the preceding taxable year, if a return showing a liability for tax was filed by the taxpayer for the preceding taxable year and such preceding year was a taxable year of 12 months.

(e) For purposes of paragraphs (b) and (d), the term "tax" shall mean the excess of the tax imposed by this code over all amounts properly credited against such tax for the taxable year.

(f) The application of this subsection to taxable years of less than 12 months shall be in accordance with regulations prescribed by the department.

(g) The provisions of this subsection shall not apply with respect to any taxable year beginning before January 1, 1972.

(3) The department may provide by regulation for a credit against estimated taxes for any taxable year of any amount determined by the taxpayer or by the department to be an overpayment of the tax imposed by this code for a preceding taxable year.

History.—§1, ch. 71-984.

## PART V

## ACCOUNTING

220.41 Taxable year.
220.42 Methods of accounting.
220.43 Reference to federal determinations.
220.44 Adjustments.

### 220.41 Taxable year.—

(1) For purposes of the tax imposed by this code and the returns required to be filed, the taxable year of a taxpayer shall be the same as the taxable year of such taxpayer for federal income tax purposes.

(2) If the taxable year of a taxpayer is changed for federal income tax purposes, the taxable year of such taxpayer for purposes of this code shall be similarly changed.

(3) Notwithstanding the provisions of subsections (1) and (2), if the department terminates the taxable year of a taxpayer under the provisions of chapter 214 relating to jeopardy assessments, the tax shall be computed for the period determined by such action.

History.—§1, ch. 71-984.

### 220.42 Methods of accounting.—

(1) For purposes of this code, a taxpayer's method of accounting shall be the same as such taxpayer's method of accounting for federal income tax purposes. If no method of accounting has been regularly used by a taxpayer, net income for purposes of this code shall be computed by such method as in the opinion of the department fairly reflects income.

(2) If a taxpayer's method of accounting is changed for federal income tax purposes, the taxpayer's method of accounting for purposes of this code shall be similarly changed.

History.—§1, ch. 71-984.

### 220.43 Reference to federal determinations.—

(1) To the extent not inconsistent with the provisions of this code or forms or regulations prescribed by the department, each taxpayer making a return under this code shall take into account the items of income, deduction, and exclusion on such return in the same manner and amounts as reflected in such taxpayer's federal income tax return for the same taxable year.

(2) A final determination under the Internal Revenue Code adjusting any item or items of income, deduction, or exclusion for any taxable year shall be prima facie correct for purposes of this code to the extent such item or items enter into the determination of net income under this code.

(3) If there has been implementing legislation under subsection 220.03(3), and to the extent required in regulations prescribed by the department, any taxpayer making a return under this code may be required to indicate the item or items of income, deduction, and exclusion which would enter into the determination of income if this code were amended to incorporate the Internal Revenue Code as amended and in effect for such taxable year.

History.—§1, ch. 71-984.

**220.44 Adjustments.**—If it appears to the director that any agreement, understanding, or arrangement exists between any taxpayers, or between any taxpayer and any other person, which causes any taxpayer's net income subject to tax to be reflected improperly or inaccurately, the director may adjust any item or items of income, deduction, or exclusion, or any factor. taken into account in apportioning income to this state, to the extent necessary clearly to reflect the net income of such taxpayer.

History.—§1, ch. 71-984.

## PART VI

### MISCELLANEOUS

220.51 Promulgation of rules and regulations.
220.52 Arrangements and captions.
220.53 Adoption of chapter 214.

**220.51 Promulgation of rules and regulations.**—In accordance with the Administrative Procedure Act, chapter 120, the department is authorized to make, promulgate, and enforce such reasonable rules and regulations, and to prescribe such forms relating to the administration and enforcement of the provisions of this code, as it may deem appropriate, including:

(1) Rules for initial implementation of this code and for taxpayers' transitional taxable years commencing before and ending after January 1, 1972;

(2) Rules or regulations to clarify whether certain groups, organizations, or associations formed under the laws of this state or any other state, country, or jurisdiction shall be deemed "taxpayers" for the purposes of this code, in accordance with the legislative declarations of intent in §220.02; and

(3) Regulations relating to consolidated reporting for affiliated groups of corporations, in order to provide for an equitable and just administration of this code with respect to multicorporate taxpayers.

History.—§1, ch. 71-984.

**220.52 Arrangement and captions.**—No inference, implication, or presumption of legislative construction shall be drawn or made by reason of the location or grouping of any particular sections or provisions of this code, nor shall any caption be given any legal effect.

History.—§1, ch. 71-984.

**220.53 Adoption of chapter 214.**—The tax imposed by this chapter is hereby made subject to chapter 214, as that chapter is modified by §220.15 and by paragraphs 220.23(2)(c) and (d).

History.—§1, ch. 71-984.

## CHAPTER 253

### INTERNAL IMPROVEMENT TRUST FUND

253.015 Limitation on expenditure of trust fund.

**253.015 Limitation on expenditure of trust fund.**—Other provisions of law to the contrary notwithstanding, effective January 1, 1972 and thereafter, all revenues and receipts accruing to the board of trustees for the benefit of the internal improvement trust fund shall be available for appropriation by the legislature solely and exclusively for the acquisition of land and the incidental expenses related thereto. Effective January 1, 1972, the uncommitted fund balance of the internal improvement trust fund as of that date shall be expended or loaned only upon specific legislative appropriation or authorization.

History.—§2, ch. 71-981.

---

## CHAPTER 316

### STATE UNIFORM TRAFFIC CONTROL

316.006 Jurisdiction.
316.007 Provisions uniform throughtout state.
316.008 Powers of local authorities.

**\*316.006 Jurisdiction.**—Jurisdiction to control traffic is vested as follows:

(1) STATE.—The department of transportation shall have all original jurisdiction over all state roads throughout this state, including those within the grounds of all state institutions and the boundaries of all dedicated state parks, and may place and maintain such traffic control devices which conform to its manual and specifications upon all such highways as it shall deem necessary to indicate and to carry out the provisions of this chapter or to regulate, warn, or guide traffic.

(2) MUNICIPALITIES.—Chartered municipalities shall have original jurisdiction over all streets and highways located within their boundaries, except state roads, and may place and maintain such traffic control devices which conform to the manual and specifications of the department of transportation upon all streets and highways under their original jurisdiction as they shall deem necessary to indicate and to carry out the provisions of this chapter or to regulate, warn, or guide traffic. This subsection shall not limit those counties which have the charter powers to provide and regulate arterial, toll, and other roads, bridges, tunnels, and related facilities from the proper exercise of those powers by the placement and maintenance of traffic-control devices which conform to

the manual and specifications of the department of transportation on streets and highways located within municipal boundaries.

(3) COUNTIES.—Counties shall have original jurisdiction over all streets and highways located within their boundaries, except all state roads and those streets and highways specified in subsection (2), and may place and maintain such traffic control devices which conform to the manual and specifications of the department of transportation upon all streets and highways under their original jurisdiction as they shall deem necessary to indicate and to carry out the provisions of this chapter or to regulate, warn, or guide traffic.

History.—§1, ch. 71-135; §1, ch. 71-982.
*Note.—Effective January 1, 1972.
Note.—See former §§186.02, 317.012, 317.021 and 317.031.

**\*316.007 Provisions uniform throughout state.**—The provisions of this chapter shall be applicable and uniform throughout this state and in all political subdivisions and municipalities therein, and no local authority shall enact or enforce any ordinance on a matter covered by this chapter unless expressly authorized. However, this section shall not prevent any local authority from enacting an ordinance when such enactment is necessary to vest jurisdiction of violation of this chapter in the local court.

History.—§1, ch. 71-135; §2, ch. 71-982.
*Note.—Effective January 1, 1972.

**\*316.008 Powers of local authorities.—**

(1) The provisions of this chapter shall not be deemed to prevent local authorities, with respect to streets and highways under their jurisdiction and within the reasonable exercise of the police power, from:

(a) Regulating or prohibiting stopping, standing, or parking;

(b) Regulating traffic by means of police officers or official traffic control devices;

(c) Regulating or prohibiting processions or assemblages on the streets or highways, including all state or federal highways lying within their boundaries;

(d) Designating particular highways or roadways for use by traffic moving in one direction;

(e) Establishing speed limits for vehicles in public parks;

(f) Designating any street as a through street or designating any intersection as a stop or yield intersection;

(g) Restricting the use of streets;

(h) Regulating the operation of bicycles;

(i) Regulating or prohibiting the turning of vehicles or specified types of vehicles;

(j) Altering or establishing speed limits within the provisions of this chapter;

(k) Requiring written accident reports;

(l) Designating no-passing zones;

(m) Prohibiting or regulating the use of con-

trolled access roadways by any class or kind of traffic;

(n) Prohibiting or regulating the use of heavily traveled streets by any class or kind of traffic found to be incompatible with the normal and safe movement of traffic;

(o) Designating hazardous railroad grade-crossings in conformity to criteria promulgated by the department of transportation;

(p) Designating and regulating traffic on play streets;

(q) Prohibiting pedestrians from crossing a roadway in a business district or any designated highway except on a crosswalk;

(r) Regulating pedestrian crossings at unmarked crosswalks;

(s) Regulating persons upon skates, coasters, and other toy vehicles;

(t) Adopting and enforcing such temporary or experimental regulations as may be necessary to cover emergencies or special conditions.

(2) The municipality, through its duly authorized officers, shall have nonexclusive jurisdiction over the prosecution, trial, adjudication, and punishment of violations of this chapter when a violation occurs within the municipality and the person so charged is charged by a municipal police officer. The disposition of such matters in the municipality shall be in accordance with that municipality's charter. This subsection shall not limit those counties which have the charter power to provide and regulate arterial, toll, and other roads, bridges, tunnels, and related facilities from the proper exercise of those powers pertaining to the consolidation and unification of a traffic court system within said counties.

(3) No local authority shall erect or maintain any official traffic control device at any location so as to regulate the traffic on any state road unless approval in writing has first been obtained from the department of transportation.

History.—§1, ch. 71-135; §3, ch. 71-982.
*Note.—Effective January 1, 1972.

# CHAPTER 323

## MOTOR CARRIERS; FREIGHT-FORWARDING ACT

### PART I
### MOTOR CARRIERS

323.15 Road tax; advance deposits; lien for taxes; enforcement of lien; records; statements, etc.

**323.15 Road tax; advance deposits; lien for taxes; enforcement of lien; records; statements, etc.—**

(1) There shall be collected by July 1 of

each year from every motor carrier for each motor vehicle controlled by such motor carrier which travels over the public highways of this state, a road tax as follows:

(a) Fifteen dollars for each truck or tractor, regardless of the number of axles, which operates exclusively within twenty-five miles of its place of domicile; and fifteen dollars for each truck with two axles wherever it operates.

(b) Fifty dollars for each truck with three axles.

(c) One hundred dollars for each truck with four axles.

(d) One hundred dollars for each tractor except those controlled by carriers whose authority from the commission is limited to the transportation of household goods or mobile homes, for which the road tax shall be forty dollars; provided, however, in those instances where a carrier domiciled in Florida on or north of U. S. highway 90 and operating exclusively on or north of said highway in interstate commerce only, the road tax on each tractor so operated by said carrier shall be ten dollars.

(e) Fifty dollars for each tractor controlled by holders of only a permit issued pursuant to §323.05.

(f) Ten dollars for each truck or tractor controlled by a motor carrier holding a certificate of registration issued pursuant to §323.28, authorizing the operation in Florida of motor vehicles under exemptions provided by the interstate commerce act.

(g) Twenty-five dollars for each bus with a capacity of twelve passengers or less.

(h) Fifty dollars for each bus with a capacity of not more than twenty-one passengers.

(i) One hundred dollars for each bus with a capacity of more than twenty-one passengers.

(j) Five dollars for each motor vehicle leased to a motor carrier for not more than fifteen days pursuant to the rules and regulations of the commission.

(2) Motor carriers shall receive as evidence of payment of the road tax a plate which shall be displayed upon the vehicle for which the tax was paid. The plate is nontransferable from one vehicle to another except pursuant to the rules and regulations of the commission. However, if a vehicle is removed from service and replaced by another vehicle, a new plate will be issued at no fee pursuant to the rules and regulations of the commission.

(3) The road tax shall be applicable to all motor carriers required by this part to obtain a certificate or permit from the commission, whether or not said certificate or permit has been secured by said motor carrier.

(4) The road tax collected shall be only for the remaining portion of the year from when the motor vehicle is placed in service by the motor carrier as follows:

(a) If the annual tax is one hundred dollars and the motor vehicle is placed in service between July 1 and September 30, then one hundred dollars is to be paid; between October 1 and December 31, seventy-five dollars; between January 1 and March 31, fifty dollars; between April 1 and June 30, twenty-five dollars.

(b) If the annual tax is fifty dollars, and the motor vehicle is placed in service between July 1 and September 30, then fifty dollars is to be paid; between October 1 and December 31, thirty-seven dollars and fifty cents; between January 1 and March 31, twenty-five dollars; between April 1 and June 30, twelve dollars and fifty cents.

(c) If the annual tax is forty dollars, and the motor vehicle is placed in service between July 1 and September 30, then forty dollars is to be paid; between October 1 and December 31, thirty dollars; between January 1 and March 31, twenty dollars; between April 1 and June 30, ten dollars.

(d) If the annual tax is twenty-five dollars, and the motor vehicle is placed in service between July 1 and December 31, then twenty-five dollars is to be paid; between January 1 and June 30, twelve dollars and fifty cents.

(e) If the annual tax is fifteen dollars, and the motor vehicle is placed in service between July 1 and December 31, then fifteen dollars is to be paid; between January 1 and June 30, seven dollars and fifty cents.

(5) Pursuant to the rules and regulations of the commission, a motor carrier may lease vehicles to another motor carrier without the payment of additional road tax, provided that when the tax that has been paid on the vehicle is less than that required when the vehicle is controlled by the lessee, then the lessor may surrender his road tax plate and upon payment of the additional amount receive the required plate.

*(6) The road tax provided for in this section shall be in lieu of all other taxes and fees of every kind, character and description, state, county or municipal, including excise and license taxes levied or imposed against such motor carriers, or the operation of such business and facilities thereof, or their property, except ad valorem taxes levied upon the property other than motor vehicles of such motor carriers, the gasoline tax and motor vehicle fuel tax, the motor vehicle license tax now or hereafter provided for by law, the sales tax imposed by chapter 212, and the income tax imposed by chapter 220.

(7) The books and records of all motor carriers shall be at all times open to inspection of the commission or any agent by it appointed for such purpose. The commission shall keep a true and accurate list of all motor carriers to whom certificates shall be issued with the post office address of each.

History.—§16, ch. 14764, 1931; CGL 1936 Supp. 1335(15); §3, ch. 18026, 1937; §1, ch. 22834, 1945; §1, ch. 26663, 1951; §1, ch. 61-272; §1, ch. 63-279; §1, ch. 63-496; §1, ch. 65-337; §§1, 2, ch. 67-397; §2, ch. 71-984.

*Note.—Subsection (6), as amended, effective January 1, 1972.

cf.—§323.05 Permit to operate motor vehicles for hire.

## CHAPTER 339

## FLORIDA HIGHWAY CODE, SIXTH PART

### Financing; Miscellaneous

339.241 Florida junkyard control law.

**339.241 Florida junkyard control law.—**

(1) SHORT TITLE.—This section shall be known as the "Florida junkyard control law."

(2) DEFINITIONS.—Wherever used or referred to in this section, unless a different meaning clearly appears from the context:

(a) "Automobile graveyard" means any establishment or place of business which is maintained, used, or operated for storing, keeping, buying, or selling wrecked, scrapped, ruined, or dismantled motor vehicles or motor vehicle parts.

(b) "Junk," "junkyard," and "scrap metal processing facility" means the same as described in paragraphs 205.371 (1) (a), (b), and (e).

(c) "Areas zoned for industrial use" means all areas zoned for industrial use by municipal or county governmental units within the state or an unzoned industrial area as defined by the department and approved by the secretary of transportation. Such areas must be based upon the existence of at least one industrial activity other than the junkyard or scrap metal processing plant.

(d) "Distance from edge of right-of-way" means the distance presently defined in subsection (g), section 136, title 23, United States Code.

(e) "Fence" means an enclosure so constructed or planted and maintained as to obscure the junkyard from ordinary view to those persons passing upon the highways in this state.

(f) "Interstate highway" means the system presently defined in subsection (e), section 103, title 23, United States Code.

(g) "Federal aid primary highway" means any highway within that portion of the state highway system as included and maintained under chapter 335, including extensions of such system within municipalities, which has been approved by the secretary of transportation pursuant to subsection (b), section 103, title 23, United States Code.

(h) "Person" means any individual, firm, agency, company, association, partnership, business trust, joint stock company, or corporation.

(i) "Department" means the department of transportation of the state.

(3) RESTRICTIONS AS TO LOCATION.—No junk, junkyard, automobile graveyard, or scrap metal processing facility shall be operated or maintained within 1,000 feet of the nearest edge of the right-of-way of any interstate or primary highway, except the following:

(a) Junkyards which are screened by natural objects, plantings, fences or other appropriate means so as not to be visible from the main traveled way of the highway or otherwise removed from sight.

(b) Junkyards or scrap metal processing facilities which are located in areas which are zoned for industrial use.

(c) Junkyards or scrap metal processing facilities which are not visible from the main traveled way of any interstate or primary highway.

Any junkyard in existence on December 8, 1971 which the secretary determines cannot be screened because of topography and elevation shall not be required under this section to be removed, relocated, or disposed of until federal funds are available.

(4) REQUIREMENTS AS TO FENCES; RULES AND REGULATIONS; EXPENDITURE OF FUNDS.—

(a) A fence constructed under the provisions of this section shall be kept in good order and repair, and any advertisement thereon shall be regulated by applicable state law.

(b) The department shall have the power to promulgate rules and regulations governing the location, construction, plantings, and materials of said fence, living or otherwise.

(c) The department is authorized to spend such funds as are necessary to obtain federal-aid funds for the purposes described in this subsection.

(5) EMINENT DOMAIN.—The power of eminent domain is vested in the department to condemn such interests in land as the department shall determine are required for the purposes of screening, relocation, removal, or disposal of junkyards and scrap metal processing facilities. Such condemnation proceedings shall be maintained in the name of the department under the procedure defined and set forth in chapters 73 and 74. Such relocation, removal, or disposal, for which compensation shall be paid, shall be restricted to those projects wherein federal participation is available.

(6) ENFORCEMENT.—It is the function and duty of the department to administer and enforce the provisions of this section. In addition to the power of eminent domain, negotiation, and compensation, the department or any public official may apply to the circuit court or other court of competent jurisdiction of the county in which said junkyard or scrap metal processing facility may be located for an injunction to abate such nuisance.

(7) PENALTY.—Any person violating any provision of this section shall be subject to fine of not less than $50 or more than $200. Each day during any portion of which such violation occurs constitutes a continuing separate offense.

History.—§§1-6, ch. 71-848; §§1-7, ch. 71-972.



**D**


Doc 2015-9686 (29 pgs)

STATE OF MICHIGAN

COURT OF CLAIMS

---

EMCO ENTERPRISES, INC.,

    Plaintiff,

v

DEPARTMENT OF TREASURY,

    Defendant.

**OPINION AND ORDER**

Case No. 12-000152-MT

Hon. Michael J. Talbot

---

This matter comes before the Court pursuant to its sua sponte order to brief the Court on the application of *Int'l Business Machines Corp v Dep't of Treasury*, 496 Mich 642; 852 NW2d 865 (2014) ("*IBM*"), as well as its sua sponte order to brief the Court on why the Compact provisions should apply to a value-added tax. *Trinova Corp v Michigan Dep't of Treasury*, 498 US 358; 111 S Ct 818; 112 L Ed 2d 884 (1991). The Court concludes that pursuant to MCR 2.116(I)(2), defendant is entitled to judgment as a matter of law.

## INTRODUCTION

Plaintiff EMCO Enterprises, Inc. (EMCO), one of numerous plaintiffs with similar claims pending in the Court of Claims,[1] brings this refund action under the former Single Business Tax Act (SBTA),[2] MCL 208.1 *et seq*. EMCO claims it is entitled to reduce its SBT liability for the 2005 through 2007 tax years by electing to apportion its income using an equally weighted, three-factor apportionment formula under the Multistate Tax Compact (Compact) provisions,

---

[1] All plaintiffs are claiming SBT refunds for at least one tax year between 2005 and 2006.

[2] The SBTA was repealed effective December 31, 2007. See 2006 PA 325.

1

MCL 205.581 *et seq.*,[3] rather than the three-factor apportionment formula mandated under the SBTA.

The primary arguments made in support of plaintiff's claim are: (1) the Compact is a binding interstate agreement that applies to the SBTA, a net income tax for Compact purposes, (2) the Department's denial of a taxpayer's right to make an apportionment election under the Compact is an unconstitutional impairment of a contract under the US Const, art I, § 10, and Michigan Const 1963, art 1, § 10, and (3) the Michigan Supreme Court's decision in *IBM*, 496 Mich 642, controls the disposition of this case. The validity of these claims in the context of the SBT has not yet been considered by a Michigan court.[4]

**The principal** question before the Court is exclusively a matter of law: whether the SBT apportionment formula for the tax years in question is mandatory or whether an SBT taxpayer may elect to apportion its tax base to Michigan using the Compact's equally weighted, three-factor apportionment formula.

**BACKGROUND**

**I.      Apportionment under the Michigan Single Business Tax**

---

[3] Section 1 of 1969 PA 343, codified under MCL 205.581 *et seq.*, includes the provisions of the Compact originally enacted by parties to the Compact (Member States).

[4] The validity of similar arguments in the context of the Michigan Business Tax Act (MBTA), MCL 208.1101, *et seq.*, was addressed on July 14, 2014, by the Michigan Supreme Court in *IBM*, 496 Mich 642. Finding that the Legislature in adopting the MBTA did not repeal by implication the three-factor apportionment formula as set forth in MCL 205.581 *et seq.*, the Court concluded that the taxpayer was entitled to use the Compact's three-factor apportionment formula in calculating its 2008 taxes. The Court also found that the Modified Gross Receipts Tax (MGRT) portion of the MBT was an "income tax" for Compact purposes. On September 11, 2014, in response to *IBM*, the Legislature enacted 2014 PA 282, which retroactively repealed the Compact provisions under MCL 205.581 *et seq.*, to January 1, 2008, and mandated the use of a single-factor apportionment factor for purposes of calculating MBT. While the case presents many of the same underlying issues as were before the Court in *IBM*, the decision here involves a different tax regime (i.e., the SBTA) that preceded the MBTA as enacted under 2007 PA 36.

## A. Initial Uniform Method of Apportionment

From January 1, 1976, until the SBTA's repeal effective December 31, 2007, entities with "business activity" in Michigan were subject to the SBT.[5] Enacted as a replacement for seven different business taxes, the SBT was an "addition-method" value-added tax (VAT) that required taxpayers to calculate a tax base by starting with federal taxable income (that is, net profits), adding back compensation, depreciation and other factors, and making certain other adjustments.[6]

Under the SBTA, a taxpayer with business activity both within and without Michigan is required to apportion its tax base as provided under Chapter 208.[7] Under Chapter 208, a three-factor apportionment formula is applied to the tax base to arrive at that portion of the base that is apportioned to Michigan.[8] Throughout its history, the SBT was calculated by using a three-factor apportionment formula consisting of payroll, property, and sales. Initially, just as it had been under the former business activity tax (BAT) (1954-1966),[9] and the former corporate income tax (CIT) (1967-1975),[10] the SBT apportionment formula was a traditional, three-factor apportionment formula that equally weighted property, payroll, and sales.

By the time the SBTA was adopted, an equally weighted apportionment formula was almost universal among states with business activity taxes.[11] The formula, based on a model

---

[5] See 1975 PA 228; 2006 PA 325.
[6] *Trinova Corp*, 498 US at 366-367.
[7] MCL 208.41.
[8] MCL 208.45, MCL 208.45a.
[9] The BAT moved to an equally weighted three-factor apportionment formula in 1954. See MCL 205.553, as amended by 1954 PA 17.
[10] 1967 PA 281.
[11] Starting in 1957, when UDITPA adopted a model of three-factor apportionment formula based on the equal weighed proportion of property, payroll, and sales in a particular state, there was a general consensus that this formula was the most equitable way of dividing up a multistate

taxanalysts
DOCUMENT SERVICE_
Doc 2015-9686 (29 pgs)

formula promulgated in the late 1950s under the Uniform Division of Income for Tax Purposes Act (UDITPA),[12] represented what was widely considered the most equitable way to apportion income of a multistate business. Under this model, if every state cooperates by adopting the same apportionment formula, no more than 100% of a multistate business's income is ever taxed, and each state is assured of receiving its fair share of the multistate taxpayer's income.[13] Conversely, to the extent that formulas among states are inconsistent, the possibility exists that either more than 100% or less than 100% of a multistate business's income could be subject to state income tax.[14] A guiding principle behind the development of the basic property-payroll-sales apportionment formula under UDITPA was a desire to achieve a long-term, overall fair and uniform system of state taxation based on cooperation among states.[15]

## B.    Deviations of Apportionment Formulas

Over time, more and more states began to move away from a uniform approach to state taxation. Legislatures, looking to maximize state revenues, began to abandon the equally weighted three-factor apportionment formula in favor of a more advantageous, heavily-weighted sales factor.[16] There were two primary reasons that budget-strapped states began to change

---

taxpayer's income among states. See UDITPA, Hist and Pref Notes, 7A ULA 141-2 (2002). The UDITPA formula was later adopted under the Compact. See discussion, below.

[12] The constitutionality of the SBTA's three-factor apportionment formula was upheld in *Trinova Corp*, 498 US 358.

[13] Anand & Sansing, *The Weighting Game: Formula Apportionment as an Instrument of Public Policy*, Nat'l Tax J, Vol 53 No 2 (June 2000) at 183.

[14] *Id.*

[15] Mazerov, *The Single Sales Factor Formula for State Corporate Taxes – A Boon to Economic Development or a Costly Giveaway?*, Center on Budget and Policy Priorities (September 1, 2005), p 13, available at <http://www.cbpp.org/files/3-27-01sfp.pdf> (last visited April 6, 2015). This same desire led to enactment of the Compact. See discussion, below.

[16] After the United States Supreme Court upheld as constitutional Iowa's single factor sales-only apportionment factor in *Moorman Mfg Co v Bair*, 437 US 237; 98 S Ct 2340; 57 L Ed 2d 197 (1978), states were assured that formulas other than three-factor, equal weighted apportionment formulas were constitutional and began more heavily weighting the sales factor.

apportionment formulas. First, by increasing the weight of the sales factor, the tax burden generally shifts from in-state taxpayers with heavy property and payroll in the state, to out-of-state taxpayers with relatively little property and payroll in the state. This tends to result in an immediate tax cut for in-state companies exporting to other state and an immediate tax increase for out-of-state companies importing goods into a state.[17] The second justification for more heavily weighting the sales factor is to provide an economic incentive for an out-of-state taxpayer to increase its property and payroll in a particular state, thereby reducing a taxpayer's apportionment fraction in the state, and consequently the overall tax that had to be paid.[18]

Reflecting a trend across the country, Michigan abandoned uniform apportionment in 1991 when the legislature made a decision to more heavily weight the sales factor.[19] Subsequent legislatures continued to amend the SBT apportionment formula, each time resulting in a more heavily weighted sales factor.[20] Below is a timeline of the SBT apportionment formulas.[21]

**SBT Apportionment Formula Weights**

| Tax Year Beginning | Property | Payroll | Sales |
|---|---|---|---|
| December 31, 1990 and earlier[22] | 33.3% | 33.3% | 33.3% |
| January 1, 1991 – December 31, 1992[23] | 30% | 30% | 40% |
| January 1, 1993 – December 31, 1996[24] | 25% | 25% | 50% |

---

[17] See Pomp, *The Future of the State Corporate Income Tax: Reflections (and Confessions) of a Tax Lawyer*, 16 State Tax Notes 939 (Mar 22, 1999), p 942.

[18] *Id.*

[19] See 1991 PA 77.

[20] The driving forces behind these changes were large in-state companies with significant property and payroll in the state, and high percentages of exported, non-Michigan sales. See Lane, *SBT Formula Goes to a Vote*, Crain's Detroit Business, p 37 (Oct 2, 1995).

[21] Not at issue here are SBTA's separate apportionment formulas for tax bases derived principally from transportation, financial, or insurance carrier services or specifically allocated.

[22] See 1975 PA 228, MCL 208.45(1).

[23] See 1991 PA 77; MCL 208.45(2).

[24] See 1991 PA 77; MCL 208.45(4).

| January 1, 1997 – December 31, 1998[25] | 10% | 10% | 80% |
| January 1, 1999 – December 31, 2005[26] | 5% | 5% | 90% |
| January 1, 2006 – December 31, 2007[27] | 3.75% | 3.75% | 92.5% |

The formula for arriving at the Michigan portion of the SBT tax base, and whether SBT taxpayers were required to use such formulas for the tax years beginning in 2005, 2006 and 2007, form the basis of this dispute.

## II.     The Multistate Tax Compact

### A.     Adoption of the Compact

In 1969, Michigan adopted the Compact provisions, effective in 1970, through enactment of 1969 PA 343. The Compact itself was drafted in 1966 in response to the threat of federal intervention over matters of state income tax,[28] and went into effect in 1967 when seven states adopted the Compact provisions.[29] By 1972, 21 states had adopted the Compact to become Member States.[30] There are currently 16 Member States.[31] Michigan is a sovereignty member

---

[25] See 1995 PA 283; MCL 208.45(1).

[26] See 1995 PA 283; MCL 208.45(6), MCL 208.45a(1).

[27] Prior to the SBTA's repeal, the formula was set to move to 2.5% property. 2.5% payroll, and 95% sales on January 1, 2008. See 2005 PA 295; MCL 208.45a(2). Under the MBTA, effective Jan. 1, 2008, the formula consisted of 0% property, 0% payroll, and 100% sales. See 2007 PA 77.

[28] The federal legislation, which was never enacted, was introduced in the wake of the United States Supreme Court's decision in *Northwestern States Portland Cement Co v Minnesota*, 358 US 450; 79 S Ct 357, 3 LEd2d 421 (1959), holding that there is no Commerce Clause barrier to the imposition of a direct income tax on a foreign corporation carrying on interstate business within a taxing state.

[29] *US Steel Corp v Multistate Tax Comm'n*, 434 US 452, 454; 98 S Ct 799; 54 L Ed 2d 682 (1978).

[30] *Id.*

[31] See <http://www.mtc.gov/The-Commission/Member-States> (lasted visited March 21, 2015). Michigan was a Compact member prior to January 1, 2008 when it retroactively repealed the Compact provisions. *See* 2014 PA 282.

6

taxanalysts®
DOCUMENT SERVICE_
Doc 2015-9686 (29 pgs)

and participates in general activities of the Commission.[32] The Compact was never approved by Congress.[33]

## B. Compact Provisions

### 1. Compact Purpose

The original purposes of the Compact included: (1) "[f]acilitat[ing] proper determination of state and local tax liability of multistate taxpayers, including the equitable apportionment of tax bases and settlement of apportionment disputes," (2) "[p]romot[ing] uniformity or compatibility in significant components of [state] tax systems," (3) "[f]acilitat[ing] taxpayer convenience and compliance in the filing of tax returns and in other phases of tax administration," and (4) "[a]void[ing] duplicative taxation."[34]

### 2. The Commission

The Compact, through Article VI, established the Multistate Tax Commission (Commission).[35] The powers of the Commission are (1) to study state and local tax systems, (2) to develop and recommend proposals for greater uniformity, and (3) to compile information helpful to the states.[36] While the Commission also has powers to draft rules and regulations,

---

[32] *Id.* ("Sovereignty members are states that support the purposes of the Multistate Tax Compact through regular participation in, and financial support for, the general activities of the Commission. These states join in shaping and supporting the Commission's efforts to preserve state taxing authority and improve state tax policy and administration.") Michigan was a Compact member prior to January 1, 2008 when it retroactively repealed the Compact provisions. *See* 2014 PA 282.

[33] Though not Congressionally approved, the Compact was upheld against constitutional challenges in *US Steel*, 434 US 452.

[34] MCL 205.581, Art I.

[35] MCL 205.581, Art VI(1).

[36] MCL 205.581, Art VI(3).



each state "retains complete freedom to adopt or reject the rules and regulations of the Commission."[37]

### 3. Compact Apportionment and Election Provisions

Article IV of the Compact incorporates UDITPA's three-factor apportionment formula based on equally weighted property, payroll, and sales factors.[38]  The Compact's elective provision under Article III provides that "[a]ny taxpayer subject to an income tax whose income is subject to apportionment and allocation for tax purposes pursuant to the laws of a party state or pursuant to the laws of subdivisions in two or more party states may elect to apportion and allocate his income in the manner provided by the laws of such states or by the laws of such states and subdivisions without reference to this compact, or may elect to apportion and allocate in accordance with article IV."[39]

### 4. Miscellaneous Compact Provisions

A state can withdraw from the Compact "by enacting a statute repealing the same."[40]  In addition, as noted above, each state retains freedom under the Compact to "adopt or reject" the Commission's rules and regulations.[41]

### 5. Repeal of the Compact

On September 11, 2014, in response to *IBM*, the Legislature enacted into law 2013 SB 156 (SB 156) as 2014 PA 282.  This law retroactively repealed the Compact provisions under MCL 205.581 *et seq.*, to January 1, 2008, and mandated the use of a single-factor apportionment

---

[37] *US Steel Corp*, 434 US at 473.

[38] MCL 205.581, Art IV(1).  See also Pomp, *Reforming a State Corporate Income Tax*, J of State Taxation (Spring 2014), p 21.

[39] MCL 205.581, Art III(1).

[40] MCL 205.581, Art X(2).

[41] *US Steel*, 434 US at 473.

factor for purposes of calculating Michigan Business Tax (MBT)[42] and the CIT. The Legislature

gave the act retroactive effect by providing as follows:

> Enacting section 1, 1969 PA 343, MCL 205.581 to 205.589, is repealed retroactively and effective beginning January 1, 2008. It is the intent of the legislature that the repeal of 1969 PA 343, MCL 205.581 to 205.589, is to express the original intent of the legislature regarding the application of section 301 of the Michigan business tax act, 2007 PA 36, MCL 208.1301, and the intended effect of that section to eliminate the election provision included within section 1 of 1969 PA 343, MCL 205.581, and that the 2011 amendatory act that amended section 1 of 1969 PA 343, MCL 205.581, was to further express the original intent of the legislature regarding the application of section 301 of the Michigan business tax act, 2007 PA 36, MCL 208.1301, and to clarify that the election provision included within section 1 of 1969 PA 343, MCL 205.581, is not available under the income tax act of 1967, 1967 PA 281, MCL 206.1 to 206.713.

PA 282 thus amended the MBT to express the "original intent" of the Legislature with

regard to (1) the repeal of the Compact provisions, (2) application of the MBT's apportionment

provision under MCL 208.1301, and (3) the intended effect of the Compact's election provision

under MCL 205.581. The effect of the amendments, as written, retroactively eliminates a

taxpayer's ability to elect a three-factor apportionment formula in calculating tax liability under

both the MBT and CIT. The explicit repeal under PA 282 did not extend to the SBTA.

## LEGAL ANALYSIS

### I.   IS THE SBT AN "INCOME TAX" WITHIN THE MEANING OF THE COMPACT?

The threshold issue that must be decided by the Court is whether the SBT is an "income

tax" within the meaning of the Compact.[43] Article III of the Compact provides that with respect

to a state "income tax," a taxpayer may elect to apply the Compact's equally weighted three-

---

[42] MCL 208.1101, *et seq.*

[43] The Court's determination is limited to a finding of whether or not the SBT is an income tax for purposes of the Compact. On the issue whether the SBT is an income tax in other contexts, see *Trinova Corp*, 498 US 358, and *Gillette Co v Dep't of Treasury*, 198 Mich App 303, 310; 497 NW2d 595 (1993).

**taxanalysts**
DOCUMENT SERVICE
Doc 2015-9686 (29 pgs)

factor formula in lieu of the state's apportionment formula.[44] "Income tax" under the Compact is interpreted broadly,[45] and is defined as:

> [A] tax imposed on or measured by net income including any tax imposed on or *measured by an amount arrived at by deducting expenses from gross income,* 1 or more forms of which expenses are not specifically and directly related to particular transactions.[46]

The Court's primary goal in statutory interpretation is "to ascertain and give effect to the Legislature's intent."[47] In so doing, the Court "should first look to the specific statutory language to determine the intent of the Legislature, which is presumed to intend the meaning that the statute plainly expresses."[48]

In calculating the SBT, the tax base starts with federal taxable income.[49] Federal taxable income is gross income minus allowable deductions under the federal tax code.[50] Allowable deductions from gross income include ordinary, necessary *expenses* paid or incurred in the carrying of a trade or business.[51] The SBT then expands the income tax base by adding back some, but not all, of the federal expense deductions taken to arrive at federal taxable income.[52] For example, except for compensation, most ordinary and necessary business expenses incurred in the carrying on of a trade or business are deducted from gross income to arrive at federal

---

[44] MCL 205.581, Art III(1).

[45] See *IBM,* 496 Mich at 667 (opinion by VIVIANO, J.), explaining that the Modified Gross Receipts Tax component of the Michigan Business Tax was an "income tax" under the Compact because the tax base started with gross income and subtracted expenses not specifically and directly related to a particular transaction.

[46] MCL 205.581, Art II(4).(emphasis added).

[47] *Bronson Methodist Hosp v Allstate Ins Co,* 286 Mich App 219, 223; 779 NW2d 304 (2009).

[48] *Id.* (internal quotation marks and citations omitted.).

[49] The tax base "means business income." MCL 208.9(1). "Business income" is defined generally as "federal taxable income." MCL 208.3(3).

[50] *Mobil Oil Corp v Dep't of Treasury,* 422 Mich 473, 496-497; 373 NW2d 730 (1985).

[51] IRC § 162(a) (emphasis added).

[52] MCL 208.9(2) through 208.9(6). Certain subtractions from federal taxable income are also required. See MCL 208.9(9), 208.9(10).

taxanalysts
DOCUMENT SERVICE_
Doc 2015-9686 (29 pgs)

taxable income, but are not added back as part of the SBT tax base.[53] The resulting tax is thus in part measured by "an amount arrived at by deducting expenses from gross income" for purposes of defining income tax under the Compact.[54] That some expenses such as compensation are also added back to the SBT tax base before the tax is calculated does not alter the conclusion that the SBT is "*imposed on or measured by an amount arrived at by deducting expenses from gross income*, 1 or more forms of which expenses are not specifically and directly related to particular transactions." Under the plain language of the Compact, it is therefore an income tax for Compact purposes.

A finding that the SBT is an income tax for Compact purposes is also consistent with the Court's finding in *IBM* that the Modified Gross Receipts Tax (MGRT) portion of the MBT "fits within the broad definition of 'income tax' under the Compact by taxing a variation of net income. . . ."[55] The SBT and the MGRT, in a broad sense, are similar taxes in that they both have a "value added" component that is distinct from a tax based purely on income.[56] That these taxes are not inherently "income taxes" is reflected in nearly identical provisions under both the SBTA and the MGRT stating that "[t]he tax levied under this section and imposed is upon the privilege of doing business and *not upon income*."[57] Despite the Legislature's words that the MGRT is not a tax imposed upon income, the Court in *IBM* declined to "put a definitive label on the MGRT"[58] and unanimously found that the MGRT was an income tax for the broad purposes

---

[53] *Id.*

[54] MCL 205.581, Art II(4).

[55] *IBM*, 496 Mich at 667 (opinion by VIVIANO, J.).

[56] McIntyre & Pomp, *A Policy Analysis of Michigan's Mislabeled Gross Receipts Tax*, 53 Wayne L Rev 1275, 1281 (2008).

[57] See MCL 208.31(4). MCL 208.1203 provides that "[t]he tax levied and imposed under this section is upon the privilege of doing business *and not upon income or property.* (Emphasis added).

[58] *IBM*, 496 Mich at 663 n 70 (opinion by VIVIANO, J.).

11

<br>**taxanalysts**®<br>DOCUMENT SERVICE<br>Doc 2015-9686 (29 pgs)

of the Compact.[59] Likewise the Court here finds that the SBT is an income tax for these same broad purposes.

It should be noted that the neither the SBT nor the MGRT are treated income taxes for all purposes. For example, in *Gillette Co v Dep't of Treasury*, 198 Mich App 303, 309; 497 NW2d 595 (1993), the Court of Appeals found that the SBT is not an income tax because it is not "measured by net income" for purposes of PL 86-272, a federal law that protects certain activities of an out-of-state business from triggering income tax "nexus" with a state. Similarly, neither is the MGRT subject to PL 86-272.[60] This is so because the MGRT, like the SBT, is not "measured by net income" for purposes of PL 86-272. Nonetheless, just as the Court in *IBM* chose to interpret the Compact's definition broadly[61] and found that the MGRT "fits within the broad definition of 'income tax' under the Compact by taxing a variation of net income . . . ,"[62] the Court reaches the same conclusion here with respect to the SBT.

## II. IS THE COMPACT BINDING ON SUBSEQUENT LEGISLATURES?

The Court now addresses whether the Compact bound future legislatures under either federal compact law or Michigan law.

### A. THE COMPACT LACKS THE "CLASSIC INDICIA" OF A BINDING INTERSTATE COMPACT UNDER FEDERAL COMPACT LAW

The United State Supreme Court has recognized that not all interstate compacts are binding contracts that restrict future legislatures. See *Northeast Bancorp, Inc v Bd of Governors*, 472 US 159; 105 S Ct 2545; 86 L Ed 2d 112 (1985). While a Congressionally-approved

---

[59] *IBM*, 496 Mich at 663 (opinion by VIVIANO, J.), 668 (ZAHRA, J., concurring), 672 n 3 (McCORMACK, J., dissenting).
[60] See the Department's Revenue Administrative Bulletin 2008-4, p 5-6, making clear that PL 86-272 does not apply to the MGRT portion of the MBT, but only to the business income tax (BIT) portion of the MBT.
[61] See *IBM*, 496 Mich at 667 (opinion by VIVIANO, J.).
[62] *Id.*

12

taxanalysts®
DOCUMENT SERVICE_
Doc 2015-9686 (29 pgs)

interstate compact has the force of federal law and is binding on Member States,[63] an interstate compact that has not been approved by Congress, such as the Compact here, can be either a *binding* interstate compact or merely an *advisory* compact.[64]

The test for distinguishing between an advisory compact and a binding interstate compact is set forth in *Northeast Bancorp*, as further explained in *Seattle Master Builders Ass'n v Pacific Northwest Electric Power*, 786 F2d 1359, 1363 (CA 9, 1986). The three "classic indicia" of a binding interstate compact are: (1) the establishment of a joint regulatory body, (2) the requirement of reciprocal action for effectiveness, and (3) the prohibition of unilateral modification or repeal. *Northeast Bancorp*, 472 US at 175; *Seattle Master Builders*, 786 F2d at 1363. Looking at the three indicia of a binding interstate compact, the Compact has none of these features and is more properly characterized as a non-binding advisory compact.

### 1. The Compact did not establish a joint regulatory agency

A hallmark of an advisory compact, as opposed to a binding contract, is that advisory compacts "cede no state sovereignty nor delegate any governing power to a compact-created agency."[65] When the Compact, through Article VI, established the Commission,[66] no governing or regulatory powers were conferred. Enumerated in Article VI, the powers of the Commission are (1) to study state and local tax systems, (2) to develop and recommend proposals for greater

---

[63] The Compact Clause of the United States Constitution, art I, §10, cl 3, provides, "No State shall, without the Consent of the Congress, . . . enter into any Agreement or Compact with another State . . . ."

[64] Advisory interstate compacts have no formal or regulatory enforcement mechanisms and are intended to study and make recommendations on interstate problems. Broun, et al, The Evolving Use and the Changing Role of Interstate Compacts: A Practitioner's Guide (2006), p 13.

[65] *Id.* at 14.

[66] MCL 205.581, Art VI.

13

taxanalysts®
DOCUMENT SERVICE_
Doc 2015-9686 (29 pgs)

uniformity, and (3) to compile information helpful to the states.[67] None of these purposes is regulatory, and it in no way indicates a delegation of sovereign authority to tax.

The conclusion that the Compact did not cede state authority or governing power to the Commission was expressly acknowledged by the Court in *US Steel Corp v Multistate Tax Comm*, 434 US 452, 473; 98 S Ct 799; 54 L Ed 2d 682 (1978):

> [The Compact] does not purport to authorize the Member States to exercise any powers they could not exercise in its absence. *Nor is there any delegation of sovereign power to the Commission; each State retains complete freedom to adopt or reject the rules and regulations of the Commission.* [Emphasis added.]

In summary, the Compact, by its terms, does not create a regulatory body.

### 2. The Compact does not require reciprocal action

There is nothing reciprocal about the Compact's provisions. Each member state operates its respective tax systems independently from the tax systems of other Member States, and the determination of tax in one state is generally independent of the determination in another state. With respect to apportionment formulas, in particular, Articles III(1) and IV's application in one member state has no bearing on another state. And the functionality of one member state's apportionment methodology does not hinge on whether another member state's apportionment methodology is reciprocal in nature. As the Supreme Court recognized in *Moorman Mfg Co v Bair*, 437 US 267, 274; 98 S Ct 2340; 57 L Ed 2d 197 (1978), "the States have wide latitude in the selection of apportionment formulas . . . ." Consistent with *Moorman*, a Member State's decision to allow or eliminate a certain apportionment formula is unaffected by the choice of formula that another member state has made.

### 3. The Compact allows unilateral withdrawal and modification

---

[67] MCL 205.581, Art VI(3).

14


Doc 2015-9686 (29 pgs)

Under the express terms of the Compact, Member States are free to unilaterally withdraw at any time without notice to another member state.[68] Thus unilateral *withdrawal* is clearly permitted under the Compact.

Whether unilateral *modification* is permitted under the Compact is less clear and not directly addressed under the Compact. However, three factors lead to a conclusion that Member States did not intend to restrict their ability to vary terms of the Compact. First, as pointed out recently by the United States Supreme Court, "States rarely relinquish their sovereign powers, so when they do we would expect a clear indication of such devolution, not inscrutable silence."[69] Because there is no such "clear indication" under the terms of the Compact that states are prevented from asserting their sovereign powers to legislate and vary the Compact's terms, it is reasonable to conclude that the parties were free to unilaterally amend the Compact provisions, including Articles III(1) and IV.

Second, language in the Compact that it "shall be liberally construed as to effectuate the purposes thereof," supports an interpretation that flexibility in administering Compact provisions was contemplated.[70]

Third, the Member States' course of performance shows that unilateral amendments to or withdrawals from the Compact have long been accepted. As pointed out by the dissent in *IBM*, 496 Mich at 681-682, "[M]ember [S]tates did *not* view strict adherence to Articles III and IV as a

---

[68] MCL 205.581, Art X(2) ("Any party state may withdraw from this compact by enacting a statute repealing the same.) See also *US Steel*, 434 US at 473 ("[E]ach State retains complete freedom to adopt or reject the rules and regulations of the Commission.")

[69] *Tarrant Regional Water Dist v Herrmann*, ___ US ___; 133 S Ct 2120, 2133; 186 L Ed 2d 153 (2013).

[70] MCL 205.581, Art XII.

taxanalysts®
DOCUMENT SERVICE_
Doc 2015-9686 (29 pgs)

binding contractual obligation, as Compact members have deviated from the Compact's election and apportionment formula without objection from other members."[71]  Moreover,

> [i]t bears emphasizing that Compact members have not only refrained from bringing legal action against one another for deviating from Articles III and IV, they have endorsed the Commissioner's interpretation of the Compact: in the *Gillette* [*Co v Franchise Tax Bd*, 151 Cal Rptr 3d 106; 291 P3d 327 (2013)] litigation, all of the member states jointly filed an amicus brief urging the Supreme Court of California to reject the lower court's construction of the Compact as a binding contract. [*IBM*, 496 Mich at 682 n 7 (MCCORMACK, J., dissenting).]

Because the Compact fails to create a regulatory body, contemplates no reciprocal actions, and contains no bar to unilateral deviations or repeal, the Court concludes that none of the "classic indicia" of a binding compact exist.  Rather than a binding interstate contract, it is more properly interpreted as an advisory compact that did not act to bind future legislatures.

## B.  THE COMPACT IS NOT A BINDING CONTRACT UNDER MICHIGAN LAW

Because it was not congressionally-approved, the Compact is governed by state law.[72] Michigan law therefore governs the interpretation of the Compact.

In Michigan, there is a "strong presumption that statutes do not create contractual rights."[73]  In addition, "[i]n order for a statute to form the basis of a contract, the statutory language must be plain and susceptible of no other reasonable construction than that the

---

[71] As summarized in Hellerstein & Hellerstein, State Taxation (2014), the course of performance of states with regard to the Compact provisions generally, and the elective apportionment provisions specifically, shows that unilateral repeal and modifications to the Compact provisions have been widespread.

[72] See *Doe v Young Marines of The Marine Corps League*, 277 Mich App 391, 399; 745 NW2d 168 (2007) (finding that Michigan courts are not bound to follow a federal court's interpretation of state law.)  See also *McComb v Wambaugh*, 934 F2d 474, 479 (CA 3, 1991) (finding that because a non-Congressionally approved compact does not express federal law, it must be construed as state law.)

[73] *Studier v Mich Pub Sch Employees' Retirement Bd*, 472 Mich 642, 661; 698 NW2d 350 (2005).

taxanalysts
DOCUMENT SERVICE_
Doc 2015-9686 (29 pgs)

Legislature intended to be bound to a contract."[74] As noted in the dissent in *IBM*, "[t]his presumption is grounded in the principle that 'surrenders of legislative power are subject to strict limitations that have developed in order to protect the sovereign prerogatives of state governments.' "[75]

There are no words in the Compact, as adopted by the Legislature under 1969 PA 343, that indicate that the state intended to be bound to the Compact, and specifically to Article III(1). Therefore, the presumption must be that the state did not surrender its legislative power to require use of a particular apportionment formula. Such interpretation comports with the Supreme Court's recognition of "the basic principle[] that the States have wide latitude in the selection of apportionment formulas . . . ."[76] This interpretation is also consistent with the Court's recent acknowledgment that states "do not easily cede their sovereign powers . . . ."[77] Because there is no clear indication under MCL 205.581 that the state contracted away its ability to either select an apportionment formula that differs from the Compact, or to repeal the Compact altogether, this Court concludes that no contractual obligation was created by enactment of 1969 PA 343.[78]

---

[74] *Id.* at 662 (quotation marks and citation omitted).

[75] *IBM*, 496 Mich at 682 (MCCORMACK, J., dissenting), quoting *Studier*, 472 Mich at 661.

[76] *Moorman*, 437 US at 274.

[77] *Tarrant*, 133 S Ct at 2132.

[78] Even if the Compact could somehow be construed as a binding contract under Michigan law, the Member States' course of performance supports a determination that Member States either waived or modified the Compact's terms under Articles III(1) and IV, or materially breached the terms under Articles III(1) and IV well before the repeal of the Compact provisions under PA 282. In addition, as suggested in the dissenting opinion in *IBM*, taxpayers would have no standing to enforce the terms of any purported contract that was made with Member States.

> [I]t is not entirely clear to me why IBM has standing to enforce the Compact as a contract, given that IBM is neither a party to the Compact nor is it clear that they were intended as a third-party beneficiary. See *Schmalfeldt v North Pointe Ins Co*, 469 Mich 422; 670 NW2d 651 (2003); MCL 600.1405. In any event, because

17

tax**analysts**®
DOCUMENT SERVICE_
Doc 2015-9686 (29 pgs)

**C.    BECAUSE NO BINDING CONTRACT WAS CREATED UNDER FEDERAL OR STATE LAW, THE LEGISLATURE WAS FREE TO MANDATE THE USE OF APPORTIONMENT FORMULAS THAT DEVIATED FROM THE COMPACT**

Generally, legislatures have the power to repeal existing legislation and are not bound by the acts of prior legislatures, so long as existing contractual obligations are not impaired.[79] The principle that one legislature cannot bind a succeeding legislature is thus derived from the constitutional power of the Legislature to legislate.[80] As discussed earlier, no contract was created by enactment of the Compact provisions. Therefore, the Legislature's constitutional right to change, amend, or repeal the law could not be restricted by enactment of 1969 PA 343,[81] and the Legislature acted within the scope of its legislative powers as vested in it by the Michigan Constitution when it amended the SBTA to mandate apportionment provisions that deviated from the Compact.

**III.    DO THE COMPACT ELECTIVE PROVISION AND THE SBTA'S MANDATED APPORTIONMENT PROVISIONS APPARENTLY CONFLICT, AND IF SO, CAN THEY BE HARMONIZED?**

Having found that future legislatures were not bound by the Compact, the Court must now decide whether the Compact elective provision and the SBT apportionment formulas are in apparent conflict during the relevant tax years in question, and if so, whether they can be

---

I conclude that no such contractual relationship was formed, I find it unnecessary to address this issue *sua sponte*. [*IBM*, 496 Mich at 681 n 5 (MCCORMACK, J., dissenting).]

[79] See, e.g., *Studier*, 472 Mich at 660; *LeRoux v Secretary of State*, 465 Mich 594, 615-616; 640 NW2d 849 (2002). See also *Atlas v Wayne Co Bd of Auditors*, 281 Mich 596, 599; 275 NW 507 (1937) ("The power to amend and repeal legislation as well as to enact it is vested in the legislature, and the legislature cannot restrict or limit its right to exercise the power of legislation by prescribing modes of procedure for the repeal or amendment of statutes; nor may one legislature restrict or limit the power of its successors.")

[80] Const 1963, art 4, § 1.

[81] *Studier*, 472 Mich at 660.

18

harmonized. If the statutes are in conflict and cannot be reconciled, the Court must give effect to the later enacted and more specific statute, and find that the Legislature repealed the earlier enacted statute by implication.[82]

## A. WHETHER THE STATUTES ARE IN APPARENT CONFLICT

The SBTA directs that "[a] taxpayer whose business activities are taxable both within and without this state, *shall* apportion his tax base as provided in this chapter."[83] Under Chapter 208 of the Michigan Compiled Laws, the SBTA provides for a three-factor formula for apportioning the tax base to Michigan.[84] The three factors, property, payroll, and sales, are each multiplied by a separately stated percentage, and the results are then added together to determine the apportionment factor.[85] For 2005, the formula was the sum of the following percentages: (1) the property factor multiplied by 5%, (2) the payroll factor multiplied by 5%, and (3) the sales factor multiplied by 90%.[86] For 2006 and 2007, the formula was the sum of the following percentages: (1) the property factor multiplied by 3.75%, (2) the payroll factor multiplied by 3.75%, and (3) the sales factor multiplied by 92.5.[87]

The Compact states, in pertinent part:

> (1) Any taxpayer subject to an income tax whose income is subject to apportionment and allocation for tax purposes pursuant to the laws of a party state or pursuant to the laws of subdivisions in two or more party states may elect to apportion and allocate his income in the manner provided by the laws of such state or by the laws of such states and subdivisions without reference to this compact, or may elect to apportion and allocate in accordance with article IV. . . [88]

---

[82] *Jackson v Mich Corrections Comm'n*, 313 Mich 352, 357; 21 NW2d 159 (1946).
[83] MCL 208.41 (emphasis added).
[84] MCL 208.45; MCL 208.45a.
[85] *Id.*
[86] 1995 PA 283; MCL 208.45(6), MCL 208.45a(1).
[87] 2005 PA 295; MCL 208.45a(2).
[88] MCL 205.581, Art III(1).

**taxanalysts**
DOCUMENT SERVICE_
Doc 2015-9686 (29 pgs)

Article IV of the Compact incorporates UDITPA's three-factor apportionment formula based on equally weighted factors and consists of the sum of the following percentages: (1) the property factor multiplied by 33.3%, (2) the payroll factor multiplied by 33.3%, and (3) the sales factor multiplied by 33.3%.[89]

The goal of statutory interpretation is to determine and give effect to the Legislature's intent.[90] "The words of a statute are the most reliable indicator of the Legislature's intent and should be interpreted according to their ordinary meaning and the context within which they are used in the statute."[91]

Looking to the specific language, the SBTA directs that that a multistate SBT taxpayer "*shall* apportion his tax base as provided in this chapter."[92] The word "shall" is used to designate a mandatory provision.[93] No other words are found within the SBTA that would otherwise provide a taxpayer with the discretion to use an apportionment formula outside of Chapter 208.[94] At the same time, the specific language of the Compact *permits* a taxpayer *to elect out* of an apportionment formula and apply an equally weighted, three-factor apportionment formula.[95] Because the SBTA during the tax years in question mandates the use of one apportionment formula, while the Compact provides for the discretionary use of another apportionment formula, the statutes are in apparent conflict.

## B.   WHETHER THE STATUTES CAN BE HARMONIZED

---

[89] MCL 205.581, Art IV(1).
[90] *People v Smith*, 496 Mich 133, 138, 852 NW2d 127 (2014).
[91] *Id.*
[92] MCL 208.41 (emphasis added).
[93] *Smitter v Thornapple Twp*, 494 Mich 121, 136; 833 NW2d 875 (2013).
[94] Though not relevant here, under limited circumstances a taxpayer petition for, or the Department may require, an alternative apportionment method under the SBTA. See MCL 208.69.
[95] MCL 205.581, Art III(1) and IV.

taxanalysts
DOCUMENT SERVICE
Doc 2015-9686 (29 pgs)

In cases where the provisions of two statutes are in apparent conflict, as is the case here, and where the provisions relate to the same subject, as do the SBT apportionment provisions for the tax years in question and the Compact's elective provision, the Court must attempt to harmonize the statutes by reading them together *in pari materia*.[96] The process for attempting to harmonize two statutes was set forth by the lead opinion in *IBM*:

> The endeavor should be made, by *tracing the history of legislation* on the subject, *to ascertain the uniform and consistent purpose of the legislature, or* to discover how the *policy of the legislature with reference to the subject-matter has been changed or modified from time to time.* In other words, in determining the meaning of a particular statute, *resort may be had to the established policy of the legislature as disclosed by a general course of legislation.* With this purpose in view therefore it is proper to consider, not only acts passed at the same session of the legislature, but also *acts passed at prior and subsequent sessions.*[97]

In reference to the subject matter of apportionment formulas, it is thus the duty of this Court to read the conflicting statutes together and determine whether the Legislature had a "uniform and consistent purpose," or whether its policies with respect to apportionment have "been changed or modified from time to time."[98] The doctrine of *in pari materia* is not without restrictions, however, and "does not permit the use of a previous statute to control by way of former policy the plain language of a subsequent statute . . . ."[99]

## 1. History and General Course of Apportionment Legislation

As discussed below, the purpose and policies behind the Compact and equally weighted, three-factor apportionment formula, and the reasons why the Legislature eventually abandoned

---

[96] *IBM*, 496 Mich at 652-653 (opinion by VIVIANO, J.), quoting *Rathbun v Michigan*, 284 Mich 521, 544; 280 NW 35 (1938). "Statutes *in pari materia* are those . . . which have a common purpose . . . ." *Id.*

[97] *IBM*, 496 Mich at 652-653 (opinion by VIVIANO, J.), citing *Rathbun*, 284 Mich at 543-544 (emphasis added; citation and quotation marks omitted.)

[98] *Id.*

[99] *Voorhies v Faust*, 220 Mich 155, 157-158; 189 NW 1006 (1922).

taxanalysts®
DOCUMENT SERVICE_
Doc 2015-9686 (29 pgs)

the formula and replaced it with a progressively heavier weighted sales factor, are key to resolving the issue of whether the statutes here can be harmonized.

When it was enacted into Michigan law in 1969, two of the Compact's stated purposes were to "[p]romote uniformity or compatibility in significant components of tax systems" and to "[a]void duplicative taxation."[100] At the time, Michigan had long since embraced a cooperative, unified approach to taxation, having adopted an equally weighted, three-factor apportionment formula in the 1950s under the BAT, and again in 1967 under the Income Tax Act ITA.[101] Thus the apportionment formulas of the ITA and the Compact were redundant, and the Compact's elective provision had no relevance to a multistate taxpayer seeking a more advantageous apportionment formula.

The Legislature's policy of adhering to an almost universal, uniform system of state taxation carried over to the SBTA as enacted in 1975.[102] Once again, just as the Legislature had done under the ITA, an equally weighted, three-factor apportionment formula was adopted from UDITPA.[103] And once again, because the apportionment formulas of the SBTA and the Compact were essentially mirror images of each other, the Compact's elective provision had no relevant application.

A turning point in Michigan tax policy occurred in 1991, when Michigan joined with many other states that had abandoned old tax policies based on cooperation, uniformity and

---

[100] MCL 205.581, Art I(2), (4).

[101] By the late 1960s, nearly all states with a corporate income tax uniformly used equally weighted, three-factor apportionment formulas. McClure, *Understanding Uniformity and Diversity in State Corporate Income Taxes*, Nat'l Tax J, Vol LXI, No 1 (March 2008), p 156. As the Supreme Court observed in *Trinova Corp*, the equally weighted, three-factor apportionment factor had become "something of a benchmark against which other apportionment formulas are judged." *Trinova Corp*, 498 US at 380-381 (citation and quotation marks omitted).

[102] See 1969 PA 343, MCL 208.41, 45.

[103] See discussion above on UDITPA. See also *Reforming a State Corporate Income Tax*, J of State Taxation (Spring 2014) at 21.

22

taxanalysts
DOCUMENT SERVICE
Doc 2015-9686 (29 pgs)

equal weighting of apportionment factors and had begun to more heavily weight the sales factor.[104] For the first time since Michigan had adopted an equally weighted, three-factor apportionment formula in 1954,[105] the sales factor was now weighted more heavily.[106] The Legislature made subsequent changes to the SBT apportionment formula in 1995 and 2005, each time increasing the weight of the sales factor. Finally, in 2007 when the Legislature adopted the MBTA, the apportionment factor moved to a single factor apportionment formula based 100% on sales,[107] and that formula remains in effect under the CIT.[108]

## 2. Modifications of Legislature's Policies of Uniform Apportionment

The Legislature's policies behind these apportionment formula changes and why it chose to progressively move towards a more heavily weighted sales factor are relevant in the Court's attempt to read the statute *in pari materia*. The primary reason that Michigan departed from a uniform, agreed-upon apportionment formula was the same reason that other states abandoned equally weighted, three-factor apportionment: "to gain a competitive advantage – or to avoid a competitive disadvantage."[109] Legislative analyses of bills that increased the weight of the sales factor in SBT's apportionment support this rationale.

---

[104] See also Mazerov, *The Single Sales Factor Formula for State Corporate Taxes – A Boon to Economic Development or a Costly Giveaway?*, Center on Budget and Policy Priorities (September 1, 2005), available at <http://www.cbpp.org/files/3-27-01sfp.pdf> (last visited April 6, 2015).

[105] 1954 PA 17.

[106] 1991 PA 77. As the revenue effect of this change, see *A Policy Analysis*, 53 Wayne L Rev at 1279 ("The result of this shift in weighting was to greatly reduce the tax on firms manufacturing entirely in Michigan for export whereas the tax on firms manufacturing outside the State for sale in Michigan was increased.")

[107] See 2007 PA 36, MCL 208.1301, 1303.

[108] 1967 PA 281, § 601, added by 2011 PA 38, effective Jan. 1, 2012, MCL 206.661, MCL 206.663(3).

[109] *Understanding Uniformity*, Nat'l Tax J, Vol LXI, No 1 at 152. Any question as to the constitutionality of a heavily weighted apportionment formula was settled by the Supreme Court in *Moorman*, 437 US 267 (upholding Iowa's single factor apportionment formula based on

**tax**analysts®
DOCUMENT SERVICE_
Doc 2015-9686 (29 pgs)

Specifically, the legislative analysis under 1991 SB 69, the bill that led to the abandonment of equally weighted apportionment under the SBTA, reveals that the mandatory weighting of the sales factor was intended to benefit multistate companies headquartered in Michigan at the expense of "multistate firms that are principally based elsewhere but exploit Michigan markets."[110] Further, the change to a mandated apportionment formula with a heavily weighted sales factor "would serve as an inducement for capital-intensive businesses to locate here, while protecting Michigan home-based companies from other states that apportion to themselves a greater part of the companies' business activity."[111] And as warned in the opposing arguments of the same bill, "once the double-double [sales factor] apportionment formula took effect, more of the tax liability would be shifted to out-of-state firms."[112]

The Legislature's purpose in abandoning the 33.3% sales factor in 1991, as well as its purpose in progressively moving towards a 100% sales factor under the MBT and CIT, is well documented, and consistent with the purposes of most other states that have now abandoned the "benchmarked" uniform apportionment formula.[113] "[T]he Legislature is presumed to be aware of, and thus to have considered the effect on, all existing statutes when enacting new laws."[114] However, there is no rational way to conclude that the Legislature intended to abandon a uniform apportionment formula, mandate the use of a new formula designed to in part shift the tax burden to out-of-state taxpayers, and at the same time permit those same out-of-state taxpayers to elect

---

sales.). This decision "opened the floodgates for states wanting to change their apportionment formulas for competitive reasons." *Understanding Uniformity*, Nat'l Tax J, Vol LXI, No 1 at 152.

[110] Senate Legislative Analysis, SB 69 (Substitute S-13 as passed by the Senate), June 13, 1991, p 6.

[111] *Id.*

[112] *Id.*

[113] See generally, *Understanding Uniformity*, Nat'l Tax J, Vol LXI, No 1.

[114] *Walen v Dep't of Corrections*, 443 Mich 240, 248; 505 NW2d 519 (1993), citing *Malcolm v East Detroit*, 437 Mich 132, 139, 468 NW2d 479 (1991).

taxanalysts®
DOCUMENT SERVICE_
Doc 2015-9686 (29 pgs)

back in to the old apportionment formula. And there would otherwise have been no point in changing the apportionment formula to encourage out-of-state firms to increase their property and payroll in Michigan, and no incentive provided to such companies to do so, if an election could be made to disregard the heavily-weighted statutory formula.

Further, the fact that the Legislature changed the weight of the apportionment formula's sales factor multiple times over the course of almost 16 years *without once* making reference to the Compact's elective provision in the bills or legislative analyses, is strong evidence that the uniform principle of state taxation adopted by the state in 1954 and reaffirmed by its adoption of the Compact in 1969, no longer had a place in the state's apportionment policy. This silence also gives meaning and understanding to what the Legislature intended to accomplish when it first abandoned uniform apportionment in 1991 and continued to more heavily weight the sales factor until adopting a single sales factor formula in 2007 under the MBTA.

In light of the " 'established policy of the legislature as disclosed by a general course of legislation,' "[115] and the prohibition against "use of a previous statute to control by way of former policy the plain language of a subsequent statute,"[116] the Court concludes that the SBTA's mandated apportionment provision for the tax years in question and the Compact's elective provision cannot be harmonized.

## C.    IMPLIED REPEAL OF FORMER STATUTE BY ENACTMENT OF THE LATER STATUTE

Finally, where two statutes are irreconcilable and cannot be harmonized, "as a general rule, a more recently enacted statute takes precedence over an earlier one, especially if the more

---

[115] *IBM*, 496 Mich at 652-653 (opinion by VIVIANO, J.), (citation omitted).
[116] *Voorhies*, 220 Mich at 157-158.

**tax**analysts®
DOCUMENT SERVICE_
Doc 2015-9686 (29 pgs)

recent one is also more specific."[117] Further, unless the subsequent act was intended as a complete substitute of the first, " '[t]he rule is that the latter act operates *to the extent of the repugnancy*, as a repeal of the first . . . .' "[118] As discussed above, the SBTA and the Compact irreconcilably conflict to the extent of the mandated post-1990 SBT apportionment provision and the Compact's elective provision. Therefore the SBTA's apportionment provision controls, and as of January 1, 1991, must be considered a repeal of the Compact's elective provision.[119]

The Court acknowledges that there is a strong presumption against implied repeals.[120] However, "[they] do happen, and, when clear, must be given effect."[121] In addition, the presumption against implied repeal is weakened where the question involves an obscure, forgotten statute.[122] The Compact elective provision is one such statute.[123] The elective provision essentially lay dormant and was of no use from its January 1, 1970 effective date through December 31, 1990, because during that time period the ITA and SBTA's mandated

---

[117] *City of Kalamazoo v KTS Indus, Inc*, 263 Mich App 23, 34-35; 687 NW2d 319 (2004) (citation omitted).

[118] *Jackson*, 313 Mich at 357 (citation omitted).

[119] The Court limits its decision to the implied repeal of the Compact's elective provision only, and not to the repeal of the entire Compact which was made through 2014 PA 282, effective January 1, 2008. As noted earlier, the Court rejects any arguments made that the legislatures subsequent to 1969 were not free to vary the terms of the Compact, or that repeal of the Compact could only be made on an "all or nothing" basis. For a contrary view, see *Gillette Co v Franchise Tax Bd*, 209 Cal App 4th 938; 147 Cal Rptr 3d 603 (2012), review granted and opinion superseded sub nom *Gillette v Franchise Tax Bd*, 151 Cal Rptr 3d 106; 291 P3d 327 (2013) (". . . the plain language of the withdrawal provision, enabling a party state to withdraw from the Compact 'by enacting a statute repealing the same,' allows only for complete withdrawal from the Compact. . . . Faced with the desire to escape an obligation under the Compact, a state's only option is to withdraw completely by enacting a repealing statute.")

[120] *Jackson*, 313 Mich at 356.

[121] *Id*. at 357 (internal citations omitted.)

[122] 1A Sutherland Statutory Construction § 23:26 (7th ed), p 535, citing *W L Mead, Inc v Int'l Bros of Teamsters*, 217 F2d 6, 9 (CA 1, 1954). (The presumption against implied repeal carries less weight where the earlier statute is an "obscure and generally forgotten" one.)

[123] See Herbert & Mayster, *The Multistate Tax Compact -- A Promise Forgotten*, 66 State Tax Notes 597 (2012).

taxanalysts®
DOCUMENT SERVICE_
Doc 2015-9686 (29 pgs)

apportionment formulas were the same as under the Compact. When the Legislature later changed the apportionment formula to more heavily weight the sales factor in 1991, 1995, 2005 and 2007, there is no evidence in the legislative analyses to suggest that the Legislature gave any consideration to the dormant elective provision of the Compact or to the potential fiscal impact of a taxpayer electing out of a mandated apportionment formula. What *is* clear from the legislative analyses is that the Legislature anticipated that by changing the apportionment formula to more heavily weight the sales factor, companies with significant sales in Michigan, but with little physical presence in the state, would "experience a substantial tax increase."[124] This conclusion could not have been rationally reached if the Legislature had been aware of the "obscure and generally forgotten" elective provision of the Compact.[125]

## IV.  IS DENIAL OF TAXPAYER'S RIGHT TO ELECT THREE-FACTOR APPORTIONMENT A VIOLATION OF THE COMMERCE AND DUE PROCESS CLAUSES OF THE UNITED STATES CONSTITUTION?

The Court rejects arguments made by plaintiff that denial of a taxpayer's use of an equally weighted, three-factor apportionment formula is unconstitutional under the Commerce and Due Process Clauses of the United States Constitution.

---

[124] Senate Legislative Analysis, SB 342, February 8, 1996. It was not just the Legislature and its constituents who failed to consider the potential impact of the Compact's elective provision. For example, at the House Tax Policy Committee hearing on SB 342 in September 1995, Marathon Oil, an out-of-state company with sales in Michigan but little or no payroll or property in the state, testified against the bill, suggesting that it was unfair to out-of-state taxpayers. *Michigan Single Sales Factor Bill Creates Controversy*, State Tax Notes, 95 STN 183-16 (September 21, 1995). If the Compact provisions had applied, there would have been no need for such testimony because any perceived unfairness would not have existed. See also Lane, *Committee Expects SBT Vote 'Thursday for Sure,'* Crain's Detroit Business, p 4 (October 9, 1995) (". . . major out-of-state corporations have fought against giving more weight to the sales factor in the SBT apportionment formula, calling instead for SBT relief they say would be more widespread and less selective.")

[125] See *W L Mead, Inc*, 217 F2d at 9.

taxanalysts®
DOCUMENT SERVICE_
Doc 2015-9686 (29 pgs)

First, plaintiff's constitutional claims are untimely. Under MCL 205.27a(7), "a claim for refund based upon the validity of a tax law based on the laws of the constitution of the United States or the state constitution of 1963" must be filed within 90 days after the due date set for the filing of the returns. Because plaintiff did not assert its constitutional claims within the 90 day period, no valid refund claim can be made on the basis of either Commerce Clause or due process violations.

Further, even if plaintiff had timely filed these constitutional claims, these very same issues were decided long ago by the Supreme Court in *Moorman*, 437 US at 274. There, the Court rejected the taxpayer's assertion that it is unconstitutional to require an out-of-state company to use Iowa's single sales factor apportionment formula rather than an equally weighted, three-factor formula. The Court stated:

> The only conceivable constitutional basis for invalidating the Iowa statute would be that the Commerce Clause prohibits any overlap in the computation of taxable income by the States. If the Constitution were read to mandate such precision in interstate taxation, the consequences would extend far beyond this particular case. For some risk of duplicative taxation exists whenever the States in which a corporation does business do not follow identical rules for the division of income. Accepting appellant's view of the Constitution, therefore, would require extensive judicial lawmaking.[126]

The Court further noted that it is for Congress, not the Court, to decide whether a particular uniform apportionment formula can be imposed on a state:

> It is clear that the legislative power granted to Congress by the Commerce Clause of the Constitution would amply justify the enactment of legislation requiring all States to adhere to uniform rules for the division of income. It is to that body, and not this Court, that the Constitution has committed such policy decisions.[127]

---

[126] *Moorman*, 437 US at 278.
[127] *Id.* at 280.

28

taxanalysts®
DOCUMENT SERVICE_
Doc 2015-9686 (29 pgs)

In conclusion, even if plaintiff's constitutional claims had been timely filed, denial of plaintiff's right to make an election to use an equally weighted, three-factor apportionment formula does not violate either the Due Process or Commerce Clauses of the United States Constitution.

## V. CONCLUSION

The Court, in fulfilling its duty to ascertain and apply the intent of the Legislature, finds that the taxpayer is required to use the apportionment formulas mandated under the SBTA for the tax years in question, and is not entitled to elect a different apportionment formula under the Compact. Though the SBT is an income tax within the meaning of the Compact, future legislatures were not bound by the policies of the legislature that enacted 1969 PA 343. The purpose of state tax uniformity as embedded in both the Compact's apportionment elective provision by the 1969 legislature, and the SBTA's equally weighted, three-factor apportionment formula as originally enacted by the 1975 legislature, is not consistent with the purpose of later amendments made to apportionment formulas by the Legislature. Under traditional rules of statutory construction, the apportionment formula under the SBTA for the tax years in question must control.

IT IS HEREBY ORDERED that summary disposition is granted to defendant pursuant to MCR 2.116(I)(2).

This order resolves the last pending claim and closes the case.

Dated:  **APR 2 1 2015**

_____
Hon. Michael J. Talbot
Chief Judge, Court of Claims

**E**


Doc 2014-30320 (34 pgs)

**STATE OF MICHIGAN**

**COURT OF CLAIMS**

YASKAWA AMERICA, INC.,

          Plaintiff,

          **OPINION AND ORDER**

v

          Case No.  11-000077-MT

DEPARTMENT OF TREASURY,

          Hon. Michael J. Talbot

          Defendant.

This matter comes before the Court pursuant to its sua sponte order issued to plaintiff Yaskawa America, Inc., to show cause why judgment should not be entered in favor of defendant Department of Treasury (Department) in light of the retroactive effect of 2014 PA 282 (PA 282). Having reviewed the responses to the order, the Court concludes that the Department is entitled to judgment as a matter of law and so GRANTS summary disposition in favor of the Department pursuant to MCR 2.116(I)(1).

**INTRODUCTION**

This case is one of many cases currently pending in the Court of Claims involving taxpayers that have claimed refunds of tax under the Michigan Business Tax (MBT) Act, MCL 208.1101 *et seq.*, based on an election to utilize a three-factor apportionment formula under the Multistate Tax Compact (Compact) provisions, MCL 205.581 *et seq.*[1]  The underlying premise

---

[1] Section 1 of 1969 PA 343, codified under MCL 205.581 *et seq.*, includes the provisions of the Compact originally enacted by parties to the Compact (Member States).

Doc 2014-30320 (34 pgs)

of these claims is that the elective three-factor apportionment provision of the Compact, as adopted by 1969 PA 343, remained viable under the MBT Act, as enacted by 2007 PA 36. Use of the single-factor apportionment formula under the MBT Act, it is argued, is not mandated because the Compact provisions, including the three-factor apportionment election provisions, remain in effect.[2]

The validity of this argument was addressed on July 14, 2014, by the Michigan Supreme Court in *Int'l Business Machines Corp v Dep't of Treasury*, 496 Mich 642; 852 NW 2d 865 (2014) ("*IBM*"). Finding that the Legislature, in adopting the MBT Act, did not repeal by implication the three-factor apportionment formula as set forth in MCL 205.581 *et seq.*, the Court concluded that the taxpayer was entitled to use the Compact's three-factor apportionment formula in calculating its 2008 taxes.

On September 11, 2014, in response to *IBM*, the Legislature enacted PA 282, which retroactively repealed the Compact provisions under MCL 205.581 *et seq.*, to January 1, 2008, and mandated the use of a single-factor apportionment formula for purposes of calculating MBT.

The Court now considers the retroactive application of PA 282. Having considered the arguments made in response to the Court's show cause order, and for the reasons stated below, the Court concludes that PA 282 retroactively applies to this case, and all pending MBT refund actions filed in reliance on the Compact's elective, three-factor apportionment formula under the former MCL 205.581 *et seq*.

---

[2] Taxpayers in some of these cases have also argued that the Compact provisions remain in effect with regard to the Income Tax Act, MCL 206.1 *et seq*.

## **BACKGROUND**

### **History of the Compact**

The Compact is an interstate tax agreement that was originally enacted in 1967 by the legislatures of seven states. The Compact was initially drafted out of concerns of state sovereignty in reaction to the introduction of federal legislation that sought to regulate various areas of state taxation.[3] The original purposes of the Compact included:

> (1) facilitating proper determination of state and local tax liability of multistate taxpayers, including the equitable apportionment of tax bases and settlement of apportionment disputes; (2) promoting uniformity and compatibility in state tax systems; (3) facilitating taxpayer convenience and compliance in the filing of tax returns and in other phases of tax administration; and (4) avoiding duplicative taxation. [*US Steel Corp v Multistate Tax Comm*, 434 US 452, 456; 98 S Ct 799; 54 L Ed 2d 682 (1978).[4]]

Michigan adopted the Compact provisions, effective in 1970, through enactment of 1969 PA 343.

### **Apportionment Formulas under the Compact and the MBT Act**

The present case, and others like it, concern two alternative methods of apportioning income for purposes of calculating MBT. Under the MBT Act, created by 2007 PA 36,[5] income is apportioned by applying a single factor apportionment formula based solely on sales. MCL

---

[3] The legislation, which was never enacted, was introduced in the wake of *Northwestern States Portland Cement Co v Minnesota*, 358 US 450; 79 S Ct 357; 3 L Ed 2d 421 (1959), which held that there is no Commerce Clause barrier to the imposition of a direct income tax on a foreign corporation carrying on interstate business within a taxing state.

[4] The Compact was never approved by Congress, but it was upheld against constitutional challenges in *US Steel*, 434 US 452.

[5] For a history of business taxation in Michigan, see *IBM*, 496 Mich at 648-650.

taxanalysts®
DOCUMENT SERVICE_

Doc 2014-30320 (34 pgs)

208.1301(2). In contrast, under the Compact's election provision, income may be apportioned using an equally-weighted, three-factor apportionment formula based on sales, property and payroll. The potential effect of electing "out" of the MBT Act's single-factor apportionment methodology is a reduction of the overall apportionment percentage for companies that do not have significant property and payroll located in Michigan.

**Decision in *IBM***

In *IBM*, 496 Mich 642, the Supreme Court considered the issue of whether MBT taxpayers must use a single-factor apportionment formula as mandated by the MBT Act or whether MBT taxpayers may elect to apply a three-factor apportionment formula under the Compact. The parties were asked by the Court to brief four issues:

> (1) whether the plaintiff could elect to use the apportionment formula provided in the Multistate Tax Compact, MCL 205.581, in calculating its 2008 tax liability to the State of Michigan, or whether it was required to use the apportionment formula provided in the Michigan Business Tax Act, MCL 208.1101 *et seq.*; (2) whether § 301 of the Michigan Business Tax Act, MCL 208.1301, repealed by implication Article III(1) of the Multistate Tax Compact; (3) whether the Multistate Tax Compact constitutes a contract that cannot be unilaterally altered or amended by a member state; and (4) whether the modified gross receipts tax component of the Michigan Business Tax Act constitutes an income tax under the Multistate Tax Compact. [*Int'l Business Machines v Dep't of Treasury*, 494 Mich 874; 832 NW2d 388 (2013).]

In its decision, the Court determined that for tax years 2008 through 2010,[6] the Legislature did not repeal by implication the three-factor apportionment formula as set forth in MCL 205.581 *et seq.*, and concluded that the taxpayer was entitled to use the Compact's three-factor apportionment formula in calculating its 2008 taxes. The Court also concluded that both

---

[6]The Legislature explicitly repealed the Compact apportionment provisions effective January 1, 2011, through enactment of 2011 PA 40.

the business income tax base and the modified gross receipts tax base of the MBT are "income taxes" within the meaning of the Compact. The Court did not reach the third issue of whether the Compact constitutes a contract.[7] On November 14, 2014, the Michigan Supreme Court denied reconsideration. *Int'l Business Machines v Dep't of Treasury*, ___Mich___; 855 NW2d 512 (2014).

**Retroactive Repeal of the Compact Provisions by PA 282**

On September 11, 2014, 2013 SB 156 (SB 156) was enacted into law as PA 282, amending the MBT Act and expressly repealing the Compact provisions, as codified under MCL 205.581 to MCL 205.589. The Legislature gave the Act retroactive effect by providing as follows:

> Enacting section 1. 1969 PA 343, MCL 205.581 to 205.589, is repealed retroactively and effective beginning January 1, 2008. It is the intent of the legislature that the repeal of 1969 PA 343, MCL 205.581 to 205.589, is to express the original intent of the legislature regarding the application of section 301 of the Michigan business tax act, 2007 PA 36, MCL 208.1301, and the intended effect of that section to eliminate the election provision included within section 1 of 1969 PA 343, MCL 205.581, and that the 2011 amendatory act that amended section 1 of 1969 PA 343, MCL 205.581, was to further express the original intent of the legislature regarding the application of section 301 of the Michigan business tax act, 2007 PA 36, MCL 208.1301, and to clarify that the election provision included within section 1 of 1969 PA 343, MCL 205.581, is not available under the income tax act of 1967, 1967 PA 281, MCL 206.1 to 206.713.

PA 282 thus amended the MBT Act to express the "original intent" of the Legislature with regard to (1) the repeal of the Compact provisions, (2) application of the MBT Act's

---

[7] Thus, this Court is bound only by the Supreme Court's pre-PA 282 ruling that (1) the Compact's election provision under Article III(1) of the Compact was not implicitly repealed by enactment of the MBT Act in 2008, (2) the election provision properly applied to the modified gross receipts tax component of the MBT, and (3) IBM could elect to use the Compact's three-factor apportionment formula in calculating its 2008 MBT liability.

taxanalysts®
DOCUMENT SERVICE_
Doc 2014-30320 (34 pgs)

apportionment provision under MCL 208.1301, and (3) the intended effect of the Compact's

election provision under MCL 205.581.[8] The effect of the amendments, as written, retroactively

eliminates a taxpayer's ability to elect a three-factor apportionment formula in calculating tax

liability under both the MBT Act and income tax act.

## PROCEDURAL SUMMARY

During the pertinent period, plaintiff was an out-of-state corporation with business

activities in Michigan. Plaintiff, and other similar taxpayers, filed their MBT returns calculating

tax by taking an election under Article III(1) of the Compact to apportion the MBT tax base

using a three-factor apportionment formula. The returns reflected overpayments of tax, and

taxpayers requested refunds of these amounts. The Department denied the refund claims,

asserting that use of the three-factor apportionment was improper and that use of the single-

factor apportionment was mandated by MCL 208.1301. In response, taxpayers paid the tax and

filed actions in the Court of Claims.

Pending the Supreme Court's resolution of *IBM*, this Court ordered this case and other

similar cases held in abeyance. After the case was decided, the Court lifted its order holding the

cases in abeyance and ordered the Department to brief the Court on why *IBM,* 496 Mich 642,

should not control the disposition of these cases. After the Legislature enacted PA 282 that

retroactively repealed the Compact provisions, the Court issued the show cause order concerning

that legislation. The Court now considers the arguments against retroactive application of PA

282.

---

[8] PA 282 also clarified that the Compact's election provision is not available under the income tax act of 1967, 1967 PA 281.

-6-



## LEGAL ANALYSIS

### I. THE UNILATERAL REPEAL OF THE COMPACT PROVISIONS BY ENACTMENT OF PA 282 WAS A PERMISSIBLE EXERCISE OF THE LEGISLATURE'S SOVEREIGN AUTHORITY TO LEGISLATE

The Court first considers whether the Legislature was authorized to unilaterally repeal the Compact provisions by enacting PA 282. This determination will depend on an analysis of (1) whether the Compact created a binding contract with Member States, (2) whether enactment of PA 282 impaired contractual obligations under the federal or state constitutional Contracts Clauses, and (3) under Michigan law, whether 1969 PA 343 could restrict subsequent legislatures from repealing the Compact provisions. For the following reasons, the Court concludes that the Legislature acted constitutionally and within its sovereign authority to legislate when it repealed the Compact provisions through enactment of PA 282.

### A. THE COMPACT IS NOT A BINDING CONTRACT

In evaluating whether repeal of the Compact by application of PA 282 unconstitutionally impairs a contract or whether a future legislature is bound to the provisions created by 1968 PA 343, there must first be a determination that a contract exists. See *IBM*, 496 Mich at 681 (MCCORMACK, J., dissenting).

#### 1. The Compact Lacks the "Classic Indicia" of a Binding Interstate Compact under Federal Compact Law

The United State Supreme Court has recognized that not all interstate compacts are binding contracts that restrict future legislatures. See *Northeast Bancorp, Inc v Bd of Governors*, 472 US 159; 105 S Ct 2545; 86 L Ed 2d 112 (1985). While a Congressionally-approved



interstate compact has the force of federal law and is binding on Member States,[9] an interstate compact that has not been approved by Congress, such as the Compact here, can be either a *binding* interstate compact or merely an *advisory* compact.[10]

The test for distinguishing between an advisory compact and a binding interstate compact is set forth in *Northeast Bancorp*, as further explained in *Seattle Master Builders Ass'n v Pacific Northwest Electric Power*, 786 F2d 1359, 1363 (CA 9, 1986). The three "classic indicia" of a binding interstate compact are: (1) the establishment of a joint regulatory body, (2) the requirement of reciprocal action for effectiveness, and (3) the prohibition of unilateral modification or repeal. *Northeast Bancorp*, 472 US at 175; *Seattle Master Builders*, 786 F2d at 1363. Looking at the three indicia of a binding interstate compact, the Compact has none of these features and is more properly characterized as a non-binding advisory compact.

### a.       The Compact did not establish a joint regulatory agency

A hallmark of an advisory compact, as opposed a binding contract, is that advisory compacts "cede no state sovereignty nor delegate any governing power to a compact-created agency." Broun, et al, The Evolving Use and the Changing Role of Interstate Compacts: A Practitioner's Guide (2006), p 14. When the Compact, through Article VI, established the Multistate Tax Commission (Commission),[11] no governing or regulatory powers were conferred.

---

[9] The Compact Clause of the US Constitution, art I, §10, cl 3, provides, "No State shall, without the Consent of the Congress, . . . enter into any Agreement or Compact with another State . . . ."

[10] Advisory interstate compacts have no formal or regulatory enforcement mechanisms and are intended to study and make recommendations on interstate problems. Broun, et al, The Evolving Use and the Changing Role of Interstate Compacts: A Practitioner's Guide (2006), p 13.

[11] MCL 205.581, Art VI.


Doc 2014-30320 (34 pgs)

Enumerated in Article VI, the powers of the Commission are (1) to study state and local tax systems, (2) to develop and recommend proposals for greater uniformity, and (3) to compile information helpful to the states.[12]  None of these purposes is regulatory, and it in no way indicates a delegation of sovereign authority to tax.

The conclusion that the Compact did not cede state authority or governing power to the Commission was expressly acknowledged by the Court in *US Steel Corp*:

> [The Compact] does not purport to authorize the Member States to exercise any powers they could not exercise in its absence.  *Nor is there any delegation of sovereign power to the Commission; each State retains complete freedom to adopt or reject the rules and regulations of the Commission.*  [Emphasis added.]  [*US Steel Corp*, 434 US at 473.]

In summary, the Compact, by its terms, does not create a regulatory body.

### b.     The Compact does not require reciprocal action

There is nothing reciprocal about the Compact's provisions.  Each member state operates its respective tax systems independently from the tax systems of other Member States, and the determination of tax in one state is generally independent of the determination in another state.  With respect to apportionment formulas, in particular, Articles III(1) and IV's application in one member state has no bearing on another state.  And the functionality of one member state's apportionment methodology does not hinge on whether another member state's apportionment methodology is reciprocal in nature.  As the Supreme Court recognized in *Moorman Mfg Co v Bair*, 437 US 267, 274; 98 S Ct 2340; 57 L Ed 2d 197 (1978), "the States have wide latitude in the selection of apportionment formulas."  Consistent with *Moorman*, a Member State's decision

---

[12] *Id*. at Art VI(3).



Doc 2014-30320 (34 pgs)

to allow or eliminate a certain apportionment formula is unaffected by the choice of formula that another member state has made.

### c. *The Compact allows unilateral withdrawal and modification*

Under the express terms of the Compact, Member States are free to unilaterally withdraw at any time without notice to another member state. MCL 205.581, Art X(2) ("Any party state may withdraw from this compact by enacting a statute repealing the same.) See also *US Steel*, 434 US at 473 ("[E]ach State retains complete freedom to adopt or reject the rules and regulations of the Commission.") Thus unilateral *withdrawal* is clearly permitted under the Compact.

Whether unilateral *modification* is permitted under the Compact is less clear and is not directly addressed under the Compact. However, three factors lead to a conclusion that Member States did not intend to restrict their ability to vary terms of the Compact. First, as pointed out recently by the United States Supreme Court, "States rarely relinquish their sovereign powers, so when they do we would expect a clear indication of such devolution, not inscrutable silence." *Tarrant Regional Water Dist v Herrmann*, ___ US ___; 133 S Ct 2120, 2133; 186 L Ed 2d 153 (2013). Because there is no such "clear indication" under the terms of the Compact that states are prevented from asserting their sovereign powers to legislate and vary the Compact's terms, it is reasonable to conclude that the parties were free to unilaterally amend the Compact provisions, including Articles III(1) and IV.

Second, language in the Compact that it "shall be liberally construed as to effectuate the purposes thereof," supports an interpretation that flexibility in administering Compact provisions was contemplated. MCL 205.581, Art XII.

Third, the Member States' course of performance shows that unilateral amendments to or withdrawals from the Compact have long been accepted.   As pointed out by the dissent in *IBM*, 496 Mich at 681-682, "[M]ember [S]tates did *not* view strict adherence to Articles III and IV as a binding contractual obligation, as Compact members have deviated without objection from other members."[13]   Moreover,

> "It bears emphasizing that Compact members have not only refrained from bringing legal action against one another for deviating from Articles III and IV, they have endorsed the Commissioner's interpretation of the Compact: in the *Gillette* [*Co v Franchise Tax Bd*, 151 Cal Rptr 3d 106; 291 P3d 327 (2013)] litigation, all of the member states jointly filed an amicus brief urging the Supreme Court of California to reject the lower court's construction of the Compact as a binding contract.  [*IBM*, 496 Mich at 682 n 7 (MCCORMACK, J., dissenting).]

Because the Compact fails to create a regulatory body, contemplates no reciprocal actions, and contains no bar to unilateral deviations or repeal, the Court concludes that none of the "classic indicia" of a binding compact exist.  Rather than a binding interstate contract, it is more properly interpreted as an advisory compact that did not act to bind future legislatures.

## 2.      The Compact is not a Binding Contract under Michigan Law

Because it was not congressionally-approved, the Compact is governed by state law.  See *Doe v Young Marines of The Marine Corps League*, 277 Mich App 391, 399; 745 NW2d 168 (2007) (finding that Michigan courts are not bound to follow a federal court's interpretation of

---

[13] As summarized in Hellerstein & Hellerstein, State Taxation (2014), the course of performance of states with regard to the Compact provisions generally, and the elective apportionment provisions specifically, shows that unilateral repeal and modifications to the Compact provisions have been widespread.



state law.)  See also *McComb v Wambaugh*, 934 F2d 474, 479 (CA 3, 1991) (finding that because a non-Congressionally approved compact does not express federal law, it must be construed as state law.)  Michigan law therefore governs the interpretation of the Compact.

In Michigan, there is a "strong presumption that statutes do not create contractual rights." *Studier v Mich Pub Sch Employees' Retirement Bd*, 472 Mich 642, 661; 698 NW2d 350 (2005). "In order for a statute to form the basis of a contract, the statutory language must be plain and susceptible of no other reasonable construction than that the Legislature intended to be bound to a contract." *Id.* at 662 (quotation marks and citation omitted).  As noted in the dissent in *IBM*, "[t]his presumption is grounded in the principle that 'surrenders of legislative power are subject to strict limitations that have developed in order to protect the sovereign prerogatives of state governments.' " *IBM*, 496 Mich at 682 (McCORMACK, J., dissenting), quoting *Studier*, 472 Mich at 661.

There are no words in the Compact, as adopted by the Legislature under 1969 PA 343, that indicate that the state intended to be bound to the Compact, and specifically to Article III(1). Therefore, the presumption must be that the state did not surrender its legislative power to require use of a particular apportionment formula.  Such interpretation comports with the Supreme Court's recognition of "the basic principle[] that the States have wide latitude in the selection of apportionment formulas . . . ." *Moorman*, 437 US at 274.  This interpretation is also consistent with the Court's recent acknowledgment that states "do not easily cede their sovereign powers . . . ." *Tarrant*, 133 S Ct at 2132.  Because there is no clear indication under MCL 205.581 that the state contracted away its ability to either select an apportionment formula that differs from the Compact, or to repeal the Compact altogether, the Court concludes that no

taxanalysts®
DOCUMENT SERVICE_

Doc 2014-30320 (34 pgs)

contractual obligation was created by enactment of 1969 PA 343 that would prohibit the enactment of PA 282.[14]

## B. REPEAL OF THE COMPACT BY PA 282 DOES NOT VIOLATE THE CONTRACTS CLAUSES OF THE STATE OR FEDERAL CONSTITUTIONS

The United States Constitution provides, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." US Const, art I, § 10, cl 1. The Michigan Constitution provides: "No . . . law impairing the obligation of contract shall be enacted." Const 1963, art 1, §10. "Statutes are presumed to be constitutional, and courts have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent." *In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 490 Mich 295, 307; 806 NW2d 683 (2011) (citation and quotation marks omitted). In addition, " '[t]he presumption of constitutionality is especially strong' " when tax legislation is concerned. *Id*. at 308 (citation omitted).

---

[14] Even if the Compact could somehow be construed as a binding contract under Michigan law, the Member States' course of performance supports a determination that Member States either waived or modified the Compact's terms under Articles III(1) and IV, or materially breached the terms under Articles III(1) and IV well before the repeal of the Compact provisions under PA 282. See n 12. In addition, as suggested in the dissenting opinion in *IBM*, taxpayers would have no standing to enforce the terms of any purported contract that was made with Member States.

> [I]t is not entirely clear to me why IBM has standing to enforce the Compact as a contract, given that IBM is neither a party to the Compact nor is it clear that they were intended as a third-party beneficiary. See *Schmalfeldt v North Pointe Ins Co*, 469 Mich 422; 670 NW2d 651 (2003); MCL 600.1405. In any event, because I conclude that no such contractual relationship was formed, I find it unnecessary to address this issue *sua sponte*. [*IBM* at 681 n 5 (MCCORMACK, J., dissenting).]

As discussed earlier, the Compact creates no binding contract, and therefore the Legislature's repeal of the Compact by PA 282 does not impair an obligation of contract in violation of the Michigan or United States Constitutions.

**C.** **BECAUSE LEGISLATURES CANNOT BIND SUBSEQUENT LEGISLATURES UNDER MICHIGAN LAW, 1969 PA 343 DOES NOT RESTRICT THE ABILITY OF A SUBSEQUENT LEGISLATURE TO CORRECT AN ERROR, EITHER PROSPECTIVELY OR RETROACTIVELY**

Generally, legislatures have the power to repeal legislation and are not bound by the acts of prior legislatures, so long as existing contractual obligations are not impaired. See, e.g., *Studier*, 472 Mich at 660; *LeRoux v Secretary of State*, 465 Mich 594, 615-616; 640 NW2d 849 (2002). See also *Atlas v Wayne Co Board of Auditors*, 281 Mich 596, 599; 275 NW 507 (1937) ("The power to amend and repeal legislation as well as to enact it is vested in the legislature, and the legislature cannot restrict or limit its right to exercise the power of legislation by prescribing modes of procedure for the repeal or amendment of statutes; nor may one legislature restrict or limit the power of its successors"). The principle that one legislature cannot bind a succeeding legislature is thus derived from the constitutional power of the Legislature to legislate. Const 1963, art 4, § 1. As discussed earlier, no contract was created by enactment of the Compact provisions. Thus, the Legislature's constitutional right to change, amend or repeal the law could not be restricted by enactment of 1969 PA 343. *Studier*, 472 Mich at 660. Therefore, the Legislature, by enacting PA 282 to correct its drafting error contained in 2007 PA 36, acted within the scope of its legislative powers as vested in it by the Michigan Constitution.

Moreover, correcting the drafting errors from 2007 PA 36 by repeal of the Compact provisions through PA 282 is consistent with the intent of the Legislature in enacting 1969 PA 353. This is evidenced by the language of Article X of the Compact:



Any party state may withdraw from this compact by enacting a statute repealing the same. No withdrawal shall affect any liability already incurred by or chargeable to a party state prior to the time of such withdrawal. [MCL 205.581, Art X(2).]

"When interpreting a statute, courts must ascertain the legislative intent that may reasonably be inferred from the words expressed in the statute." *Andrie Inc v Dep't of Treasury*, 496 Mich 161, 167; 853 NW2d 310 (2014) (quotation marks omitted). This requires the Court to consider "the plain meaning of the critical word or phrase as well as its placement and purpose in the statutory scheme." *Id*. (citations and quotation marks omitted).

It is clear from the language of Article X(2) that in 1969 the Legislature contemplated the possibility of future withdrawal from the Compact. Withdrawal from the Compact provisions by PA 282 is therefore consistent with the Legislature's intent. The Court rejects any argument that under Article X(2) repeal of the Compact can be prospective only. As made clear by the enacting provisions of PA 282, the repeal of the Compact provisions was intended to apply prospectively from January 1, 2008. Because it is this Court's duty to carry out the intent of the Legislature, repeal of the Compact provisions by PA 282 must be given effect.

## D. CONCLUSION

The Court concludes that the Compact did not create a binding contract with Member States, but it was merely an advisory compact. Because no contract was created under federal Compact or Michigan law, there was no impairment of contractual obligations and therefore no violations of the Contracts Clauses of the federal or state constitutions. Finally, inasmuch as there is no impairment of contractual obligations, the Legislature was free to amend or repeal 1969 PA 343. Thus this Court must give effect to and apply the intent of PA 282 as a valid expression of the Legislature's sovereign and constitutional authority to legislate.

taxanalysts®
DOCUMENT SERVICE_

Doc 2014-30320 (34 pgs)

II.    THE RETROACTIVE APPLICATION OF PA 282 DOES NOT VIOLATE OTHER PROVISIONS OF THE STATE OR FEDERAL CONSTITUTIONS

Other constitutional arguments against the retroactive application of PA 282 concern due process, separation of powers, the Commerce Clause, and the First Amendment's right to petition.[15]  These arguments have no merit.

It is well settled that a tax act is not necessarily unconstitutional because it is retroactive. *Welch v Henry,* 305 US 134, 147; 59 S Ct 121; 83 L Ed 87 (1938).  A statute is presumed constitutional unless there is a clear showing to the contrary.  *Ammex, Inc v Dep't of Treasury*, 273 Mich App 623, 635; 732 NW 2d 116 (2007); *Gen Motors Corp v Dep't of Treasury*, 290 Mich App 355, 369; 803 NW 2d 698 (2010).  In addition, a taxing statute must be shown to "clearly and palpably violate the fundamental law before it will be declared unconstitutional." *Ammex*, 273 Mich App at 635-636 (citation and internal quotation marks omitted).  For the following reasons, the presumption that PA 282 is constitutional remains intact.

A.    RETROACTIVE APPLICATION OF PA 382 DOES NOT VIOLATE DUE PROCESS

PA 282's retroactive application does not violate due process of law.  First, taxpayers have no vested interests in tax laws, and therefore no valid claim that an interest in "life, liberty, or property" has been deprived by retroactive application of PA 282.  Second, the Legislature

---

[15] Contracts Clause arguments are relevant in the context of whether a contract that was allegedly entered into vis-à-vis the adoption of the Compact, and for reasons discussed earlier, must fail. As to whether the retroactive application of a tax statute would generally implicate the Contracts Clauses of the Michigan or United States Constitutions, taxes are not considered contractual in nature, but are instead statutory.  *Welch v Henry,* 305 US 134, 146; 59 S Ct 121; 83 L Ed 87 (1938).  Any further discussion of whether PA 282 violates the Contracts Clauses is unnecessary.



Doc 2014-30320 (34 pgs)

had a legitimate purpose for giving retroactive effect to PA 282. And third, the period of retroactivity of PA 282 is rationally related to that purpose.

### 1. Taxpayers have No Vested Interests

"The due process clauses of the United States and Michigan Constitutions apply when government actions deprive a person of a liberty or property interest." *Edmond v Dep't of Corrections*, 143 Mich App 527, 533; 373 NW2d 168 (1985). To determine whether the Due Process Clause applies, courts look to the nature of the interest at stake. *Id*. A property interest must be a vested right to be protected under due process. *Detroit v Walker*, 445 Mich 682, 698-699; 520 NW2d 135 (1994).

In *United States v Carlton*, 512 US 26; 114 S Ct 2018; 129 L Ed 2d 222 (1994), the Supreme Court specifically rejected the argument that the taxpayer had a viable vested right in tax legislation. *Id.* at 33. It explained that "[t]ax legislation is not a promise, and a taxpayer has no vested right in the Internal Revenue Code." *Id*. The Michigan Court of Appeals has also made clear that a taxpayer "does not have a vested right in a tax statute or in the continuance of any tax law." *Gen Motors Corp*, 290 Mich App at 371. See also *Walker*, 445 Mich at 703; *GMAC v Treasury Dep't*, 286 Mich App 365, 377-378; 781 NW2d 310 (2009). Similarly, no taxpayer has a vested right in a tax refund based on the continuation of the Compact election provisions, and any due process claim must fail.

### 2. The Legislature had a Legitimate Purpose for Giving Retroactive Effect to PA 282

Not only are taxpayers' rights not vested here, but there are no substantive due process violations implicated by the retroactive application of PA 282. The test for determining whether

due process has been violated by retroactive tax legislation was set forth by the Supreme Court in

*Carlton*, 512 US 26. Under *Carlton*, a statute's retroactive application satisfies due process if:

(1) it is supported by a legitimate legislative purpose, and (2) it is rationally related to that

legislative purpose. *Carlton*, 512 US at 30.

In enacting PA 282 and giving it retroactive effect, the Legislature had a legitimate

purpose: to protect state revenues. The potential ramifications of not giving retroactive effect to

PA 282 were made clear in the Senate Fiscal Agency's legislative analysis of SB 156:[16]

> The first enacting section of the bill would retroactively repeal the State's enactment of the Multistate Tax Compact, effective January 1, 2008. As a result, taxpayers filing under the MBT would not be allowed to use alternative apportionment calculations provided under the Compact when computing a Michigan tax base. While the Department of Treasury has not allowed taxpayers to use these alternative calculations, the Michigan Supreme Court's recent decision in *IBM Corp. v Department of Treasury* may enable certain taxpayers to use these calculations, and the Department estimates that approximately $1.1 billion in refunds would be paid as a result. Because MBT revenue is directed to the General Fund, these refunds would reduce General Fund revenue, and *the bill would prevent a reduction in General Fund revenue of $1.1 billion.* [Senate Legislative Analysis, SB 156, September 10, 2014, p 5. (Emphasis added.)]

Furthermore, as was recognized by the Court in *Gen Motors*, 290 Mich App at 373, a

legislature's purpose to "mend a leak in the public treasury or tax revenue" is legitimate. See

also *Carlton*, 512 US at 32 (finding a legitimate governmental purpose where the Internal

---

[16] Although legislative bill analyses are not official statements of legislative intent, they nonetheless can have probative value. See, e.g., *North Ottawa Community Hosp v Kieft*, 457 Mich 394, 406 n 12; 578 NW2d 267 (1998); *Nemeth v Abonmarche Dev, Inc*, 457 Mich 16, 27-29; 576 NW2d 641 (1998); *People v Grant*, 455 Mich 221, 240-241; 565 NW2d 389 (1997); *Travis v Dreis & Krump Mfg Co*, 453 Mich 149, 164-166, 551 NW2d 132 (1996) (opinion by BOYLE, J.).



Revenue Code was retroactively amended for purposes of correcting a legislative error that would have "created a significant and unanticipated revenue loss.")

Here, PA 282 served the legitimate governmental purpose of fixing a legislative error and preventing the potential loss of over $1 billion of MBT revenues in the form of tax refunds from overpayments.

**3. Retroactive Application of PA 282 is a Rational Means of Furthering this Legitimate Purpose**

In addition to having a legitimate legislative purpose of preventing a catastrophic fiscal shortfall, the retroactive application of PA 282 is also a rational means of furthering this legitimate purpose. In *Gen Motors*, 290 Mich App at 375, the Court of Appeals found that whether a retroactive tax law met the rational means prong of *Carlton* includes a consideration of whether the retroactive period is "modest" as tested against the "totality of circumstances." In determining that a five-year look back period was a rational means of accomplishing the prevention of revenue loss, the Court looked to whether (1) the retroactive amendment created a "wholly new tax," (2) the taxpayer acted in reliance on an expectation its activity would not be taxed, (3) how promptly the Legislature acted to correct the problem leading to loss in revenue, and (4) the period of time to which the amendment retrospectively applies.

Applying the "totality of circumstances" here, the retroactive application of PA 282 does not exceed the modest limitation of the Due Process Clause and is a rational means of accomplishing the Legislature's purpose of stemming revenue losses.

First, PA 282 does not reach back in time to assess a "wholly new tax" on long-concluded transactions, but rather it confirmed that single-factor apportionment under the MBT



Doc 2014-30320 (34 pgs)

was mandatory and that an election to use a three-factor apportionment formula could not be made.

Second, as a matter of law, there can be no valid claim that an MBT taxpayer acted in reliance on an expectation that for the MBT its income would be apportioned by the three-factor apportionment provision. As the Supreme Court recognized in *Moorman*, 437 US 267, the states have wide latitude in the selection of an apportionment methodology. Moreover, it is also well established that a taxpayer does not have a vested right in a tax statute or in the continuance of any tax law. *Walker*, 445 Mich at 703; *Ludka v Dep't of Treasury*, 155 Mich App 250; 399 NW2d 490 (1986). And as *Carlton*, 512 US at 33, made clear, even where a taxpayer has detrimentally relied on a tax statute, this does not result in a constitutional violation:

> Although Carlton's reliance is uncontested—and the reading of the original statute on which he relied appears to have been correct—his *reliance alone is insufficient to establish a constitutional violation. Tax legislation is not a promise, and a taxpayer has no vested right in the Internal Revenue Code*. [Emphasis added.]

Because taxpayers do not, as a matter of law, have a reliance interest in any particular apportionment formula a state chooses in dividing the income of multistate taxpayer, this Court rejects any assertion that a taxpayer would have changed its behavior or structured its affairs differently had it known that the Compact's elective provision was no longer available.

Third, the Legislature acted promptly in correcting its error. Not until July 14, 2014, when the Court decided *IBM*, was it made clear to the Legislature that 2007 PA 36 was defective. SB 156, H-1, which added the retroactive repeal of the Compact, provisions, was introduced on September 9, 2014, and was enacted into law on September 11, 2014.

Fourth, the period of time to which the amendment applies was modest, particularly in light of the time frames of other retroactive legislation that Michigan courts and those of other jurisdictions have held were within the modesty limits of the Due Process Clause. For example, in *Gen Motors*, 290 Mich App 355, the Court concluded that a five-year retroactive period (eleven years as applied to the specific taxpayer's tax years) was modest. In *GMAC*, 286 Mich App 365, the Court upheld a law with a seven-year retroactive period. See also *Enterprise Leasing Co v Arizona Dep't of Revenue*, 221 Ariz 123; 211 P3d 1 (Ariz Ct App, 2008) (six year period); *King v Campbell Co*, 217 SW3d 862 (Ky Ct App, 2006) (upholding 2005 legislation that denied refunds of taxes overpaid since 1986 under 2004 judicial decision); *Miller v Johnson Controls, Inc*, 296 SW3d 392 (Ky, 2009) (upholding 2000 legislation retroactively ratifying 1988 tax-agency policy that a 1994 judicial decision overruled); *Zaber v City of Dubuque*, 789 NW2d 634 (Iowa, 2010) (five-and-one-half years); *Licari v Comm'r*, 946 F2d 690 (CA 9, 1991) (four years); *Tate & Lyle, Inc v Comm'r of Internal Revenue*, 87 F3d 99 (CA 3, 1996) (six years); *Montana Rail Link, Inc v United States*, 76 F3d 991 (CA 9, 1996) (four years).

All of these factors lead to the conclusion that the Legislature's means of stemming the loss of revenues, by giving retroactive effect to PA 282, was a rational means of furthering a legitimate governmental purpose.

**B. RETROACTIVE APPLICATION OF PA 282 DOES NOT VIOLATE PRINCIPLES OF SEPARATION OF POWERS**

In addition to being a rational means of achieving a legitimate purpose, PA 282 does not violate the principle of separation of powers under the Michigan Constitution. The Separation of Powers Clause is set forth in Const 1963, art 3, § 2:

The powers of government are divided into three branches; legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.[17]

With respect to retroactive legislation, the Legislature is permitted to retroactively change legislation, so long as it does not "not reverse a judicial decision or repeal a final judgment." *GMAC*, 286 Mich App at 380; *Romein v Gen Motors Corp*, 436 Mich 515, 536-537; 462 NW2d 555 (1990), aff'd 503 US 181; 112 S Ct 1105; 117 L Ed 2d 328 (1992). See also *Wylie v City Comm'n of Grand Rapids*, 293 Mich 571; 292 NW 668 (1940). Furthermore, a legislature is entitled to correct its own mistakes though retroactive legislation. See *Gen Motors*, 290 Mich App at 373.

By enacting PA 282, the Legislature acted within its authority to legislate by correcting a mistake made clear to it by the Court in *IBM*. PA 282 did not purport to overturn the *IBM* decision, nor did it repeal the final judgment as it applied to the plaintiff. The Court's holding in *IBM* was limited to a finding that there was no *implicit* repeal of the Compact apportionment provisions through enactment of 2007 PA 36, and PA 282 does not conflict with or disturb this ruling. Through enactment of PA 282, the Legislature took steps to retroactively repeal the

---

[17] As expressly provided in the Constitution, the legislative power is vested in a senate and a house of representatives, Const 1963, art 4, § l; the executive power is vested in the governor, Const 1963, art 5, § l Sec. 1; and the judicial power is vested exclusively in the courts, Const 1963, art 6, § 1. Pursuant to these powers, it is the legislature's duty to state what the law is, it is the judiciary's role to interpret this law, and it is and it is the executive branch's obligation to enforce the law as written and as interpreted by the judiciary. 1 Official Record, Constitutional Convention 1961, pp 601-602 ("[H]e who makes a law shall not enforce it, nor sit in judgment upon it; that he who enforces a law shall not make or change it nor shall he judge of its violation; and he who sits in judgment shall have neither made the law nor enforced it.")

Compact provisions *explicitly,* clarifying its original intent in enacting the MBT. Such action did not impinge upon the judiciary's functions in violation of the separations of powers.

Although *IBM* left unresolved the issue of whether the retroactive repeal of the Compact provisions would be constitutional, both the majority and the concurring opinions suggest that an explicit, retroactive repeal of the Compact provisions, effective January 1, 2008, could have led to a different result.[18] Rather than deviating from the Court's opinion, PA 282's explicit, retroactive repeal of the Compact provisions is consistent with the language in *IBM* suggesting that retroactive repeal would be an appropriate legislative response to the challenges being made. The Legislature did not violate the separation of powers doctrine when it passed the retroactive amendments under PA 282.

## C. PA 282 DOES NOT VIOLATE THE COMMERCE CLAUSE

PA 282 does not violate the Commerce Clause[19], which prohibits state laws that (1) facially discriminate against interstate commerce, (2) have a discriminatory effect, or (3) are enacted for a discriminatory purpose. *Caterpillar Inc v Dep't of Treasury*, 440 Mich 400, 422-425; 488 NW2d 182 (1992). Under the dormant Commerce Clause, states may not discriminate

---

[18] Discussing 2011 PA 40, which retroactively repealed the Compact apportionment provisions effective January 1, 2011, the majority stated that "[t]here is no dispute that the Legislature specifically intended to retroactively repeal the Compact's election provision for taxpayers subject to the [MBT] beginning January 1, 2011. *The Legislature could have—but did not— extend this retroactive repeal to the start date of the* [*MBT*]." *IBM*, 496 Mich at 659. (Emphasis added.) See also concurring opinion of Justice Zahra, noting that "the [MBT's] exclusive apportionment method remains in conflict with the election provision of the Compact. *This conflict, in my view, is easily resolved because the Legislature in 2011 also expressly supplemented the Compact*." *Id*. at 669. (Emphasis added.)

[19] US Const, art I, § 8, cl 3.

-23-



against interstate commerce by "unduly burden[ing] interstate commerce." *Quill Corp v North Dakota*, 504 US 298, 312; 112 S Ct 1904; 119 L Ed 2d 291 (1992) (citations omitted). PA 282 neither discriminates against, nor unduly burdens, interstate commerce.

First, PA 282 is not facially discriminatory. Facial discrimination requires an "explicit discriminatory design to the tax." *Amerada Hess Corp v Dir*, 490 US 66, 75; 109 S Ct 1617; 104 L Ed 2d 58 (1989). The text of PA 282 makes clear, on its face, that no taxpayer, regardless of location, can elect the three-factor apportionment.

Second, PA 282 has no discriminatory effect. The effect of PA 282 is that no taxpayer, whether in-state or out-of-state, can make an election to apply a three-factor apportionment for MBT purposes. As the United States Supreme Court made clear in *Moorman*, 437 US 267, requiring a single-factor apportionment formula does not have the effect of discriminating against an out-of-state taxpayer.

In addition, PA 282 was not enacted for a discriminatory purpose, but rather sought to clarify the original intent of the 2007 Legislature with respect to all taxpayers, both in-state and out-of-state. Any claims made that PA 282 violates the Commerce Clause of the United States Constitution must therefore fail.

**D. PA 282 DOES NOT VIOLATE THE FIRST AMENDMENT PETITION CLAUSE**

Neither does PA 282, by retroactively revoking taxpayers' right to petition the Department and appeal to a court for a refund of tax, violate their First Amendment right to petition the government.



The right of citizens to petition the government for redress of grievances is specifically guaranteed by the United States and Michigan Constitutions. US Const Amend I; Const 1963, art 1, § 3. This right is not unlimited, however, and "may be circumscribed to the extent necessary to achieve a valid state objective." *Jackson Co Ed Ass'n v Grass Lake Community Sch Bd of Ed*, 95 Mich App 635, 641-642; 291 NW2d 53 (1979).

The Supreme Court has long made clear that the First Amendment does not require the government to listen to individuals or to respond to individual grievances. In *Bi-Metallic Investment Co v State Bd of Equalization*, 239 US 441; 36 S Ct 141; 60 L Ed 372 (1915), the Court responded to a real estate owner's argument that it had no opportunity to be heard in opposition to a legislative tax valuation increase by stating:

> Where a rule of conduct applies to more than a few people it is impracticable that everyone should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. Generally statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. *Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule.* [*Id*. at 445 (emphasis added).]

See also *Smith v Arkansas State Highway Employees, Local 1315*, 441 US 463, 464-465; 99 S Ct 1826; 60 L Ed 2d 360 (1979) (finding that the Arkansas Highway Commission did not have an affirmative obligation under the First Amendment "to listen, to respond or, in this context, to recognize the association and bargain with it.")

The Supreme Court's analysis in *Bi-Metallic Investment* applies here. There is no merit to any argument that the retroactive application of PA 282 violates a taxpayers's First Amendment right to petition the government. Taxpayers' First Amendment rights on matters of tax legislation—whether prospective or retroactive—are properly protected by taxpayers' power


Doc 2014-30320 (34 pgs)

over those who "make the rule[s]"—that is, the Legislature. *Bi-Metallic Investment*, 239 US at 445. While the Court has an obligation, within jurisdictional limits, to respond to taxpayers' grievances with respect to individual overpayments of tax, it is under no constitutional obligation under the First Amendment to answer to taxpayers about general validity of the legislation itself. Thus application of PA 282 does not violate a taxpayer's First Amendment rights.

Moreover, to the extent that PA 282 may impact taxpayers' procedural rights of petitioning the court for a refund of tax, these rights are properly safeguarded under rights of due process, which "affirmatively require[s] the government to provide meaningful procedural opportunities in response to judicial petitions, far and above any required by the First Amendment standing alone." Andrews, *A Right of Access to Court Under the Petition Clause of the First Amendment: Defining the Right*, 60 Ohio St L J 557, 634 (1999). And as the Court has already discussed, plaintiff's constitutional rights of due process have been satisfied with respect to the application of PA 282.

### III. THERE WERE NO PROCEDURAL VIOLATIONS THAT BAR APPLICATION OF PA 282

### A. THE TITLE-OBJECT CLAUSE OF THE MICHIGAN CONSTITUTION WAS NOT VIOLATED

PA 282 satisfies the Title-Object Clause of the Michigan Constitution. This clause states:

> No bill shall be altered or amended on its passage through either house so as to change its original purpose as determined by its total content and not alone by its title. [Const 1963, art 4, § 24.]

PA 282 is titled as follows:

> AN ACT to amend 2007 PA 36, entitled "An act to meet deficiencies in state funds by providing for the imposition, levy, computation, collection, assessment, reporting, payment, and enforcement of taxes on certain commercial, business, and financial



activities; to prescribe the powers and duties of public officers and state departments; to provide for the inspection of certain taxpayer records; to provide for interest and penalties; to provide exemptions, credits, and refunds; to provide for the disposition of funds; to provide for the interrelation of this act with other acts; and to make appropriations," by amending sections 111, 305, 403, and 433 (MCL 208.1111, 208.1305, 208.1403, and 208.1433), sections 111 and 305 as amended by 2012 PA 605, section 403 as amended by 2008 PA 434, and section 433 as amended by 2007 PA 215, and by adding section 508; and to repeal acts and parts of acts.

The three different challenges that may be brought against a statute on the basis of the Title-Object Clause are: (1) a multiple-object challenge, (2) a title-body challenge, and (3) a change of purpose challenge. *Ray Twp v B & BS Gun Club*, 226 Mich App 724, 728; 575 NW2d 63 (1997); *HJ Tucker & Assoc, Inc v Allied Chucker & Engineering Co*, 234 Mich App 550, 556-557; 595 NW2d 176 (1999). In assessing the validity of these challenges, the constitutional requirements under the Title-Object clause are to be construed reasonably. *Mooahesh v Dep't of Treasury*, 195 Mich App 551, 563; 492 NW2d 246 (1992). See also *Gen Motors Corp*, 290 Mich App at 388.

### 1. Multiple-Object Challenge

With respect to the multiple-object challenge, the body of the law, as well as its title, must be examined to determine whether the act embraces more than one object or purpose. *Ray Twp*, 226 Mich App at 731. The object of the legislation must be determined by examining the law as enacted, not as originally introduced. *People v Kevorkian*, 447 Mich 436, 456; 527 NW2d 714 (1994). A bill that is enacted into law may include all matters germane to its object, as well as all provisions that directly relate to, carry out, and implement the principal object. *City of Livonia v Dep't of Social Servs*, 423 Mich 466, 497; 378 NW2d 402 (1985). "The purpose of the single-object rule is to avoid bringing into one bill diverse subjects that have no necessary connection." *Mooahesh*, 195 Mich App at 564.



In determining whether PA 282 violated the single object rule, *Mooahesh* is instructive. *Mooahesh* involved a title-object challenge to 1988 PA 136, which (1) amended the Individual Income Tax Act to provide that lottery winnings are taxable, and (2) repealed a section from the Lottery Act that had previously exempted lottery winnings from taxation.[20] The Court first determined that the general purpose of the act as found in the title ("to meet deficiencies in state funds") was to raise revenues, and that "[a] statute may authorize the doing of all things that *are in furtherance of the general purpose of act* without violating the one-object limitation of art 4, § 24." *Mooahesh*, 195 Mich App at 564 (emphasis added). It further stated that "[t]he object of 'meet[ing] deficiencies in state funds' may reasonably be found to include the repeal of a tax exemption, even if that exemption does not appear in any act specifically devoted to taxation." *Mooahesh*, 195 Mich App at 566. In addition, acknowledging that "it might have been 'better draftsmanship,' to have provided for a separate amendment to the Lottery Act," the Court determined that "the inclusion of the repeal of the tax exemption provision in an act amending the income tax laws does not render the act in violation of the single-object requirement." *Id*. (internal citations omitted.)

---

[20] The title of 1988 PA 516 provided, in pertinent part:

> An act to amend sections . . . of the Public Acts of 1967, entitled "An act to meet deficiencies in state funds by providing for the imposition, levy, computation, collection, assessment, and enforcement by lien and otherwise of taxes on or measured by net income; to prescribe the manner and time of making reports and paying the taxes, and the functions of public officers and others as to the taxes; to permit the inspection of the records of taxpayers; to provide for interest and penalties on unpaid taxes; to provide exemptions, credits and refunds of the taxes; to prescribe penalties for the violation of this act; to provide an appropriation; and to repeal certain acts and parts of acts. . . ." [Emphasis added.]

taxanalysts®
DOCUMENT SERVICE_

Doc 2014-30320 (34 pgs)

Just as the statute considered in *Mooahesh* had as its general purpose the raising of revenues, so too was the general purpose of PA 282. And just as it might have been "better draftsmanship" to have provided for a separate amendment repealing § 34 of the Lottery Act, the Legislature in enacting PA 282 might have been better advised to repeal the Compact provisions in a separate act. But like the choice to amend the ITA and repeal a section of the Lottery Act in one act, the choice to include the repeal of the Compact and amend the MBT in one act is not a violation of the single-object requirement.[21]

## 2.    Title-Body Challenge

With respect to a title-body challenge, the title of an act must express the general purpose or object of the act. *Ray Twp*, 226 Mich App at 728. " '[T]he title need not serve as an index of all that the act contains.' " *Midland Twp v Mich State Boundary Comm'n,* 401 Mich 641, 653; 259 NW 2d 326 (1977) (quoting *People v Milton*, 393 Mich 234, 246-247; 224 NW2d 266 (1974)). It is sufficient if the title " 'is a descriptive caption, directing attention to the subject matter which follows . . . or if it be expressive of the purpose and scope of the enactment.' " *Mooahesh*, 195 Mich App at 556-557, quoting *People ex rel Wayne Prosecuting Atty v Sill*, 310

---

[21] As repeated by the Court in *Mooahesh*, 195 Mich App at 564:

> There is . . . no constitutional requirement that the legislature do a tidy job in legislating. It is perfectly free to enact bits and pieces of legislation in separate acts or to tack them on to existing statutes even though some persons might think that the bits and pieces belong in a particular general statute covering the matter. The constitutional requirement is satisfied if the bits and pieces so enacted are embraced in the object expressed in the title of the amendatory act and the act being amended. [*Id.* quoting *Detroit Bd of Street R Comm'rs v Wayne Co*, 18 Mich App 614, 622-623; 171 NW2d 669 (1969).]



Doc 2014-30320 (34 pgs)

Mich 570, 574; 17 NW2d 756 (1945). The test under a title-body challenge is whether the title "gives fair notice to the legislators and the public of the challenged provision." *H J Tucker & Assocs*, 234 Mich App at 559. "The notice aspect is violated where the subjects are so diverse in nature that they have no necessary connection." *Mooahesh*, 195 Mich App at 569.

Here, as discussed earlier, the Legislature's broad purpose of PA 282 was to raise revenue through the imposition of tax. The title adequately expressed this object and gave notice of this general purpose. To withstand scrutiny under Const 1963, art 4, § 24, it was not necessary for the Legislature to provide in the title "an index of all that the act contains," *Midland Twp*, 401 Mich at 653. In addition, the subjects within the title all had a nexus to the purpose of raising revenue and were not "so diverse in nature that they [had] no necessary connection" to this purpose. *Mooahesh,* 195 Mich App at 569. There was no violation of the title-body rule under PA 282.

### 3.    Change-of-Purpose Challenge

Finally, a change of purpose challenge to PA 282 on the ground that its purpose changed during passage through the Legislature, is tested as to whether "the change represents an amendment or extension of the basic purpose of the original, or the introduction of entirely new and different subject matter." *Anderson v Oakland Co Clerk*, 419 Mich 313, 328; 353 NW2d 448 (1984) (LEVIN, J., concurring) (internal quotation marks omitted). See also *Kevorkian*, 447 Mich at 461 ("[T]he test for determining if an amendment or substitute changes a purpose of the bill is whether the subject matter of the amendment or substitute is germane to the original purpose.")



Here, as discussed earlier, the general purpose of SB 156 as originally introduced was to raise revenues. This original purpose of SB 156 did not change under Substitute H-1, as introduced and later enrolled as PA 282.

As originally introduced, SB 156 amended the MBT by (1) allowing an adjustment to the modified gross receipts tax base for amounts attributable to the taxpayer pursuant to a discharge of indebtedness, (2) revising the calculation of the investment credit with respect to the recapture of revenue when property previously subject to the credit is sold, (3) revising the calculation of the credit for a taxpayer located and conducting business in a renaissance zone before December 1, 2002, and, (4) revising a provision concerning a dock sale, for purposes of apportionment. See Senate Legislative Analysis, SB 156, March 19, 2013. The original bill stated that the act was "curative and intended to clarify the original intent of the Legislature." *Id*. Substitute H-1, as enrolled as PA 282, retained the original proposed amendments, and added, in pertinent part, (1) a requirement that a taxpayer claim a refund in 2015 if as a result of the amendments, there was an overpayment for a tax year between 2010 and 2014, and (2) a provision that the bill would retroactively repeal the Compact provisions under Public Act 343 of 1969 to January 1, 2008, and express legislative intent regarding the single-factor apportionment formula and the elimination of the Compact's election provision. See Senate Legislative Analysis, SB 156, September 10, 2014.

Substitute H-1, as enrolled as PA 282, was "an extension of the basic purpose of the original," rather than "the introduction of the entirely new and different subject matter" that would otherwise violate the change-of-purpose rule. *Anderson*, 419 Mich at 327. The general purpose of both the bill as originally enacted, and substitute H-1, as enrolled as PA 282, was also

to raise revenues. Because the general purpose of the bills did not change or introduce new and different subject matter, a change-in-purpose challenge to PA 282 must fail.

In conclusion, given the presumption that PA 282 is constitutional, and in light of the fact that the Title-Object Clause is to be liberally construed, the Court concludes that PA 282 does not violate the Title-Object Clause of the Constitution.

## B. THE "FIVE-DAY RULE" UNDER THE MICHIGAN CONSTITUTION WAS NOT VIOLATED

The issue whether PA 282 violates the Title-Object Clause is integrally related to the "five-day rule" of art 4, § 26 of Const 1963 which states, in pertinent part, that no bill can be passed until it has been printed or reproduced and in the possession of each house for at least five days.[22] This rule was not violated by passage of PA 282.

Whether the five-day rule has been violated depends on whether (1) the bill was in the possession of both houses for five days, and (2) whether there has been a change in purpose. *Anderson*, 419 Mich at 339 (LEVIN, J., concurring). Here, SB 156 was before both the House and Senate for at least 5 days.[23] And as discussed earlier, SB 156 as finally passed served the original bill's general purpose of raising revenues. The Court therefore concludes that enactment of PA 282 did not violate Const 1963, art 4, § 26.

---

[22] As explained by the Court in *Anderson*, 419 Mich at 329-330, "The five-day rule and the change of purpose provision were contained in the same article and section of the Constitution of 1908. Const 1908, art 5, § 22. It is clear that the function of the change of purpose provision, both in the Constitution of 1908 and as modified in the Constitution of 1963, is to fulfill the command of the five-day rule."
[23] See 2013 Senate Journal 9; 2014 Senate Journal 61.

-32-



**C.     THE TAX-TITLE CLAUSE OF THE MICHIGAN CONSTITUTION WAS NOT VIOLATED**

PA 282 does not violate the "tax-title" clause of art 4, § 32 of the Michigan Constitution. That provision, also known as the "distinct-statement" clause, requires that "[e]very law which imposes, continues or revises a tax shall distinctly state the tax." *Id*.  The purpose of this clause is " 'to prevent the Legislature from being deceived in regard to any measure for levying taxes, and from furnishing money that might by some indirection be used for objects not approved by the Legislature.' " *Dawson v Sec of State*, 274 Mich App 723, 747; 739 NW2d 339 (2007). (Citation omitted.)

Both the title and the body of PA 282 make clear that the act related distinctly to tax, and there is no language within SB 156, enrolled as PA 282, that would have caused the Legislature to be "deceived in regard to any measure for levying taxes." *Dawson*, 274 Mich App at 747. There is no merit to any claim that PA 282 violates Const 1963, art 4, § 32.

**IV.     CONCLUSION**

The passage of PA 282 is a valid, constitutional act by the Legislature that provided clarity to taxpayers as to the original intent of the MBT Act.[24]  It also prevented the significant fiscal harm to the state that would have resulted if taxpayers had been permitted to elect apportionment provisions under the Compact.   The Legislature's choice in PA 282 to retroactively repeal the Compact provisions was within the boundaries of the Michigan and United States Constitutions and stayed true to the Legislature's original intent to require single-

---

[24] PA 282 also clarified that the Compact's election provision is not available under the Income Tax Act, MCL 206.1, *et seq*.

factor apportionment under the MBT Act. Application of PA 282 to the disposition of this case, and others like it, is appropriate;[25] failure to do so would otherwise provide taxpayers with a windfall that the Legislature did not mean to provide. See Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation*, 73 Harv L Rev 692, 705 (1960).

IT IS HEREBY ORDERED that summary disposition is GRANTED in favor of the Department pursuant to MCR 2.116(I)(1).

This order resolves the last pending claim and closes the case.

Dated: December 19, 2014

_____
Hon. Michael J. Talbot
Chief Judge, Court of Claims

---

[25] Similar claims brought under the Income Tax Act, MCL 206.1, *et seq.*, would likewise fail; PA 282 would apply and negate the basis for the plaintiff's claim.